Attachment D

This exhibit depicts the alignment of existing training modules under the new CCC progression lines established by this agreement. This listing depicts the training available by job classification, but it does not represent a required level of training for all employees within a specific job classification. The parties agree to meet and discuss significant changes to this training structure, as stated in Article II, Section 7E of the Labor Agreement. Significant changes are when modules move from one job classification to another.

| Proposed CCC Progression Line--Major Functions & Training Modules | | | | |
|---|---|---|---|---|
| **CSA-I** | **CSA-II** | **CSA-III** | **CSR** | **Sr-CSR** |
| CTP Res Payment Agreements CTP Res Start/Stop Service CSS Account Maintenance Foundational Tools Outage Problems | CSS Res and Non-Res Collection CSS Res Start/Stop Service Small C&I Start/Stop Service Res Backoffice Billing | New and Upgraded Electric Service Res Energy Education C&I Backoffice Rebilling Res Billing Calls Misc Calls | Small C&I Energy Ed Small C&I Billing Calls Renewable Energy Advanced Billing | Escalated Contacts Training/Coaching Group Meeting Leader |
| New Employee Orientation | Disconnect Service Orders | Billing Calls-Residential | Billing Calls--Small C&I | Sr. CSR Skills |
| Web Retrieval | Add Customer | Callout Response-Advanced | Energy Education Small C&I | Instructor Orientation |
| Payment Assistance | Connect Service Orders- Residential | Budget Billing  Calls | RTS Systems & Options | Instructor Training |
| Budget Billing Basics | POS ID and Security Deposits | WMS Intro | Responding to Legislative Complaints | |
| Residential Reco CTP | Connect Service Orders-Non Residential | REMSI | Renewable Energy- Processing Applications | |
| Lost and Misapplied Pmts Introduction | Act 54 Introduction | Initiating WRs for New Service | Advanced Renewable Energy Training | |
| OnTrack Overview | Complaints and Disputes 2 | Initiating WRs for Change of Service | LP Billing | |
| WATT Application | PA State Sales Tax Rule Introduction | Initiating WRs for Removals | Summary Billing | |
| PUC Dec Entry | Rate Schedules Introduction | Cancelling & Reactivating Work Orders | Mixed Meter Rebilling | |
| Web Self Service Application Overview | Establishing and Removing an Area Light | Initiating WRs for Relocation of Company Facilities | OnTrack Rebilling | |
| Programs to Help Customers | Customer Choice | Relocations, Tree Trimming, Misc Investigation Orders | OnTrack Bankruptcies | |
| Revenue Protection Intro | Budget Billing Explanation and Adj | Initiating WRs for Area Lights | Holiday Lighting | |
| Aspect Phones & Screen Pop | Landlord Coding | Energy Education- Residential | PUC Hearings | |
| Call Handling Expectations | Meter Reading and Billing | MyPPL Analyzer | Theft/Sensitive Acct Rebilling | |
| Telephone Techniques | CSS Payment Agreements | Carbon Calculator | Outside Attorney Interface | |
| Language Interpreter | Overdue Final Bills | Request Credit | | |
| Call Intercept | Residential Reco CSS | Healing Customer Relationships | | |
| CS Letters Introduction | Non-Residential Termination | Area Light Rebilling | | |
| Office Communicator | Non-Residential Reconnection | C&I Back Office Billing & WFMs | | |
| HuP- Three Point Communication | Special Agreements | Bankruptcies | | |
| VPP | Service Orders and Field Orders Introduction | Line Extension Guarantee Billing | | |
| Standards of Conduct and Integrity | Electronic Funds Transfer | Rate Change Requests/Rebilling | | |
| Facility Emergency Plan | Collection Referrals | TOU Rebilling | | |
| Human Performance | PUC Mediation Response | | | |
| Hazard Communication | Continuous Account Transfer Reversal | | | |
| Managing the Collection Experience | Residential High Balance WATT Referrals | | | |
| Complaints & Disputes 1 | Working Faxed 30 Day Med Certs | | | |
| Residential Dunning | Transferring Balance from Finalled or Written off | | | |
| CTP  Stop | Caring for Customers | | | |
| CTP Transfer | Introduction to Basic Billing | | | |
| CTP Start | Residential WFMs | | | |
| Customer Choice Introduction | Rate Schedules | | | |
| Landlord Coding Introduction | Pennsylvania State Sales Tax Rules | | | |
| Reaching for Stellar Service | Late Payment Charges | | | |
| Components of Electric Bill | Issuing a Duplicate Bill | | | |
| CSS Introduction | Transfers & Refunds | | | |
| CSS Retrieval | Late Payer Program | | | |
| Account Information | Rejected Bills | | | |
| Documenting Contacts with Customers | Calculating and Applying Interest | | | |
| Maintaining Account Information | Security Deposit Waiver Mailbox | | | |
| Operation Help Enrollments | Due Date Change Requests | | | |
| Third Party Notification | EFT Billing | | | |
| Web Self Service Application | Adjust Metered Usage Application | | | |
| CSR Web Administration | Budget Billing Rebilling | | | |
| Web Self-Service Application Admin | Res Stopped Meter WATT Prep | | | |
| Power Problems | Res Stopped Meter Rebilling | | | |
| PA OneCall Introduction | Sales Tax Exemptions/Certificates | | | |
| | Connect at Wrong Address | | | |
| | Referrals to Attorneys | | | |

# EXHIBIT C

**Exhibit 1**
COMPANY
9/14/16
reporter: trisha sims
Veritext Legal Solutions

| Item | Avg Dollar | FTE | CSR + Sup | CSA1 + Sup | CSA2 + Sup | CSA3 + Sup |
|---|---|---|---|---|---|---|
| 004200: Customer Service Repr | $9,005 | 30 | | | | |
| * Avg Dollar Per CSR | | | $270,137.40 | | | |
| 005267: Customer Service Assistant-I | $5,041 | 30 | | | | |
| ** Avg Dollar Per CSA I | | | | $151,222 | | |
| 005268: Customer Service Assistant-II | $5,835 | 30 | | | | |
| * Avg Dollar Per CSA II | | | | | $175,060 | |
| 005269: Customer Service Assistant-III | $7,403 | 30 | | | | |
| * Avg Dollar Per CSA III | | | | | | $222,093 |
| 000194: Customer Contact Supv | $13,033 | 3 | $39,100 | $39,100 | $39,100 | $39,100 |
| * Avg Dollar Per CC Supv | | | | | | |
| Total Monthly expense | | | $309,238 | $190,322 | $214,160 | $261,193 |
| ** Vendor Partner Hourly rate | $29 | | | | | |
| Average Dollar per CSA | $5,027 | 30 | $150,797 | $150,797 | $150,797 | $150,797 |
| **Monthly additional expense** | | | $158,441 | $39,525 | $63,363 | $110,396 |
| **Annual additional expense** | | | $1,901,287 | $474,299 | $760,359 | $1,324,748 |

* Monthly Rate average includes wage + benefits
** Vendor Partner average includes leadership coverage

| Item | Avg Dollar | FTE | CSR + Sup | CSA1 + Sup | CSA2 + Sup | CSA3 + Sup |
|---|---|---|---|---|---|---|
| 004200: Customer Service Repr | $9,005 | 30 | | | | |
| * Avg Dollar Per CSR | | | $270,137.40 | | | |
| 005267: Customer Service Assistant-I | $5,041 | 30 | | | | |
| ** Avg Dollar Per CSA I | | | | $151,222 | | |
| 005268: Customer Service Assistant-II | $5,835 | 30 | | | | |
| * Avg Dollar Per CSA II | | | | | $175,060 | |
| 005269: Customer Service Assistant-III | $7,403 | 30 | | | | |
| * Avg Dollar Per CSA III | | | | | | $222,093 |
| 000194: Customer Contact Supv | $13,033 | 3 | $39,100 | $39,100 | $39,100 | $39,100 |
| * Avg Dollar Per CC Supv | | | | | | |
| Total Monthly expense | | | $309,238 | $190,322 | $214,160 | $261,193 |
| ** Vendor Partner Hourly rate | $22 | | | | | |
| Average Dollar per CSA | $3,813 | 30 | $114,398 | $114,398 | $114,398 | $114,398 |
| **Monthly additional expense** | | | $194,840 | $75,924 | $99,763 | $146,795 |
| **Annual additional expense** | | | $2,338,078 | $911,090 | $1,197,150 | $1,761,540 |

* Monthly Rate average includes wage + benefits
** Vendor Partner average includes leadership coverage

| | Hrly Rate | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bethlehem - Training | $19.00 | 1566 | 240 | 0 | 0 | 0 | 641.29 | | | | 1505 | |
| | | $29,754 | $4,560 | $0 | $0 | $0 | $12,185 | $0 | | | $28,595 | |
| Bethlehem - Collections | $22.50 | | 1320 | 2798.83 | 2092.42 | 2222.33 | 1529.67 | 960 | 1920 | 2640 | 2220.44 | |
| | | $0 | $29,700 | $62,974 | $47,079 | $50,002 | $34,418 | $21,600 | $43,200 | $59,400 | $49,960 | |
| Bethlehem - BO | $25.00 | | 720 | | | | | | | | 320 | |
| | | $0 | $18,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,000 | |
| Bethlehem - Inbound | $25.00 | | | | | | 606.04 | 1616 | 656 | | 506 | |
| | | $0 | $0 | $0 | $0 | $0 | $15,151 | $40,400 | $16,400 | $0 | $12,650 | |
| Florida - Training | $19.00 | | 240 | 1911.95 | 3548.15 | 3285.64 | 5162.02 | | | | | |
| | | $0 | $4,560 | $36,327 | $67,415 | $62,427 | $98,078 | $0 | $0 | $0 | $0 | |
| Florida - Production (Rate $22.50) | $22.50 | | | 2321.95 | | | | | | | | |
| | | $0 | $0 | $52,244 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Florida - Production | $25.00 | | | | 2603.99 | 6074.31 | 3578.11 | 8566.22 | 10777 | 9914.03 | 8179.61 | |
| | | $0 | $0 | $0 | $65,100 | $151,858 | $89,453 | $214,156 | $269,425 | $247,851 | $204,490 | |
| Florida - Emergency Recovery | $25.00 | | | | 21.5 | | | | | | | |
| | | $0 | $0 | $0 | $538 | $0 | $0 | $0 | $0 | $0 | $0 | |
| OT and/or Holiday Production | $37.50 | | | | 28 | 137.17 | 229.74 | 832.53 | 547.66 | 54.42 | | |
| | | $0 | $0 | $0 | $1,050 | $5,144 | $8,615 | $31,220 | $20,537 | $2,041 | $0 | $68,607 |
| Memorial Day | $34.50 | | | | | | | | 56 | | | |
| | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,932 | $0 | $0 | |
| Total Billable hours (Training + Productivity) | | 1566 | 2520 | 4710.78 | 8294.06 | 11719.45 | 11746.87 | 11974.75 | 13956.66 | 12608.45 | 12731.05 | 91828 |
| Training | | $29,754 | $9,120 | $36,327 | $67,415 | $62,427 | $110,263 | $0 | $0 | $0 | $28,595 | $343,901 |
| Production | | $0 | $47,700 | $62,974 | $112,717 | $201,860 | $139,021 | $276,156 | $329,025 | $307,251 | $275,100 | $1,751,803 |
| OT & Holidays | | $0 | $0 | $0 | $1,050 | $5,144 | $8,615 | $31,220 | $22,469 | $2,041 | $0 | $70,539 |
| Circuit ($0.18 * 75 FTE * 173.33 hrs per month) | | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | $2,340 | |
| Total (Vendor Agents only) | | $32,094 | $59,160 | $114,640 | $183,522 | $271,771 | $260,239 | $309,715 | $353,834 | $311,631 | $306,035 | $2,202,643 |
| Vendor Hrly rate (including circuit) | | $20.49 | $23.48 | $24.34 | $22.13 | $23.19 | $22.15 | $25.86 | $25.35 | $24.72 | $24.04 | $23.99 |
| Avg. 75 FTE hrly rate - Circuit | | $0.18 | $0.18 | $1.18 | $0.18 | $0.18 | $0.18 | $0.18 | $0.18 | $0.18 | $0.18 | |
| Vendor Hourly Rate | | $20.67 | $23.66 | $25.52 | $22.31 | $23.37 | $22.33 | $26.04 | $25.53 | $24.90 | $24.22 | $24.17 |
| | | | | | | | | | | | | |
| Billable Hours (Productive + Training) | | 1566 | 2520 | 7033 | 8294 | 11719 | 11747 | 11975 | 13957 | 12608 | 12731 | 94150 |
| In-house (CSA3) - 2015 | $20.59 | $32,244 | $51,887 | $144,804 | $170,775 | $241,303 | $241,868 | $246,560 | | | | |
| In-house (CSA3) - 2016 | $21.15 | | | | | | | | $295,183 | $266,669 | $269,262 | |
| Benefit Multiplyer | 0.3041 | $42,049 | $67,665.58 | $188,838.78 | $222,707 | $314,684 | $315,420 | $321,539 | $384,949 | $347,763 | $351,144 | $2,556,759 |
| Billable Productive Hours | | 0 | 2040 | 5121 | 4746 | 8434 | 5944 | 11975 | 13957 | 12608 | 11226 | |
| Shift Differential - 2015 | $1.90 | $0 | $3,876 | $9,729 | $9,017 | $16,024 | $11,293 | $22,752 | | | | |
| Shift Differential - 2016 | $2.00 | | | | | | | | $27,913 | $25,217 | $22,452 | |
| Total (Production, Training, Benefits, Shift Dif) | | $42,049 | $71,542 | $198,568 | $231,725 | $330,708 | $326,713 | $344,291 | $412,862 | $372,980 | $373,596 | $2,705,034 |
| Billable OT Hours | | 0 | 0 | 0 | 28 | 137.17 | 229.74 | 832.53 | 603.66 | 54.42 | 0 | |
| Shift OT 1.5 | 1.5 | $0 | $0 | $0 | $865 | $4,236 | $7,096 | $25,713 | $19,151 | $1,726 | $0 | $58,787 |
| | | | | | | | | | | | *Variance Vendor vs. Inhouse* | |
| Total In-house (Agents only) | | $42,049 | $71,542 | $198,568 | $232,589 | $334,945 | $333,808 | $370,004 | $432,013 | $374,706 | $373,596 | $2,763,821 | $561,178 |
| Hourly Rate | | $26.85 | $28.39 | $28.23 | $28.04 | $28.58 | $28.42 | $30.90 | $30.95 | $29.72 | $29.35 | $29.36 |
| | | | | | | | | | | | | |
| Vendor AVP - Supervisor Billable hours | $25 | 960 | 1120 | 1176 | 1632 | 2294 | 1680 | 1680 | 1760 | 1760 | 1776 | |
| Supervisor Cost | | $24,000 | $28,000 | $29,400 | $40,800 | $57,350 | $42,000 | $42,000 | $44,000 | $44,000 | $44,400 | $395,950 |
| | | | | | | | | | | | | |
| Supervisor Head Count | | 6 | 6 | 7 | 9 | 13 | 10 | 10 | 10 | 10 | 10 | |
| In-House Hourly Rate (no Benefits) | $38.65 | $37,104 | $43,288 | $45,452 | $63,077 | $88,663 | $64,932 | $64,932 | $68,024 | $68,024 | $68,642 | |
| Benefit Multiplyer | 0.3041 | $48,387 | $56,452 | $59,274 | $82,258 | $115,626 | $84,678 | $84,678 | $88,710 | $88,710 | $89,517 | $798,290 | $402,340 |

Right side block:

| | |
|---|---|
| Circuit Hardware | $51,994 |
| Scranton Circuit | $13,536 |
| Allentown Circuit | $16,920 |
| Total | $82,450 |
| | |
| Hourly rate over 3 years | $13 |
| 45 Agents | $0.29 |
| 75 Agents | $0.18 |
| 105 Agents | $0.13 |

*Variance Vendor vs. Inhouse* (near Total In-house): $561,178

*Variance Vendor vs. inhouse* (bottom): $402,340



Months

| | Rate | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | | | | 30 | 30 | 30 | | | | 10 | | | | 10 | |
| CSA 1 - Productive | | | | | | 29 | 26 | 27 | | 0 | 0 | 9 | | | 0 | 10 |
| CSA 1 - Attrition | 0.05 | | | | 2 | 3 | 3 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| CSA 2 - Training | | | | | | | 29 | 26 | 27 | | | | 9 | | | |
| CSA 2 - Productive | | | | | | | | 28 | 24 | 25 | | 0 | 0 | 9 | | 0 |
| CSA 2 - Attrition | 0.03 | | | | 0 | 0 | 1 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| CSA 3 - Training | | | | | | | | | 28 | 24 | 25 | | | | 8 | |
| CSA 3 - Productive | | | | | | | | | | 27 | 50 | 74 | 72 | 71 | 70 | 76 |
| CSA 3 - Attrition | 0.02 | | | | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 1 | 1 | 1 | 2 | 2 |
| Total Training | | | | | 30 | 30 | 59 | 26 | 55 | 24 | 35 | 0 | 9 | 0 | 18 | 0 |
| Total Productive | | | | | 0 | 29 | 26 | 55 | 24 | 52 | 50 | 83 | 72 | 80 | 70 | 86 |
| Total | | | | | 30 | 59 | 85 | 81 | 79 | 76 | 85 | 83 | 81 | 80 | 88 | 86 |
| In-House | Year 1 | Year 2 | | Year 3 | | | | | | | | | | | | |
| CSA 1 | $14.738 | $15.521 | 2.75% | $15.948 | $76,636 | $76,636 | $76,636 | $0 | $0 | $0 | $25,545 | $0 | $0 | $0 | $25,545 | $0 |
| CSA 2 | $17.160 | $17.632 | 2.75% | $18.117 | $0 | $0 | $86,256 | $161,001 | $151,691 | $74,359 | $0 | $0 | $26,769 | $25,966 | $0 | $0 |
| CSA 3 | $20.590 | $21.156 | 2.75% | $21.738 | $0 | $0 | $0 | $0 | $99,928 | $183,582 | $269,132 | $263,750 | $258,475 | $253,305 | $276,790 | $271,254 |
| Total | | | | | $76,636 | $76,636 | $162,892 | $161,001 | $251,620 | $257,941 | $294,678 | $263,750 | $285,244 | $279,271 | $302,335 | $271,254 |
| Benefit Multiplier | 0.3041 | | | | $99,941 | $99,941 | $212,428 | $209,962 | $328,137 | $336,381 | $384,289 | $343,956 | $371,986 | $364,198 | $394,276 | $353,743 |
| Shift Dif | $1.90 | | | | $9,861 | $19,229 | $27,800 | $26,740 | $25,967 | $25,126 | $28,075 | $27,250 | $26,764 | $26,199 | $28,780 | $28,106 |
| Fully Loaded | | | | | $109,802 | $119,170 | $240,227 | $236,702 | $354,105 | $361,507 | $412,364 | $371,206 | $398,751 | $390,397 | $423,056 | $381,848 |
| Vendor | | | | | | | | | | | | | | | | |
| Training | $19 | | | | $98,798 | $98,798 | $194,303 | $85,625 | $181,130 | $79,038 | $115,264 | $0 | $29,639 | $0 | $59,279 | $0 |
| Productive | $25 | | | | $0 | $123,498 | $110,823 | $239,851 | $103,998 | $227,236 | $218,444 | $359,239 | $313,835 | $345,388 | $301,407 | $370,518 |
| Total | | | | | $98,798 | $222,296 | $305,126 | $325,476 | $285,128 | $306,274 | $333,709 | $359,239 | $343,475 | $345,388 | $360,686 | $370,518 |

| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | | 10 | | | | 10 | | | | 8 | |
| CSA 1 - Productive | | 0 | 0 | 10 | | 0 | 0 | 10 | | 0 | 0 | 8 |
| CSA 1 - Attrition | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| CSA 2 - Training | 9 | | | | 9 | | | | 9 | | | |
| CSA 2 - Productive | 0 | 9 | | 0 | 0 | 9 | | 0 | 0 | 9 | | 0 |
| CSA 2 - Attrition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CSA 3 - Training | | | 8 | | | | 8 | | | | 8 | |
| CSA 3 - Productive | 74 | 73 | 72 | 78 | 76 | 75 | 73 | 80 | 78 | 77 | 75 | 81 |
| CSA 3 - Attrition | 1 | 1 | 2 | 2 | 2 | 1 | 2 | 2 | 2 | 2 | 2 | 2 |
| Total Training | 9 | 0 | 18 | 0 | 9 | 0 | 18 | 0 | 9 | 0 | 16 | 0 |
| Total Productive | 74 | 82 | 72 | 87 | 76 | 84 | 73 | 89 | 78 | 85 | 75 | 89 |
| Total | 83 | 82 | 90 | 87 | 85 | 84 | 91 | 89 | 87 | 85 | 91 | 89 |
| In-House | | | | | | | | | | | | |
| CSA 1 | $0 | $0 | $26,903 | $25,557 | $0 | $0 | $26,903 | $25,557 | $0 | $0 | $21,522 | $20,446 |
| CSA 2 | $27,505 | $26,680 | $0 | $0 | $27,505 | $26,680 | $0 | $0 | $27,505 | $26,680 | $0 | $0 |
| CSA 3 | $273,137 | $267,674 | $291,656 | $285,823 | $280,107 | $274,504 | $298,350 | $292,383 | $286,535 | $280,805 | $304,524 | $298,434 |
| Total | $300,642 | $294,354 | $318,559 | $311,380 | $307,612 | $301,185 | $325,253 | $317,940 | $314,041 | $307,485 | $326,046 | $318,880 |
| Benefit Multiplier | $392,067 | $383,867 | $415,432 | $406,071 | $401,157 | $392,775 | $424,162 | $414,626 | $409,541 | $400,991 | $425,197 | $415,851 |
| Shift Dif | $27,442 | $26,863 | $29,430 | $28,743 | $28,067 | $27,476 | $30,031 | $29,331 | $28,643 | $28,040 | $29,927 | $29,249 |
| Fully Loaded | $419,509 | $410,730 | $444,863 | $434,814 | $429,223 | $420,250 | $454,192 | $443,957 | $438,183 | $429,031 | $455,124 | $445,100 |
| Vendor | | | | | | | | | | | | |
| Training | $29,639 | $0 | $59,279 | $0 | $29,639 | $0 | $59,279 | $0 | $29,639 | $0 | $52,692 | $0 |
| Productive | $322,765 | $354,139 | $309,983 | $378,922 | $331,001 | $362,211 | $317,894 | $386,674 | $338,598 | $369,656 | $325,190 | $385,591 |
| Total | $352,404 | $354,139 | $369,262 | $378,922 | $360,641 | $362,211 | $377,172 | $386,674 | $368,238 | $369,656 | $377,882 | $385,591 |

| | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | | | 8 | | | | | | | | | | |
| CSA 1 - Productive | | 0 | 0 | 0 | 8 | | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 1 - Attrition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 2 - Training | 8 | | | | | 8 | | | | | | | | |
| CSA 2 - Productive | 0 | 8 | | 0 | 0 | 0 | 8 | | 0 | 0 | 0 | 0 | | |
| CSA 2 - Attrition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 3 - Training | | | 7 | | | | | 7 | | | | | | |
| CSA 3 - Productive | 80 | 78 | 77 | 82 | 80 | 79 | 77 | 76 | 81 | 79 | 78 | 76 | | |
| CSA 3 - Attrition | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | |
| Total Training | 8 | 0 | 7 | 8 | 0 | 8 | 0 | 7 | 0 | 0 | 0 | 0 | | |
| Total Productive | 80 | 86 | 77 | 82 | 88 | 79 | 85 | 76 | 81 | 79 | 78 | 76 | | |
| Total | 88 | 86 | 84 | 90 | 88 | 87 | 85 | 83 | 81 | 79 | 78 | 76 | | |
| In-House | | | | | | | | | | | | | | |
| CSA 1 | $0 | $0 | $0 | $22,114 | $21,008 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | |
| CSA 2 | $25,122 | $24,368 | $0 | $0 | $0 | $25,122 | $24,368 | $0 | $0 | $0 | $0 | $0 | | |
| CSA 3 | $299,933 | $293,934 | $314,380 | $308,092 | $301,930 | $295,891 | $289,974 | $310,498 | $304,288 | $298,203 | $292,239 | $286,394 | | |
| Total | $325,054 | $318,302 | $314,380 | $330,206 | $322,938 | $321,013 | $314,342 | $310,498 | $304,288 | $298,203 | $292,239 | $286,394 | $10,087,856 | |
| Benefit Multiplier | $423,903 | $415,098 | $409,982 | $430,621 | $421,144 | $418,633 | $409,933 | $404,921 | $396,822 | $388,886 | $381,108 | $373,486 | | |
| Shift Dif | $28,846 | $28,242 | $27,479 | $29,559 | $28,889 | $28,492 | $27,896 | $27,140 | $26,597 | $26,065 | $25,543 | $25,033 | | |
| Fully Loaded | $452,749 | $443,340 | $437,461 | $460,180 | $450,033 | $447,126 | $437,829 | $432,060 | $423,419 | $414,951 | $406,652 | $398,519 | **$14,228,433** | |
| Vendor | | | | | | | | | | | | | | |
| Training | $26,346 | $0 | $23,053 | $26,346 | $0 | $26,346 | $0 | $23,053 | $0 | $0 | $0 | $0 | | |
| Productive | $345,605 | $372,319 | $331,920 | $355,007 | $380,840 | $340,949 | $367,756 | $327,447 | $350,625 | $343,612 | $336,740 | $330,005 | | Variance |
| Total | $371,952 | $372,319 | $354,972 | $381,353 | $380,840 | $367,295 | $367,756 | $350,500 | $350,625 | $343,612 | $336,740 | $330,005 | **$12,406,874** | $1,821,559 |

Months

| | Rate | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | 40 | 40 | 40 | | 20 | | 15 | | | | 10 | |
| CSA 1 - Productive | | | 36 | 28 | 33 | | 18 | | 13 | | | 0 | 9 |
| CSA 1 - Attrition | 0.1 | 4 | 8 | 7 | 3 | 2 | 2 | 2 | 1 | 0 | 0 | 1 | 1 |
| CSA 2 - Training | | | | 28 | 21 | 30 | | 16 | | 12 | | | |
| CSA 2 - Productive | | | | | 27 | 19 | 28 | | 15 | | 11 | | 0 |
| CSA 2 -Attrition | 0.05 | 0 | 0 | 1 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| CSA 3 - Training | | | | | | 25 | 17 | 27 | | 14 | | 10 | |
| CSA 3 - Productive | | | | | | | 25 | 41 | 66 | 65 | 77 | 76 | 84 |
| CSA 3 - Attrition | 0.02 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 |
| Total Training | | 40 | 40 | 68 | 21 | 75 | 17 | 58 | 0 | 26 | 0 | 20 | 0 |
| Total Productive | | 0 | 36 | 28 | 60 | 19 | 71 | 41 | 95 | 65 | 89 | 76 | 93 |
| Total Agents | | 40 | 76 | 96 | 81 | 94 | 88 | 99 | 95 | 91 | 89 | 96 | 93 |
| Vendor | | | | | | | | | | | | | |
| Training | $19 | $131,731 | $131,731 | $223,942 | $69,159 | $246,995 | $55,986 | $191,010 | $0 | $85,625 | $0 | $65,865 | $0 |
| Productive | $25 | $0 | $155,997 | $123,064 | $258,955 | $82,332 | $305,494 | $176,233 | $409,564 | $281,619 | $384,838 | $328,730 | $403,621 |
| Total | | | | | | | | | | | | | |

| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | | 10 | | | | 10 | | | | 8 | |
| CSA 1 - Productive | | 0 | 0 | 9 | | 0 | 0 | 9 | | 0 | 0 | 7 |
| CSA 1 - Attrition | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 |
| CSA 2 - Training | 9 | | | | 9 | | | | 9 | | | |
| CSA 2 - Productive | 0 | 9 | | 0 | 0 | 9 | | 0 | 0 | 9 | | 0 |
| CSA 2 -Attrition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CSA 3 - Training | | | 8 | | | | 8 | | | | 8 | |
| CSA 3 - Productive | 82 | 81 | 79 | 85 | 84 | 82 | 80 | 87 | 85 | 83 | 82 | 88 |
| CSA 3 - Attrition | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Total Training | 9 | 0 | 18 | 0 | 9 | 0 | 18 | 0 | 9 | 0 | 16 | 0 |
| Total Productive | 82 | 89 | 79 | 94 | 84 | 91 | 80 | 96 | 85 | 92 | 82 | 95 |
| Total Agents | 91 | 89 | 97 | 94 | 93 | 91 | 98 | 96 | 94 | 92 | 98 | 95 |
| Vendor | | | | | | | | | | | | |
| Training | $29,639 | $0 | $59,279 | $0 | $29,639 | $0 | $59,279 | $0 | $29,639 | $0 | $52,692 | $0 |
| Productive | $357,329 | $387,232 | $343,179 | $409,287 | $362,882 | $392,674 | $348,512 | $414,514 | $368,004 | $397,693 | $353,431 | $411,535 |
| Total | | | | | | | | | | | | |

| | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CSA 1 - Training | | | | 8 | | | | | | | | | | |
| CSA 1 - Productive | | 0 | 0 | 0 | 7 | | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 1 - Attrition | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 2 - Training | 8 | | | | | 8 | | | | | | | | |
| CSA 2 - Productive | 0 | 8 | | 0 | 0 | 0 | 8 | | 0 | 0 | 0 | 0 | | |
| CSA 2 -Attrition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CSA 3 - Training | | | 7 | | | | | 7 | | | | | | |
| CSA 3 - Productive | 86 | 84 | 83 | 88 | 86 | 84 | 83 | 81 | 86 | 85 | 83 | 81 | | |
| CSA 3 - Attrition | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | |
| Total Training | 8 | 0 | 7 | 8 | 0 | 8 | 0 | 7 | 0 | 0 | 0 | 0 | | |
| Total Productive | 86 | 92 | 83 | 88 | 93 | 84 | 90 | 81 | 86 | 85 | 83 | 81 | | |
| Total Agents | 94 | 92 | 90 | 96 | 93 | 92 | 90 | 88 | 86 | 85 | 83 | 81 | | |
| Vendor | | | | | | | | | | | | | | |
| Training | $26,346 | $0 | $23,053 | $26,346 | $0 | $26,346 | $0 | $23,053 | $0 | $0 | $0 | $0 | $1,587,356 | Variance |
| Productive | $372,728 | $398,207 | $357,968 | $380,535 | $404,124 | $365,466 | $391,089 | $350,994 | $373,700 | $366,226 | $358,901 | $351,723 | **$11,928,379** | $2,300,054 |
| Total | | | | | | | | | | | | | | |

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sup / Agent Ratio 14.1 | | 2 | 4 | 6 | 6 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 |
| Supervisor - Vendor $ | $25 | $9,286 | $18,107 | $26,177 | $25,180 | $24,452 | $23,660 | $26,436 | $25,660 | $25,202 | $24,671 | $27,100 | $26,466 |
| Supervior - Inhouse $ | $38.65 | $14,328 | $27,940 | $40,393 | $38,854 | $37,731 | $36,508 | $40,793 | $39,595 | $38,889 | $38,068 | $41,817 | $40,838 |

| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sup / Agent Ratio 14.1 | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 6 | 6 | 6 | 7 | 6 |
| Supervisor - Vendor $ | $25,840 | $25,296 | $27,713 | $27,066 | $26,429 | $25,872 | $28,278 | $27,620 | $26,971 | $26,404 | $28,180 | $27,542 |
| Supervior - Inhouse $ | $39,873 | $39,033 | $42,763 | $41,764 | $40,781 | $39,922 | $43,635 | $42,619 | $41,618 | $40,743 | $43,484 | $42,499 |

| | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sup / Agent Ratio 14.1 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 5 | | |
| Supervisor - Vendor $ | $27,162 | $26,594 | $25,875 | $27,834 | $27,203 | $26,830 | $26,268 | $25,556 | $25,045 | $24,544 | $24,053 | $23,572 | $916,142 | Supervisor Variance |
| Supervior - Inhouse $ | $41,913 | $41,036 | $39,927 | $42,949 | $41,976 | $41,400 | $40,533 | $39,434 | $38,645 | $37,872 | $37,115 | $36,373 | $1,413,659 | $497,517 |

**PPL EU Benefits Budget**
**Budget Item 12000**
**($000)**

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| FICA SS & Medicare* | 15,615 | 15,167 | 15,029 | 15,422 | 15,782 |
| FUTA* | 195 | 190 | 188 | 193 | 197 |
| SUTA* | 781 | 758 | 751 | 771 | 789 |
| Workmen's Comp | 3,022 | 3,110 | 3,202 | 3,305 | 3,403 |
| Sub-Total | 19,614 | 19,225 | 19,170 | 19,691 | 20,172 |
| | | | | | |
| Retirement Plan - DB | 24,500 | 24,500 | 24,500 | 24,500 | 24,500 |
| SERP | - | - | - | - | - |
| Supp Comp Pension Plan | - | - | - | - | - |
| Sub-Total | 24,500 | 24,500 | 24,500 | 24,500 | 24,500 |
| | | | | | |
| Group Life (Net) | 639 | 622 | 627 | 637 | 645 |
| Post Retirement | | | | | |
| Medical & Life | 750 | 750 | 750 | 750 | 750 |
| Med Care-Active (Net) | 22,765 | 23,413 | 24,252 | 25,397 | 26,442 |
| Dental Plan (Net) | 1,279 | 1,245 | 1,253 | 1,275 | 1,290 |
| L-T Disab. CIGNA Inc Repl | 578 | 563 | 567 | 576 | 583 |
| AD or D | 123 | 120 | 120 | 123 | 124 |
| L-T Disab. Med/Dental/Life Ins | 352 | 361 | 369 | 379 | 389 |
| | | | | | |
| Def Svgs Plan | 7,000 | 7,350 | 7,718 | 8,103 | 8,509 |
| Retirement Plan - DC | | | | | |
| Sub-Total | 33,487 | 34,424 | 35,656 | 37,241 | 38,730 |
| | | | | | |
| Total | 77,601 | 78,149 | 79,326 | 81,432 | 83,402 |
| Check | | | | | |
| | | | | | |
| Total T&B | 77,601 | 78,149 | 79,326 | 81,432 | 83,402 |
| Total Adjusted Payroll* | 195,193 | 189,583 | 187,861 | 192,780 | 197,275 |
| | | | | | |
| Loading Rate | 39.8% | 41.2% | 42.2% | 42.2% | 42.3% |
| Loading Rate Used | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Adjusted base payroll | 195,193 | 189,583 | 187,861 | 192,780 | 197,275 |

**Exhibit 4**
COMPANY
9/14/16
reporter: trisha sims
Veritext Legal Solutions

# EXHIBIT D

Form 4624 (06/2009)

# NOTIFICATION OF CONTRACTOR WORK



Send original, signed form to:
**IBEW Local 1600 - IEW**

| PPL Electric Utilities | 707 | will use the following contractor for work at PPL: |
|---|---|---|
| Business Unit Name | Responsibility Center | |

| Contractor Name<br>iQor | Contractor Type | Date of This Form<br>10/19/2015 |
|---|---|---|
| Job Location/Plant<br>Bethlehem, PA and Fort Lauderdale, FL | ☒ Specific | Contractor Start Date<br>11/01/2015 |
| Brief Description of Work | ☐ Blanket | Contractor Stop Date<br>12/31/2016 |

**Brief Description of Work**
PPL Electric Utilities has signed a contract with First Contact LLC
(iQor) to handle inbound and outbound customer service interactions, back office work, and provide 24/7 support. iQor provides redundancy and disaster recovery capabilities to meet customer needs if an event impacts PPL facilities.

## Instructions

A) Check all justification boxes that apply

B) Send copy of completed form to the Local Chief Steward

C) Send copy of completed form to Labor Relations, GENN2.

D) Place copies in your local files as directed by your dept.

## Justification for Contractor Work (Must satisfy Article II, Section 5, Paragraph D)
Check all boxes that apply.

### Skills/License Not Available Within PPL

☐ Contractor has employees with special skills not available within PPL

☐ Contractor has license or certification to perform specialized work

☐ Contractor utilizes special tools or equipment not available within PPL

☒ Contractor will provide employees with specialized skills because PPL employees with those skills are fully employed doing this work.

### Peak Work

☐ Contractor to work during power plant outage

☐ Contractor to work on special projects

☒ Contractor to work during seasonal/other peaks

### Economic Advantage

☒ Use of contractor will reduce cost of work

### Time Constraints (short-term conditions)

☐ Contractor required to meet an identifiable in-service deadline

☐ Contractor required to meet customer in-service deadline

☐ Contractor required to avoid PPL losing market share if deadline not met

☒ Contractor required to work during emergency

### Public/Customer Relations

☐ Contractor required to provide timely restoration of service

☐ Contractor required to meet specific regulatory requirements

☐ Contractor required to meet extraordinary work situations

_____ Approval

Chris Graham
Print Name

10/21/15
Date

cc: Labor Relations - GENN2
Local Chief Steward -



**Exhibit 16**
UNION
9/14/16
*reporter: trisha sims*
Veritext Legal Solutions

U-16

# EXHIBIT E

| Job Title | 7/2015 | 8/2015 | 9/2015 | 10/2015 | 11/2015 | 12/2015 | 1/2016 | 2/2016 | 3/2016 |
|---|---|---|---|---|---|---|---|---|---|
| CSA1 Lehigh | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 0 |
| CSA2 Lehigh | 18 | 18 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| CSA3 Lehigh | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| CSRs Lehigh | 49 | 48 | 47 | 47 | 47 | 47 | 45 | 43 | 44 |
| Sr CSRs Lehigh | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Lehigh | 81 | 80 | 77 | 76 | 76 | 76 | 74 | 72 | 72 |
| CSA1 SCR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CSA2 SCR | 6 | 6 | 6 | 6 | 6 | 5 | 5 | 5 | 5 |
| CSA3 SCR | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| CSRs SCR | 63 | 63 | 62 | 62 | 61 | 60 | 59 | 59 | 59 |
| Sr CSRs SCR | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Scranton | 81 | 81 | 80 | 80 | 79 | 77 | 76 | 76 | 76 |
| CCC Total Staff | 162 | 161 | 157 | 156 | 155 | 153 | 150 | 148 | 148 |

**Exhibit 11**
UNION
9/14/16
reporter: trisha sims
Veritext Legal Solutions

# EXHIBIT F



INTERNATIONAL BROTHERHOOD OF ELECTRIAL WORKERS
# LOCAL UNION 1600
## GRIEVANCE FORM
### KEYWORD:

GRIEVANCE NO.

15- Leh-035

PDF FILE NO.

---

**GRIEVANCE RECORD**
Name(s) _Local 1600 / Steve Knoebel_ Job Title _President_
Department & Work Location _Customer Service - various locations_
Date of Occurrence(s) _11/12/15_ Date of Complaint Discussion _11/5/15_
Date Reduced to Writing _11/12/15_ Name of Steward _Steve Knoebel_
Brief Statement of Grievance _Company is contracting Local 1600 work_

---

Provision of Labor Agreement in Dispute: Article _1_ Section _1_ Paragraph _A_ ☒ And any other
Article _II_ Section _5_ Paragraph _D_ Article _VI_ Section _1_ Paragraph _D_ applicable provision
SETTLEMENT DESIRED _Maintain proper staffing levels with_
_Local 1600 members. Make Union and members whole_

☒ Make whole and any other appropriate relief
Signed _Steven C Knoebel_ Signed _Steven C Knoebel_
(Employee) (Steward)
Appropriate Supervisor & Title _Chris Graham    Director Customer Services Op._
Date of Supervisor Written Response _11/19/15_
Withdrawn ___ Settled* ___ To Step 1 ___ Signed _Steven C Knoebel_ Date _12/3/15_
(Steward)
THIS GRIEVANCE AND INFORMATION INCLUDING, BUT NOT NECESSARILY LIMITED TO THE ABOVE PROVISIONS OF THE CONTRACT(S),
PARTIES PAST PRACTICE(S) OR OTHER AGREEMENTS BETWEEN IBEW1600 AND THE EMPLOYER.

---

**STEP 1**                                          Date of Meeting ___
Union Representatives: ___
Company Representatives: ___
Remarks: (To be completed by Steward) ___

Withdrawn ___ Settled* ___ To Step 2 ___ Signed ___ Date ___
(Steward)

Mutually extended to ___ Signed ___ Signed ___
(Date) (Union) (Company)

---

**STEP 2**                                          Date of Meeting ___
Union Representatives: ___
Company Representatives: ___
Remarks: (To be completed by Chief Steward) ___

Withdrawn ___ Settled* ___ (To Step 3) Signed _Steven C Knoebel_ Date _12/3/15_
(Chief Steward)

Mutually extended to ___ Signed ___ Signed ___
(Date) (Union) (Company)

# EXHIBIT G

JF·3

**PPL Electric Utilities**
Two North Ninth Street
Allentown, PA 18101-1179
Tel. 610.774.5151
http://www.pplweb.com/

**ppl**™

11/18/2015

Steve Knoebel

RECEIVED

NOV 23 2015

LOCAL 1600

GRIEVANCE #-15LEH-035

In accordance with Article III of the Labor Agreement, this letter serves as the company's written response to your grievance that was reduced to writing on 11/5/2015.

Your grievance cited a violation of Art I Section 1 A, Art II Section 5 D and Art 6 Section 1 D. The Brief Statement of Grievance states "Company is contracting local 1600 work". The Settlement Desired states "Maintain proper staffing with 1600 members make union and members whole".

I have reviewed the provision in dispute and find there is no violation of the Labor Agreement. As you are well aware the language under Article II Section 5 D plainly grants the Company the right to contract work. The only restriction placed on this right is that "No employee will be laid off or suffer loss of regular straight time pay". Nothing in Art II Sec 5 D sets a limit on the amount of work the company may contract out if the contracting falls within the parameters outlined in Art II Sec 5 D.

Chris Graham

Director Customer Services Operations

Copy to:
Chris Cardenas- LEHSC
James Price –LEHSC
Jim Caffrey –LEHSC
Jane Biever –Local 1600
Tim Newman, GENN2
Lisa Walsh, GENN2

# EXHIBIT H

1        AMERICAN ARBITRATION ASSOCIATION

2                    * * *

3        IN THE MATTER OF THE ARBITRATION

4            BETWEEN IBEW LOCAL 1600

5                    AND

6            PPL SERVICES CORPORATION

7                    * * *

8          CASE NUMBER 01-16-000-3483

9        GRIEVANCE:  G15LEH-035-LOCAL 1600,

10             et al.-Contractors

11                   * * *

12        Wednesday, September 14, 2016

13                   * * *

14                    --

15                Holiday Inn

16             7736 Adrienne Drive

17     Breinigsville, Pennsylvania  18031

18                   * * *

19      Scheduled to begin at 10:00 a.m.

20

21                   * * *

22

23          VERITEXT LEGAL SOLUTIONS

             MID-ATLANTIC REGION

24       4949 Liberty Lane, Suite 200

             Allentown, PA  18106

25             (610) 434-8588

```
 1    THE ARBITRATOR:
 2            JOHN M. SKONIER, ESQUIRE
              2417 Oakland Drive
 3            Norristown, Pennsylvania  19403
              (484) 919-4031
 4            touchstones@comcast.net
 5
      APPEARANCES:
 6
              PROSKAUER ROSE, LLP
 7            BY:  MICHAEL J. LEBOWICH, ESQUIRE
              Eleven Times Square
 8            New York, New York  10036-8299
              (212) 969-3217
 9            mlebowich@proskauer.com
10            -- Representing PPL Services Corporation
11
              BLOOM & ASSOCIATES
12            BY:  JOSHUA M. BLOOM, ESQUIRE
              3204 Grant Building
13            310 Grant Street
              Pittsburgh, Pennsylvania  15219
14            (412) 288-6000
              bloom@bloomlawyers.com
15
              -- Representing IBEW Local 1600
16                          * * *
17    ALSO PRESENT:
18    FOR IBEW LOCAL 1600:
19            Steven C. Knoebel, President/Financial
                 Secretary
20            Jane Biever, Business Representative
              Tyonia Crawford, Steward
21            Laura Fitzgerald, Steward
              Shelley Ortiz, Manager, Business
22               Improvement
              Lori Wagner, Manager, Customer Care
23            Monica Brooks, Manger, Customer Care
24
25
```

1  APPEARANCES:  (Continued)

2  ALSO PRESENT: (Continued)

3  FOR PPL SERVICE CORPORATION:

4          Tim Newman, Labor Relations

           Chris Graham, Direct of Customer

5              Care Operations

           Bassem Hanna, Manager of Customer

6              Care Operations

           Jesse Deffler, HR Intern

7          Kelley Toth, HR Consultant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX
2    Witness                                    Page
3    JANE BEIVER
4        Direct By Mr. Bloom ..................  37
         Cross By Mr. Lebowich .................  66

5

6    STEVEN C. KNOEBEL
7        Direct By Mr. Knoebel .................  74
         Cross By Mr. Lebowich .................  78
8        Redirect By Mr. Bloom ................  83
9    SHELLEY ORTIZ
10       Direct By Mr. Lebowich ................  85
         Cross By Mr. Bloom ....................  90
11       Redirect By Mr. Lebowich .............  90
12   CHRIS GRAHAM
13       Direct By Mr. Lebowich ................  91
         Cross By Mr. Bloom ....................  122
14       Redirect By Mr. Lebowich .............  141
         Recross By Mr. Bloom ..................  145
15

16                    * * *
17            INDEX TO EXHIBITS
18   Joint
     Exhibit          Description             Page
19
     Exhibit 1   Collective bargaining           7
20               agreement
21   Exhibit 2   Union grievance form            8
22   Exhibit 3   Company's response offer        8
23

24

25

```
             * * *
         INDEX TO EXHIBITS
           (Continued)
```

Union
Exhibit          Description              Page

Exhibit 1    Company proposal - CSR          39
             Progression line
Exhibit 2    E-mail dated 3/28/12 with       41
             attached LOU

Exhibit 3    Agreement between IBEW 1600      43
             and PPL
Exhibit 4    E-mail dated 6/5/12             48
Exhibit 5    Information request with        49
             attachment

Exhibit 6    Information request dated       51
             5/11/16 with attachment
Exhibit 7    PPL membership spreadsheet      53
             dated June 2012

Exhibit 8    Staffing spreadsheet dated      54
             December 2012
Exhibit 9    PPL membership spreadsheet      55
             dated January 2016

Exhibit 10   Union promotions spreadsheet    55
             dated 1/1/2012
Exhibit 11   Total number of customer        57
             service staff spreadsheet for
             7/2015 to 3/2016
Exhibit 12   Calls offered spreadsheet       58
Exhibit 13   Spreadsheet of iQor staff       59
             employees
```

```
1                        *  *  *
2                  INDEX TO EXHIBITS
3                     (Continued)
4   Union
    Exhibit           Description           Page
5
    Exhibit 14   Professional Services         61
6                Agreement between First
                 Contact LLC and PPL Electric
7                Utilities Corporation dated
                 9/10/15
8
    Exhibit 15   iQor invoices                 63
9
    Exhibit 16   Notification of contractor    64
10               work dated 10/21/15
11
12                       *  *  *
13  Company
    Exhibit           Description           Page
14
    Exhibit 1    Cost comparison              108
15
    Exhibit 2    Spreadsheet of invoices      113
16
    Exhibit 3    Three-year staffing plan     141
17
    Exhibit 4    PPL EU Benefits Budget       147
18
19
20
21
22
23
24
25
```

1                        * * *

2           THE ARBITRATOR:  All right.  We're here

3    for an arbitration between IBEW Local 1600 and PPL

4    Services Corporation.

5           AAA has docketed this as Grievance

6    01-16-0000-3483, Grievance G15LEH-035-Local 1600,

7    et al.-Contractors.

8           Let me state for the record that

9    representing the company is Michael J. Lebowich,

10   Esquire.  Representing the union is Joshua M.

11   Bloom, Esquire.

12          All right.  It's a contract

13   interpretation.  So the union will go first; but

14   before that, preliminary matters, any joint

15   exhibits that we can agree to?

16          MR. BLOOM:  The collective bargaining

17   agreement.

18          MR. LEBOWICH:  Yes.

19          THE ARBITRATOR:  J-1.

20          MR. LEBOWICH:  You probably have a few

21   copies of that.

22          (Joint Exhibit 1, Collective bargaining

23   agreement, was marked for identification.)

24          MR. BLOOM:  The union grievance as Joint

25   No. 2.

1          (Joint Exhibit 2, Union grievance form,

2     was marked for identification.)

3          MR. LEBOWICH:  That's fine.

4          MR. BLOOM:  The company's response offer

5     as Joint 3.

6          (Joint Exhibit 3, Company's response

7     offer, was marked for identification.)

8          THE ARBITRATOR:  Are you giving a copy to

9     the stenographer?  I'm just asking.  Some people

10    do, and some people don't.

11         MR. LEBOWICH:  Oh, to hold?

12         THE ARBITRATOR:  Yes.

13         MR. BLOOM:  I didn't know there was going

14    to be a court reporter.  So I brought generally

15    four copies of things.

16         MR. LEBOWICH:  Yeah.  I think that's fine.

17    We should be okay.  Between us we'll be okay, as

18    long as they get marked.

19         So this is No. 3 (indicating)?

20         MR. KNOEBEL:  No, that's 2.

21         THE ARBITRATOR:  Joint 3 is a letter dated

22    11/18/2015 to Steve Knoebel from Chris Graham,

23    director, customer service operations.

24         MR. LEBOWICH:  We're fine with all that.

25         THE ARBITRATOR:  Okay.  Is that it for the

1  joints?

2      MR. BLOOM:  Yes.

3      THE ARBITRATOR:  Okay.  All right.  If the

4  union is ready, do you have an opening?

5      MR. BLOOM:  Yes.  My name is Joshua Bloom,

6  and I represent IBEW 1600.  As pointed out, this

7  is a contract interpretation case.  It's been

8  filed against PPL, which is in the business of

9  transmission and distribution of electricity.

10     The company previously had six power

11 generation facilities; nuclear, gas, hydro and

12 coal.  It's my understanding that those power

13 plants have been divested approximately during

14 2014.

15     This grievance concerns the customer

16 service department.  During approximately 2010,

17 the company formally approached the union; and the

18 company wanted -- within the customer service

19 department, wanted lower pay scale positions.  The

20 company felt that there were too many higher-paid

21 employees doing work that could be done by

22 lower-scaled paid positions.

23     They wanted additional pay steps, job

24 titles and job training for progression through

25 those steps.

1          The company offered the union and
2     expressly represented to the union that the union
3     would have more bargaining unit employees if they
4     agreed to its proposal.  It would have fewer
5     contractors doing the bargaining unit work.
6          Just as a point of reference, at the time
7     there was a company called PPL Solutions doing
8     some contract work, contracting out work; and that
9     issue was settled between the companies, and
10    that's not part of the case.  I'll refer later to
11    subcontracting with regard to a company called
12    iQor.
13         The union and the company negotiated,
14    based on the company's representation, for
15    approximately two years.  On March 28, 2010, the
16    company again represented to the union that if it
17    agreed to this that it would increase Local 1600
18    membership, that it would make some temporary work
19    that was being done permanent, that it would hire
20    an additional 22 employees and would reduce the
21    need for contractors.
22         On April 30 of 2012, all of those
23    negotiations resulted in an ultimate agreement, a
24    written agreement, which was later placed into the
25    collective bargaining agreement and almost all

1    relevant parts on what's pages 127 to 129 on

2    Joint 1.  I will be referencing that, if you can

3    please take a look at it.

4            I think we're all working off the same

5    book.  Are the page numbers the name?

6            MR. LEBOWICH:  What number did you give?

7            THE ARBITRATOR:  I have Exhibit P on the

8    top.

9            MR. KNOEBEL:  It's a different page number

10   in this one.

11           MR. BLOOM:  If you go to the top, it says:

12   This exhibit embodies the understanding between

13   the parties relative to the revised progression

14   lines for the customer contact centers located in

15   Lehigh and Scranton.

16           It states the parties agree to create and,

17   most importantly, maintain the following

18   positions; and it lays out six positions, which

19   I'm going to use the acronyms:  CSA-I, CSA-II,

20   CSA-III and Customer Service Representative,

21   that's CSR, Customer Service Representative-Shift,

22   what they call CSR-Shift, and the Senior Customer

23   Service Representative.

24           Prior to this agreement, there was a

25   CS Clerk, CSR and a CSR-Shift.  So this agreement

1    resulted in much -- a few more lower pay scale

2    positions and then one more actually higher pay

3    scaled position, which was a Senior Customer

4    Service Representative.

5           Then the agreement goes down to the --

6    this, actually, at the time was called a letter of

7    understanding.  I may refer to it as the letters

8    LOU.

9           It talked about the company's obligations

10   with initial staffing.  So if you go a few

11   paragraphs down, it says:  Initial staffing for

12   the newly created positions will be accomplished

13   in the following manner.

14          It talks about within 60 days ratification

15   of the agreement, that they make the attempts

16   permanent to go into these lower positions.

17          It indicates later in the agreement that

18   they're going to hire a number of -- between 20 to

19   22 CSA-Is.  Then later in the agreement, if you

20   look at the next page, it goes from the initial

21   staffing and then it talks about what's going to

22   happen to fill the positions through promotions

23   and hiring.

24          At the top of the page it states:  Future

25   promotional opportunities will be filled in the

1    following manner.

2          Then it talks about each one of these
3    positions, that when there is -- that each
4    individual in that position will be offered the
5    opportunity to promote based upon job seniority
6    and to the particular position, it says as
7    vacancies arise.

8          So in other words, the company agreed that
9    they will fill the vacancies with promotions.  For
10   all of the positions in the CSA-I, they agreed
11   that not only would they have the opportunity to
12   be promoted, but it states:  This position will be
13   considered the entry level position, and vacancies
14   will be filled by newly hired employees.

15         So if there is a vacancy, the company
16   agreed they would fill it.

17         Now, before the letter of understanding or
18   what's noted in the collective bargaining
19   agreement as Exhibit P, there were approximately
20   205 employees in customer service.  December 2012,
21   after the company initially staffed the department
22   pursuant to this agreement, it ended up being
23   approximately 212 employees in the customer
24   service department; and although the company did
25   honor the agreement to create the positions and

1  initially fill them, most, unfortunately, the
2  evidence is going to show that the company never
3  maintained the positions as they promised.
4        THE ARBITRATOR:  Never maintained the
5  positions?
6        MR. BLOOM:  Never maintained the
7  positions.
8        Now, for CSA-I, there's an automatic
9  promotion to CSA-II.  The agreement says 12
10  months, but there's a side agreement that made it
11  six months; but other than those automatic
12  promotions from the CSA-Is that were initially
13  hired, there were zero promotions within -- from
14  one bargaining unit position to the higher
15  bargaining unit position in the progression.
16  There have been absolutely zero.
17        So even through the company said they will
18  fill those vacancies through promotions, other
19  than those automatic promotions from I to II, the
20  company never filled any vacancies with
21  promotions.
22        Also, the company never continued to hire
23  any open vacancies within the CSA position, even
24  though it agreed that it will fill those
25  vacancies.

1       By October of 2015, the customer service

2  department had went down to approximately 156

3  employees; and that was from a high, from what our

4  records show, of approximately 212 in December of

5  2012.

6       So by the time of October -- and that's an

7  important time period, October of 2015; I'll

8  explain why -- as you can see, it went down

9  substantially after that.

10      Rather than fill the vacancies via

11 promotion and hiring as it had promised, the

12 company went out and made a deal with a

13 subcontracting company called First Contact,

14 LLC -- but all the documents will reference it as

15 iQor -- to do the bargaining unit work.

16      So, basically, what the company did was --

17 rather than fulfill its end of the bargain on

18 Exhibit P, what it did it is backfilled what

19 should have been promotions and new hires.  It

20 just used subcontractors that were doing the work

21 in Florida.

22      This is a very, very substantial contract

23 that the company made.  The company's contract

24 with iQor was for three years.  It was estimated

25 at $3 million per year to do all facets,

1   essentially, of the bargaining unit customer

2   service work and to do that work, 365 days a year,

3   seven days per week, 24 hours per day.

4        Based upon an information request that the

5   union made of the company, the union learned that

6   iQor employees are doing most all facets of the

7   bargaining unit work, 81 of them -- 81 employees

8   who are routinely, like I said, 365, seven days a

9   week, 24 hours a day, doing their work.

10       Basically, when the company blatantly

11  failed to maintain the positions by promoting and

12  hiring, it circumvented its duty by diverting the

13  bargaining unit work to the iQor contractor; and

14  this is a direct violation of Exhibit P.

15       Alternatively and independently, the

16  company also violated Article II, Section 5-D of

17  the CBA because it didn't meet any of the five

18  justifications to subcontract within the CBA.

19       I'll point out in my closing brief that

20  the company actually is the one that has the

21  burden to prove that it met the justifications,

22  which makes a tremendous amount of sense because

23  they have all of the information about the

24  contracting out.  The union can only get what it's

25  smart enough to ask for it, and it can't know

1  everything based upon what happens in remote

2  areas.

3          On page three of the collective bargaining

4  agreement, joint 1, is the subcontracting

5  provision, which is Article II, Section 5-D.

6  Again, that's on page three.  It lays out the five

7  justifications that the company is permitted to

8  subcontract out bargaining unit work.

9          The first one, it says when the skills are

10 not available from the present employees.

11 Evidence will show that the bargaining unit had

12 all the requisite skills; and within this LOU, or

13 Exhibit P, that I just talked about, the actual

14 document, was the company and the union agreeing

15 on what the training process was going to be to

16 ensure that all the skills necessary for the job

17 were going to be held by the bargaining unit

18 employees.

19         The job description shows that they had

20 all the skills.  This was not a situation where

21 the company contracted to supplement the

22 bargaining unit.  These iQor employees were doing

23 the work 24 hours a day, seven days a week, 365

24 days a year.

25         The second justification, public and/or

1  customer relations will require it, the company
2  didn't claim that in its notification.
3      Third, the claim that the present
4  employees could not meet the work in time, the
5  company never brought to the attention that the
6  employees were not completing the work on time.
7      The bargaining unit employees were doing
8  all the work without a problem; and they had
9  employees called CSR-Shift that were working later
10 hours or early morning hours, and there were 10 of
11 them.  IQor had five employees that were working
12 in the middle of the night, essentially; but the
13 bargaining unit already had 10 employees to do
14 this and could definitely get the work done on
15 time that we can also show from the information
16 requested.
17     It's not as if the calls went up
18 tremendously bringing in this need to go get 81
19 employees from a contractor.  The calls stayed
20 about the same.  Everything pretty much remained
21 the same.
22     The next justification that permits the
23 company to subcontract out is when it's economical
24 to do so.  In October of 2015, the bargaining unit
25 had 156 employees; and the work was getting done.

1    Now, it may be that they needed to add on new

2    employees; and we believe that they did pursuant

3    to what they agreed and were obligated to do under

4    Exhibit P, but they brought in iQor.

5         The information we got from the company as

6    of March of 2016, there was eight less employees.

7    So you have 81 employees from iQor doing the work

8    that eight employees who attritted out were doing,

9    but the work was still getting done.

10        Based upon the documents we received from

11   the company, the company is on track to spend

12   $3.75 million the first year with iQor.  They were

13   spending $312,017 a month on iQor.  Meanwhile,

14   they -- they made the deal in 2012 to create and

15   maintain the bargaining unit positions in the LOU.

16        The fifth justification, peaks of work for

17   temporary increase, basically you're talking about

18   emergency work.  Respectfully, that defense is

19   completely invalid.  This is not a situation where

20   they were brought in to be on call in the event

21   that there was a peak of work or an emergency.

22        These iQor employees, 81 of them, were

23   doing work 24 hours, seven days a week, 365 days.

24   They were doing all facets of it.  This is

25   definitely routine; not peak.

1          In short, the company violated Exhibit P

2    by filling vacancies -- by failing to fill the

3    vacancies in customer service; and rather than

4    promoting and hiring to fill the vacancies, they

5    subcontracted out.

6          Alternatively and additionally, they

7    didn't comply with the subcontracting provision,

8    for whatever reason.  I can't read their mind.

9          As a remedy, Local 1600 is respectfully

10   requesting that this honorable arbitrator find

11   that the company violated Exhibit P, Article II,

12   Section 5-D and that the company cease and desist

13   from continuing to use iQor contractor or any

14   other new contractors in an effort to circumvent

15   its duty to fill vacancies through promotions and

16   new hires as it's required to do in Exhibit P and

17   that it make employees whole for all lost work

18   opportunities, wages, benefits, et cetera and that

19   the company be required to comply with Exhibit P

20   by filing the vacancies through promotions and new

21   hires as it had agreed to do.

22          That's it.  Thank you very much.

23          THE ARBITRATOR:  Thank you.

24          MR. LEBOWICH:  Can we go off the record?

25   I'm going to need a couple of minutes.

1          THE ARBITRATOR:  Do you need to

2    conference?

3          MR. LEBOWICH:  Yes.

4          (Pause in the proceedings.)

5          THE ARBITRATOR:  Okay.

6          MR. LEBOWICH:  Yes.

7          THE ARBITRATOR:  When you're ready.

8          MR. LEBOWICH:  Mr. Arbitrator, as the

9    saying goes, here we go again.  We're here before

10   you once again to address yet another attempt by

11   Local 1600 to limit the company's broad

12   contractual rights to subcontract.

13          As we all know, Local 1600 does not

14   approve of when we subcontract work; but as you

15   and other arbitrators all have heard me say before

16   and other arbitrators have decided, the parties'

17   collective bargaining agreement clearly and

18   without doubt gives the company significant

19   authority to do just that; and as you also heard,

20   this case today involves customer care agents, the

21   individuals who answer the phones to help you with

22   billing, collection and service issues.

23          Now, I have to veer off of what I had

24   prepared -- and I'll get back to that when I get

25   to union counsel's alternative argument -- to

1  address what I think are some fundamental concerns

2  that I now have about the proceeding we're here

3  for today.

4       Union's counsel and the union is

5  presenting to you that their primary argument in

6  this matter is that the company violated

7  Exhibit P.

8       Now, I will put aside for now at least the

9  fact that I think that is completely wrong and it

10  does not -- there's nothing in Exhibit P that in

11  any way limits our ability to subcontract or

12  otherwise require us to fill any particular

13  position.

14       But I have to start with the fact that

15  Joint Exhibit 2, which was presented to you today,

16  makes -- which is the grievance in this matter --

17  makes absolutely positively no mention of

18  Exhibit P and Article III of the collective

19  bargaining agreement, Section 3, which Article III

20  is the grievance procedure.

21       Article III, Section 3-B states -- and

22  this is on page five of Joint Exhibit 1 --

23  grievances, in order to be considered and be

24  subject to adjustment, must be made in writing

25  signed by the aggrieved employee and must specify

1   the article and section of the agreement upon
2   which the grievance is based.
3          It also, by the way, must come within
4   five -- there's a five-day period and a 10-day
5   period, and I'll come back to that in a second;
6   but before we go any further, there is nothing in
7   Joint Exhibit 2 that mentions anything about
8   Exhibit P.  Yeah, there's Article I, Section 1-A.
9   We see that all the time.  We see Article II,
10  Section 5, paragraph D.  That's the subcontracting
11  clause.  We see Article VI, Section 1-D.  That's
12  the clause the union continuously insists that
13  requires us to fill vacancies that doesn't
14  actually require us to fill vacancies.
15         That's fine.  We'll address those things
16  on the merits, but there is nothing about
17  Exhibit P; and if the union is going to point out
18  in this thing that they've added to their own
19  grievance form -- that's not our document; it's
20  the union's grievance form -- that says "and any
21  other applicable provision," well, Mr. Arbitrator,
22  that doesn't do anything.
23         The contract language clearly states they
24  must articulate which article is being violated,
25  or exhibit in this case.  It's easy enough to

1  write Exhibit P.  It could have been done.  It

2  wasn't; and, therefore, any argument -- any

3  argument at all that they're going to make here

4  today should be rejected out of hand; and,

5  frankly, I would argue it is inappropriate to put

6  testimony on at all as it has nothing to do with

7  this case.

8       Further, the argument that I heard being

9  made was that we were failing to fill vacancies.

10  Exhibit P requires -- according to the union, what

11  I heard, it requires us to fill vacancies -- not

12  prohibit subcontracting, but requires us to fill

13  vacancies.

14       That's not what the grievance is about.

15  There's -- and if it is, it isn't timely because

16  the grievance procedure requires within five

17  working days from the date of the occurrence that

18  the issue first be raised with a supervisor and

19  then 10 days later be put in writing.

20       We have nothing about each individual

21  vacancy that wasn't filled.  The union's counsel

22  talks about natural attrition.  I believe the

23  numbers were going down from 212 to 156; but,

24  clearly, if the union's position is we should have

25  been filling vacancies all along, there should

1  have been grievances all along there.

2       If they are, they're not here today.  I'm

3  not precluding the fact that those things might

4  exist somewhere.  I don't know, but that's not the

5  issue that's being addressed here.

6       What's being addressed here is contracting

7  out.  At least, that's what we thought because

8  what triggered this grievance was, in fact, the

9  contractor notification that was presented to the

10 union somewhere along the way in late 2015.

11      So any of these arguments -- and then I

12 will switch to the alternative; what they call the

13 alternative.  Frankly, it's what I thought we were

14 here about.  But any of the arguments about

15 Exhibit P, failing to fill vacancies, some

16 argument that we limited the rights that had been

17 fully and fleshed out by other arbitrators in

18 Article II, Section 5-D or the interpretation of

19 Article VI, 1-D, which you've heard me say before

20 in another case and Arbitrator Agis [ph] has said

21 repeatedly, that that does not require the filling

22 of any vacancy, that clause.  All that clause does

23 is inform the union.  If the company wishes to

24 fill a vacancy, we have to let the union know

25 we're going to do that; and it's been made

1　patently clear in at least two cases over the last

2　two years.

3　　　　So all of that -- all of that,

4　Mr. Arbitrator, I present to you is simply not

5　before you and should not be heard today.  If we

6　do go forward, it should be rejected on procedural

7　grounds; failing to follow the grievance procedure

8　and failing to be timely.

9　　　　With that, however, while I would ask that

10　you take my request to not proceed on those

11　arguments, I'll give you our response to the

12　alternative.

13　　　　I think it's important because I think

14　there's some fundamental misunderstandings about

15　the nature of the contracting, both before and

16　after iQor was engaged; and I will take union

17　counsel's point about the fact that the union may

18　not have all that information, but that's what

19　we're here to present to you.

20　　　　So, as I said, the case involves customer

21　care and customer contact issues, individuals who

22　handle billing, collection and service.

23　　　　First, let me say that PPL -- and there

24　was some reference to this, but not in sufficient

25　detail -- has been contracting out this type of

1   call center work for years.

2         The grievance did arise when PPL selected

3   a new contractor, iQor; but at the time that

4   happened, PPL had been using PPL Solutions, which

5   is now another company called Hanson.  But also a

6   second company called NCO was already in place at

7   that time, and iQor was simply -- maybe that's a

8   little overgeneralistic -- was replacing NCO and

9   admittedly expanding upon what NCO --

10          THE ARBITRATOR:  You're saying iQor was

11   the third?

12          MR. LEBOWICH:  IQor is the third

13   contractor, and NCO is no longer.  PPL Solutions,

14   now Hanson -- there was a corporate transaction --

15   is still there as well; but NCO did exist before

16   iQor, and iQor took over from NCO.

17          So what are we talking about?  You heard

18   some of the background; but just so we're clear,

19   PPL has two call centers in Pennsylvania.  They

20   are staffed by Local 1600 representative

21   bargaining unit employees.

22          These individuals at the call centers and

23   who are in the customer care group are in job

24   classifications -- they have job classifications

25   of Customer Care Agent I, II, III and there is a

1    higher level of Customer Service Rep and Senior

2    Customer Service Rep.  It is correct that I do

3    believe we do not have any current Customer

4    Service Agent Is.

5           Now, one point that is critical here is

6    that bargaining unit employees take the broad

7    range of calls from Monday through Friday,

8    8:00 a.m. to 5:00 p.m.  That is it.  That is all

9    there is.  There is a CSR-Shift position.

10          THE ARBITRATOR:  Meaning that's all there

11   is of their work?

12          MR. LEBOWICH:  Of their work.

13          THE ARBITRATOR:  Okay.

14          MR. LEBOWICH:  That's what they do.  There

15   is a CSR-Shift position that at one point in time

16   was in the customer care organization.  It is no

17   longer in the customer care organization.  It's

18   over in the dispatch -- I'm using the wrong term.

19          MR. NEWMAN:  Field services area.

20          MR. LEBOWICH:  -- the field services area

21   to deal with calls at night about emergencies, but

22   that's not what we're talking about here.  It's a

23   few people.  They do exist, but they're not even

24   in the customer care organization.  They're in the

25   top of the progression line.  It's possible for

1   one person who is a Customer Service Rep to move

2   into that job, but they are -- they're not even

3   part of this group.

4          THE ARBITRATOR:  They're in the bargaining

5   unit, but not part of this group?

6          MR. LEBOWICH:  Correct.

7          THE ARBITRATOR:  All right.

8          MR. LEBOWICH:  So prior to 2015, NCO and

9   PPL Solutions were engaged to provide supplemental

10  additional call service agents in that 8:00 a.m.

11  to 5:00 p.m. range, not overnight, not second

12  shift or third shift, basically doing the same --

13  pretty much the same time and work that PPL

14  employees are doing.

15         From a timeliness point of view, that's

16  been going on for a long time.  Nothing has

17  changed about that.  Okay.  Bringing iQor in has

18  not changed that at all.  PPL Solutions continues

19  to do that, and now iQor does that.

20         Now, in the spring of 2015, PPL decided,

21  in order to provide better customer service, it

22  should move to 24-hour service, 365, seven days a

23  week, as union counsel points out; and as part of

24  that process, it evaluated its current contractors

25  and decided that it needed to replace NCO.

1      PPL instead, as you heard, engaged iQor in
2  the fall of 2015 and provided -- to provide
3  eventually 24-hour coverage; and, again, that was
4  to replace what NCO was currently doing, which was
5  providing additional support from 8:00 to 5:00,
6  peaks, emergencies, things like that and -- I'll
7  talk a little bit about the peak work in a second
8  that was dismissed by union's counsel -- to
9  eventually add a second and third shift.
10      That selection of iQor was made by Chris
11  Graham, the PPL director of customer service
12  operations; and he will be testifying, presumably,
13  later today.
14      Now, as I believe you know and you've
15  heard already today, the collective bargaining
16  agreement firmly establishes the company's right
17  to subcontract work, provided it meets one of the
18  applicable criteria; and the ones that we will be
19  talking about today are that the needed skills are
20  not available from present employees, it would be
21  more economical when peaks of work -- let me get
22  it right -- when peaks of work would require a
23  temporary increase of the company's forces with
24  the subsequent layoff of such additional forces.
25          There is no limit on the amount of this

1    contracting as long as no current employee is laid

2    off or loses straight time pay.  Again, no current

3    employee is laid off or loses straight time pay.

4    We've heard no allegation, nor could there be one

5    as no employee has been laid off or lost straight

6    time pay as a result of our contracting with iQor.

7            So Chris Graham evaluated his options and

8    decided that iQor was the way to move forward.

9    Why?  Well, first, some of this was just replacing

10   the peak work, for example, that NCO had been

11   doing; and, yes, there is peak work done by

12   customer care agents.

13           There's a need for peaks, particularly in

14   the springtime in what is commonly known in the

15   industry as cut season when we start to have the

16   legal authority to cease -- to cut off people's

17   electricity.  That, as a result, increases call

18   volume.  So we staff up using contractors.

19           So one of the things that iQor is doing

20   and we put out a contractor notification for was

21   that they were going to replace NCO to provide

22   this peak work.

23           One of the other -- there was a comment

24   about emergencies.  Well, one of the reasons --

25   and you'll hear the reason why emergency work was

1  placed on the contractor notification form -- is
2  that PPL determined that it would be a good idea
3  in the case of an emergency, such as a weather
4  event that took out our two facilities in
5  Pennsylvania, that we actually have redundancy
6  somewhere else outside of the northeast weather
7  system.
8      We hope that never happens, of course; but
9  it is an important thing to have, and that is why
10 emergencies is checked off.
11     Next, contrary to the comment that was
12 suggested, PPL clearly did not have the people to
13 fill a second and third shift.  We have an 8:00 to
14 5:00 work force.  That's when people work.  It
15 happens to be the prime workforce.  If you work in
16 a call center, that is the prime shift to have, a
17 day shift; and we would be adding here -- our
18 contractor is adding to a second and third shift.
19     Absent subcontracting, I don't think there
20 would be any dispute, because I think this is the
21 union's argument, that -- their argument is that
22 we would have to hire people, is that we would
23 have to hire new employees to fill that or
24 attempt, I guess, to do it on overtime which would
25 not, by any means, be sustainable or reasonable to

1    suggest to perform this work.

2              Did we have people who are capable of

3    performing customer care work?  Yes.  Did we have

4    enough people to do that on a second and third

5    shift?  Absolutely not.

6              As you heard, we have 60, 70, 80 people

7    working on this through iQor; and, of course, as

8    it is our position and is clear in the contract,

9    there is no obligation to hire new people and

10   there is no obligation to do this on overtime.

11             The contracting language provides for just

12   this possibility because the language is when

13   present employees are not able to do the work in

14   question.

15             Finally, it was, to be blunt, a lot

16   cheaper to do this.  We have looked at this a

17   number of ways, and Mr. Graham reviewed the

18   average cost of monthly wages on a per-person

19   basis -- and let me just stop there for a second.

20   That's the correct way of looking at this, on a

21   per-person basis.  The fact -- this is not a

22   question of we had eight people who could do the

23   work and the contractors had 80.  That's not what

24   happened here.

25             Again, the Customer Shift -- the Customer

1  Service-Shift people, CSR-Shift people, aren't
2  even relevant.  That's not even the same work
3  that's being done by the contractors; but even if
4  you had a couple of people working, the analysis
5  isn't, well, I have eight people and they've been
6  doing enough, and we're comparing that to putting
7  on 80 people.
8          The reality is what would it take -- the
9  key element is what would it take for us to
10  provide the same level of service that we're using
11  the contractor for, and that's the same 80 people.
12  I'm just using that number because that's the
13  number that union counsel used.
14          So Mr. Graham reviewed an average cost per
15  job at each level at CSA-I through CSR; and no
16  matter how you look at it, when you look at the
17  average cost of monthly wages, benefits and
18  allocating unproductive time like vacations and
19  things like that, which we don't pay for with a
20  contractor, even at the lowest levels at CSA-I,
21  the total cost of contracting is estimated to be
22  far less than hiring our own employees.
23          In preparation for this case, because the
24  issue was raised by union, they asked us to say,
25  okay, what do the invoices look like?  What did we

1   actually spend money on?

2        Well, Mr. Graham analyzed that to look at

3   the total actual cost compared to if we had

4   engaged our own bargaining unit employees.  And so

5   far in just the -- I guess this was through is

6   November through July, I believe.  I may be off by

7   a month.  We've saved over -- just under $800,000,

8   about 765,000, in comparison, just in that first

9   year.

10       And as we projected going forward on that

11  $3 million per year contract, which is what it is

12  estimated to be, our conservative estimate shows

13  us saving another $2 million over the next three

14  years; and these later calculations, just so you

15  know because we like to be conservative when we do

16  this, if it's to the best that we can, these later

17  calculations done even include vacations and paid

18  time off.  They don't include cost of overheard,

19  for example, keeping the call centers open on

20  second and third shifts, the security that's

21  required, the electricity, the building

22  maintenance, et cetera, if we were to try to do

23  24-hour shifts ourselves.

24       It does include -- some of the analysis

25  that you'll see does include the increased cost of

1  supervision; but either way, we still make

2  money -- we save money by using their supervision

3  rather than our supervision.

4          All of that put together, Mr. Arbitrator,

5  we believe shows that the contracting clearly

6  falls within that which is allowed by the

7  collective bargaining agreement, and has been

8  established by many arbitrators before today's

9  hearing; and we suggest to you that the grievance

10  must be denied in its entirety on both procedural

11  and substantive grounds.  Thank you.

12          THE ARBITRATOR:  Thank you.

13          Union, are you ready to proceed?

14          MR. BLOOM:  Yeah.  I don't know -- I

15  wouldn't suggest that I provide any rebuttal to

16  the underlying merits of the case, but I didn't

17  know if you wanted me to provide a rebuttal

18  opening to the brief scope of the grievance issues

19  or to do it through a witness.

20          THE ARBITRATOR:  Why don't you do it

21  through a witness?

22          MR. BLOOM:  Okay.

23          Is it possible that the three of us could

24  caucus?  I have a question about the order.

25          (A brief recess was taken.)

1          THE ARBITRATOR:  Union's first witness?
2          MR. BLOOM:  I'm going to call Jane Biever.
3          (Discussion held off the record.)
4                        * * *
5                    JANE BEIVER,
6  having been duly sworn or affirmed, was examined
7  and testified as follows:
8          THE ARBITRATOR:  State your name and your
9  position.
10          THE WITNESS:  Jane, J-A-N-E, Biever,
11  B-I-E-V-E-R, business rep, IBEW Local 1600.
12          THE ARBITRATOR:  Thank you.
13                        * * *
14                  DIRECT EXAMINATION
15  BY MR. BLOOM:
16  Q.      By whom are you currently employed?
17  A.      IBEW Local 1600.
18  Q.      And how long have you been employed?
19  A.      Eleven years.
20  Q.      With IBEW 1600?
21  A.      With 1600, yes.
22  Q.      Okay.  And what has your title been with
23  1600?
24  A.      Business rep or business representative.
25  Q.      Okay.  Were you employed by PPL in the

1   past?

2   A.      Yes.

3   Q.      And what positions did you hold with PPL?

4   A.      I was a Cash Receipts Operator, Steno

5   Clerk General and Customer Service Representative.

6   Q.      And how long were you employed by PPL?

7   A.      I started in '91 and I'm technically still

8   employed.  I'm on a leave of absence from PPL.

9   Q.      How long did you work as a Customer

10  Service Representative?

11  A.      Approximately 10 years.

12  Q.      From when to when, do you recall?

13  A.      Maybe '95-'96 to about 2005.

14  Q.      What are your duties as business

15  representative with regard to the customer service

16  department?  Are you the main representative from

17  the union?

18  A.      I am.  It is one of my jurisdictions, yes.

19  Q.      Okay.  You recall -- I mentioned in my

20  opening statement that the company had approached

21  the union in approximately 2010 with a formal

22  offer with regard to making some changes in the

23  customer service department.  Do you recall that?

24  A.      Yes.

25  Q.      Okay.  I'm going to hand you what I would

 1    like to mark as Union Exhibit No. 1.

 2           (Union Exhibit 1, Company proposal-CSR

 3    Progression Line, was marked for identification.)

 4    BY MR. BLOOM:

 5    Q.      Take a look at this document, please.  Is

 6    this a true and accurate copy of the proposal that

 7    the company supplied the union in approximately --

 8    on August 27, 2010?

 9    A.      Yes.

10    Q.      Okay.  Now, was this proposal immediately

11    accepted by the union or did negotiations ensue in

12    response to this proposal?

13    A.      Negotiations ensued.

14    Q.      Okay.  Could you please look at where it

15    says proposal?  And I'll represent to you it says:

16    The company is proposing a change to the two CSR

17    progression lines in Lehigh and Scranton as

18    follows.

19           Then the next paragraph, could you please

20    read the first sentence?

21    A.      Sure.  You're talking about the paragraph

22    underneath the bullet points?

23    Q.      Yes.

24    A.      Okay.  Ultimately there would be more

25    bargaining unit employees, fewer contractors and

1   fewer generalists proposed (CSR-4).

2   Q.      Okay.  What was your understanding when

3   the company approached the union in 2010 of what

4   the -- in large picture, what the company was

5   looking for and what it was offering in exchange?

6   A.      The company was looking to expand the

7   progression line.  What they wanted from us were

8   some lower rated job classifications within the

9   progression line; and in exchange for that, there

10  would be more employees.  There would be a higher

11  staffing number, and there would be fewer

12  contractors in use.

13          MR. BLOOM:  Okay.  I'd like to offer

14  Union 1 into evidence.  By the way, do we need to

15  offer each document into evidence or just only if

16  there's an objection?

17          THE ARBITRATOR:  No.  Everything will be

18  admitted unless I hear an objection and sustain

19  the objection.

20          MR. LEBOWICH:  It's the company's

21  proposal.  I'll just save it for cross.

22  BY MR. BLOOM:

23  Q.      In response to this company proposal, did

24  the union negotiate with the company and did the

25  talks continue?

1  A.      Yes.

2  Q.      All right.  I'd like to hand you what I'll

3  mark as Union Exhibit 2.

4          (Union Exhibit 2, E-mail dated 3/28/12

5  with attached LOU, was marked for identification.)

6  BY MR. BLOOM:

7  Q.      What I've handed you is what is marked as

8  Union Exhibit No. 2.  I'll represent to you it

9  appears to be an e-mail sent to you from David

10  Ling.  Who was David Ling?

11          THE ARBITRATOR:  If you know his job

12  position.

13          THE WITNESS:  I think at that time, he was

14  still director of customer contact centers.

15          THE ARBITRATOR:  Okay.

16  BY MR. BLOOM:

17  Q.      He's a manager or representative of the

18  company, to your understanding?

19  A.      Yes.

20          THE ARBITRATOR:  Can we have a stipulation

21  just on the identity of this individual?

22          MR. LEBOWICH:  He is the manager rep, or

23  he was.

24          THE WITNESS:  He was the director of

25  customer operations at that time.

1          THE ARBITRATOR:  Thank you.

2    BY MR. BLOOM:

3    Q.       And if you look at the e-mail that he sent

4    you, did Mr. Ling again represent to you that it

5    would increase your membership and reduce

6    contractors?

7    A.       Yes.

8    Q.       Where is that?

9    A.       In the first full dot and the second full

10   dot.

11   Q.       Now, it also states that upon ratification

12   the company would begin the hiring process to hire

13   18 existing spec temps into the CSA-III position.

14          Did that -- did the company go through

15   with that?

16   A.       Yes.

17   Q.       Now, you realize that this e-mail does not

18   contain the final agreement?

19   A.       Right.

20   Q.       It says:  In addition, we'll hire an

21   additional 22 new employees into the new lines at

22   CSA-I within six months of ratification.

23          Did the company ultimately go ahead and

24   hire approximately 20 or 21 --

25   A.       Yes.

1  Q.      -- new employees into the CSA-I after the

2  agreement was reached?

3  A.      Yes.

4  Q.      And during the year of 2012?

5  A.      Yes.

6  Q.      Okay.  Did the company and the union

7  ultimately reach an agreement, which is called a

8  letter of understanding, regarding these issues

9  that was signed by both parties --

10 A.      Yes.

11 Q.      -- and executed?

12 A.      Yes.

13 Q.      I'm going to hand you what I'll mark as

14 Union Exhibit No. 3.

15         MR. LEBOWICH:  Can we go off the record?

16         (Discussion held off the record.)

17         (Union Exhibit 3, Agreement between IBEW

18 1600 and PPL, was marked for identification.)

19         THE ARBITRATOR:  So we're on Union 3, the

20 letter of understanding.

21 BY MR. BLOOM:

22 Q.      Is this a true and accurate copy of the

23 agreement that was reached between IBEW Local 1600

24 and PPL regarding the agreement to -- that was I

25 discussed with Union Exhibit No. 2?  Basically,

1   this is the final agreement?

2   A.      Yes.

3   Q.      In looking at this agreement -- turn to

4   page three.  Actually, the document states

5   April 30, 2012, but it was -- was it signed

6   April 12, 2012?

7   A.      Yes.

8   Q.      Okay.  And was it signed by the company?

9   Do you happen to know whose that signature was?

10  A.      I think it's Kent, Sr.'s signature, but I

11  can't confirm that.

12  Q.      Do you know who he was -- well, he still

13  is?

14  A.      I'm guessing -- is he director of human

15  resources?

16          MR. LEBOWICH:  Labor relations.

17          THE WITNESS:  Labor relations.

18          THE ARBITRATOR:  Once again, can we agree

19  that that's his signature?

20          MR. LEBOWICH:  That's Kent's signature.

21  BY MR. BLOOM:

22  Q.      Just for a point of reference, looking at

23  this document, it has the agreement on the first

24  two pages -- sorry -- the first three pages.  Then

25  there's a graph that shows the progression line on

1    four and then the job descriptions?

2    A.      Correct.

3    Q.      Were these new job description?

4    A.      Some of them, yes.

5    Q.      One of the job description -- it's on page

6    10 of 14.  Can you take a look there?

7    A.      Okay.

8    Q.      Is that the Customer Service

9    Representative-Shift?

10   A.      Yes.

11   Q.      Is that the CSR-Shift worker?

12   A.      Yes.

13   Q.      Did the union ever agree with the company

14   at any time, other than this agreement, as to

15   those duties of the Customer Service

16   Representative-Shift, or CSR-Shift, changing to

17   only becoming dispatch?

18   A.      No.

19   Q.      Did you consider these job descriptions to

20   be part and parcel to this agreement which I've

21   marked as Union Exhibit No. 3?

22   A.      Yes.

23   Q.      Okay.

24           THE ARBITRATOR:  Okay.  Some of them at

25   the end, their descriptions designate "created"

1  and on the others, it says "revised."  Can I take

2  that "created" are the newer ones?

3        THE WITNESS:  Just a minute.  Yes.  You're

4  looking at the CSA-I, II and III?

5        THE ARBITRATOR:  Yes.

6        THE WITNESS:  And then also the Senior

7  CSR?

8        THE ARBITRATOR:  Yes.  Well, it says

9  created.

10        THE WITNESS:  Yes.  That's the new job

11  description, correct.

12  BY MR. BLOOM:

13  Q.      Do you want to -- I know I referenced this

14  in my opening statement, but explain for the

15  Arbitrator what positions, if any, were eliminated

16  through this agreement.

17  A.      Collection Assistants and Customer Service

18  Clerk, contact center.

19  Q.      And what was your understanding of

20  where -- the duties that were performed by

21  employees in those positions, did they go into the

22  newly created job titles?  Is that your

23  understanding?

24  A.      Yes.

25  Q.      And was there also an agreement contained

1   in here that this would be made part of a formal
2   collective bargaining agreement --
3   A.      Yes.
4   Q.      -- if you look at the bottom on page three
5   of 14?
6           All right.  Now, before I -- if you look
7   at page three, the Customer Service-I, if you at
8   the second bullet point there, the second sentence
9   states:  The first 20 CSA-Is hired into these new
10  lines will all be new hires and hire, hire, post
11  will go into effect the following these hires.
12          Did that sentence make it into the
13  collective bargaining agreement, the actual --
14  I'll represent to you that it doesn't in Joint 1.
15  A.      I don't think so.  I think now they are
16  all new hire.
17  Q.      Because the 20 were hired?
18  A.      Yes.
19  Q.      Does that become moot?  Is that why it
20  wasn't put in there, to your understanding?
21  A.      Yes.
22  Q.      Okay.  Will you state specifically -- I'm
23  sorry, not specifically; but to your understanding
24  in general, were there -- some of the newly
25  created positions, were they much lower, the same

1   or higher pay scale than the pre-existing

2   positions, the previous positions?

3   A.       One is -- I'm sorry.  Let me look.  One I

4   believe is comparable.  The Customer Service

5   Assistant-II is comparable to a Collection

6   Assistant, which they're both a B-1 rate of pay.

7   The Customer Service Assistant-I is, for lack of a

8   better term, cheaper.  The Customer Service

9   Assistant-III is again, for lack of a better term,

10  cheaper than a CSR; but the skill level within the

11  job classification was higher than the other two

12  where they could perform maybe complex work.

13  Q.       Okay.  I'll hand you what I would like to

14  mark as Union Exhibit No. 4.

15           (Union Exhibit 4, E-mail dated 6/5/12, was

16  marked for identification.)

17  BY MR. BLOOM:

18  Q.       I've handed you some e-mail correspondence

19  between you and Shelley Ortiz.  Hopefully, I

20  pronounced that correctly.

21           Is this correspondence just confirming and

22  demonstrating that the company did hire those

23  initial positions, the initial staffing?

24           MR. LEBOWICH:  Objection.  The document

25  speaks for itself.  We're getting a little bit of

1    leading here.

2            THE ARBITRATOR:  It says what it says.

3            MR. BLOOM:  Yeah.  I'm just trying to get

4    the reference of why I'm entering it.  That's all.

5    I can just ask her what it is, or I can just enter

6    it.

7            THE ARBITRATOR:  You can just enter it if

8    you're going to make an argument that it states

9    what you want to state.

10           MR. BLOOM:  Yeah.  It's not critical or

11   crucial.  It's just background.

12           THE ARBITRATOR:  All right.  So you've got

13   it in.

14           MR. LEBOWICH:  No objection.

15   BY MR. BLOOM:

16   Q.      After the grievance was filed in this

17   case, did you make an information request to the

18   company?

19   A.      I did.

20   Q.      Okay.  And did the company offer a written

21   response?

22   A.      They did.

23   Q.      I'm going to hand you what I'll mark as

24   Union No. 5.

25           (Union Exhibit 5, Information request with

1   attachment, was marked for identification.)

2   BY MR. BLOOM:

3   Q.      Is this a true and accurate copy of your

4   information request and Timothy Newman's response,

5   except for, I believe, his response did also have

6   attachments that we may offer some or all in later

7   reference?

8   A.      Yes.

9           MR. LEBOWICH:  Now, I'm curious about the

10  relevance of this.  This is not -- it doesn't go

11  to the nature of the grievance itself.  I mean,

12  there's no -- we don't have any dispute that an

13  information request was made; but, particularly,

14  the dialogue back and forth about information we

15  provided and information we didn't provide, I

16  think is, frankly, irrelevant here.  We eventually

17  did provide information.  I don't think there's a

18  dispute here.

19          THE ARBITRATOR:  Is there any issue on

20  information provided?

21          MR. BLOOM:  There is.  First of all, we're

22  going to offer you some graphs and charts that the

23  company responded, and I think it needs -- the

24  request and the response from the company help

25  explain and give background to what those

1  documents are, that help explain that.

2         Also, the company takes the position that

3  some of the information requests are irrelevant;

4  and the union writes back, in part -- talks about

5  its claim with Exhibit P, which has been raised as

6  a grievance issue.  So that's why these documents

7  are being added.

8         THE ARBITRATOR:  Go ahead.

9  BY MR. BLOOM:

10 Q.     All right.  I'd like to hand you what I've

11 marked as Union Exhibit No. 6.

12        (Union Exhibit 6, Information request

13 dated 5/11/16 with attachment, was marked for

14 identification.)

15 BY MR. BLOOM:

16 Q.     Is this a true and accurate copy of the

17 response -- I should say the reply that the union

18 made to the company's responses to the relevance

19 issues with information requests, as I referenced

20 in Union Exhibit No. 5?

21 A.     Yes.

22        MR. LEBOWICH:  I'm going to continue to

23 object to both the hearsay nature of this, to the

24 extent that the union is using -- well, it's

25 trying to use these documents -- these are her

1  e-mails to us.  I mean, they can't be taken for

2  the truth of the matter.  That's all I'm saying.

3  If he's presenting that there was an exchange, I

4  get that; but, again, anything that -- this is an

5  e-mail explaining why they think certain documents

6  are relevant.

7          THE ARBITRATOR:  Right, which is their

8  position.

9          MR. LEBOWICH:  Right.  It's just that.

10  It's just their position.  It can't be taken for

11  fact.

12          MR. BLOOM:  I'm not offering it to say

13  it's the position offered; and therefore, if you

14  don't object, it goes in.  We win.  I'm not saying

15  that.

16          THE ARBITRATOR:  Okay.  We understand this

17  is union's position on these items.

18          MR. BLOOM:  Right.  And that was asserted

19  to the company on May 11.

20  BY MR. BLOOM:

21  Q.      Other than the information request that

22  you made, does the union keep track of the

23  membership, who is working or were working at the

24  time for PPL?

25  A.      Yes.

1  Q.      Okay.  And how does the union keep track

2  of the number of employees in each position?

3  A.      We actually receive a monthly spreadsheet

4  of union membership, their employment status,

5  other pertinent information, job description, rate

6  of pay, effective date.

7          (Union Exhibit 7, PPL membership

8  spreadsheet dated June 2012, was marked for

9  identification.)

10  BY MR. BLOOM:

11  Q.      I'm going to hand you what I've marked as

12  Union No. 7, and I will represent that there's a

13  handwritten number at the top right-hand corner

14  that says 205.  That is something that we wrote in

15  preparation but --

16          THE ARBITRATOR:  You wrote in preparation

17  for this case?

18          MR. BLOOM:  Yes.  It states the number of

19  positions.

20  BY MR. BLOOM:

21  Q.      What were the number of positions based

22  upon the union's calculation, based upon what you

23  told me how you arrived at it?

24          THE ARBITRATOR:  Let him see the document.

25          MR. LEBOWICH:  This isn't the whole thing;

1    right?  This is just customer care?

2           MR. BLOOM:  Exactly.  Correct.

3    BY MR. BLOOM:

4    Q.     Based upon the union's records, what were

5    the number of customer care employees that PPL

6    employed in June of 2012?

7    A.     205.

8    Q.     Okay.  I'll hand you what I'll mark as

9    Union Exhibit No. 8.

10          (Union Exhibit 8, Staffing spreadsheet

11   dated December 2012, was marked for

12   identification.)

13   BY MR. BLOOM:

14   Q.     This is essentially the same document

15   compiled by the union for staffing of PPL Customer

16   Service for December of 2012?

17   A.     Yes.

18   Q.     Okay.  What is the number -- I wrote only

19   on mine this time.

20   A.     212.

21          THE ARBITRATOR:  This is December?

22          MR. BLOOM:  December.

23          THE WITNESS:  Yes.

24   BY MR. BLOOM:

25   Q.     I'll hand what you I'll mark as Union

1  Exhibit No. 9.

2          (Union Exhibit 9, PPL membership

3  spreadsheet dated January 2016, was marked for

4  identification.)

5  BY MR. BLOOM:

6  Q.      How many PPL employees were employed in

7  the customer service department in January of

8  2016?

9  A.      163.

10          MR. BLOOM:  And I'll represent that the

11  handwriting on the upper right-hand side was not

12  part of the computer printout.  That's something

13  that I didn't write, but one of us wrote.

14          MR. MUFFLEY:  And this is January of 2016?

15          MR. BLOOM:  Correct.

16  BY MR. BLOOM:

17  Q.      I'll hand you what I'll mark as Union 10.

18          (Union Exhibit 10, Union promotions

19  spreadsheet dated 1/1/2012, was marked for

20  identification.)

21  BY MR. BLOOM:

22  Q.      Can you explain for the Arbitrator what

23  this document is and whom you received it from?

24  A.      This was received from the company.  It's

25  a list of all promotions made within the Lehigh

1    and/or Scranton customer contact centers from

2    January 1, 2012, and I'm going to say to the date

3    we received it, March 18, 2016.

4    Q.       Was this what the company provided in

5    response to your information request?

6    A.       Yes.

7    Q.       About the number of promotions?

8    A.       Yes.

9    Q.       Okay.  If you look in the middle there, it

10   says Customer Service Assistant-I.  Then it goes

11   down; and then there's a III, II, II, III, II.

12           Then to the right, it says "job

13   title-new."  Those positions, were those

14   bargaining unit positions, to the right?

15   A.       The Customer Service Assistant-II are

16   bargaining unit positions, and then the bottom

17   five are management positions.

18   Q.       So is it fair to say, based upon this

19   document, that the only promotions the company

20   made to customer service from 1/1/2012 to March 18

21   of 2016 was the Customer Service Assistant-Is to

22   the Customer Service Assistant-IIs?

23   A.       Yes.

24   Q.       Okay.  Okay.  And were those promotions --

25   how were those promotions to take place under the

1  letter of understanding?  Is that something that

2  was based upon performance and need or something

3  else?

4  A.      The letter states that it would be

5  automatic promotion.  Now, initially, it stated

6  after a year; but we do have a separate agreement

7  that now it's after six months.

8  Q.      There's an agreement to the effect that it

9  was six months, but it says we're not to use it

10  for any other purpose --

11          MR. LEBOWICH:  We have no problem with

12  that.

13          MR. BLOOM:  If they'll stipulate that it

14  was --

15          MR. LEBOWICH:  We know it's six months.

16  BY MR. BLOOM:

17  Q.      I'm going to hand you what we'll mark as

18  Union Exhibit No. 11.

19          (Union Exhibit 11, Total number of

20  customer service staff spreadsheet for 7/2015 to

21  3/2016, was marked for identification.)

22  BY MR. BLOOM:

23  Q.      I'll represent to you that this was a

24  document that was received by the union from the

25  company in response to the information request as

1  to the total number of customer service staff from

2  July of 2015 to March of 2016.  Am I accurate in

3  the way I represented it?

4  A.      Yes.

5  Q.      Based upon the company's information

6  response, how many employees did PPL have employed

7  in the customer service department as of October

8  of 2015?

9  A.      156.

10  Q.      Okay.  And how many as of March of 2016?

11  A.      148.

12  Q.      Okay.  Do you know when the contracting

13  out to iQor started or began with PPL?

14  A.      It was October-November of 2015.

15  Q.      Okay.  I'm going to hand you what we'll

16  mark --

17          MR. LEBOWICH:  Give me one second.

18          (Pause in proceedings.)

19  BY MR. BLOOM:

20  Q.      I'll hand you what I'll mark as Union

21  No. 12.

22          (Union Exhibit 12, Calls offered

23  spreadsheet, was marked for identification.)

24  BY MR. BLOOM:

25  Q.      Again, this is a document that the company

1    offered in response to the union's information

2    request?

3    A.        Yes.

4    Q.        Is this the manner in which the union

5    requested it?  I'll represent to you that the

6    union initially requested that it be broken down

7    by calls offered to iQor, calls offered to the

8    union or to the union bargaining unit employees;

9    and the company stated that they were unable to do

10   that.  We'll take them for their word for that.

11          Are these the total number of calls

12   offered to both iQor, bargaining unit employees

13   and/or anybody else that came in through customer

14   service?  Is that your understanding?

15   A.        That's my understanding.

16   Q.        Did you receive this document from the

17   company?

18   A.        Yes, I did.

19   Q.        I'll hand you what I'll mark as Union

20   No. 13.

21          (Union Exhibit 13, Spreadsheet of iQor

22   staff employees, was marked for identification.)

23   BY MR. BLOOM:

24   Q.        Is this also a document that the company

25   provided to you in response to your information

1  request?

2  A.      Yes.

3  Q.      And was it in response to the union's

4  request as to how many iQor staff employees were

5  performing customer service work?

6  A.      Yes.

7  Q.      If you look at the three blocks at the

8  bottom, is there any one of these blocks that

9  pertains to basically the midnight hours or the

10  early morning hours?

11  A.      Yes.

12  Q.      Okay.  Where is that located?

13          THE ARBITRATOR:  The 10:00 to 7:00?

14          THE WITNESS:  Yes.  Thank you.

15  BY MR. BLOOM:

16  Q.      What's your understanding of how many iQor

17  employees are working in the late hours taking in

18  calls?

19  A.      Five.

20  Q.      And in the past, had CSR-Shifts ever taken

21  calls late?

22  A.      Yes.

23  Q.      And when did that stop and start?

24  A.      I'm going to say the last four or five

25  years.

1    Q.      Four or five years ago?

2    A.      Yes.

3    Q.      I'm going to hand you what I'll mark as

4    Union 14.

5           (Union Exhibit 14, Professional Services

6    Agreement between First Contact, LLC and PPL

7    Electric Utilities Corporation dated 9/10/15, was

8    marked for identification.)

9    BY MR. BLOOM:

10   Q.      I've handed you a contract that's been

11   marked as Union Exhibit No. 14 that's titled

12   Professional Services Agreement between First

13   Contact, LLC and PPL Electric Utilities

14   Corporation, dated September 10, 2015.

15   A.      Yes.

16   Q.      Is it your understanding that what -- is

17   this what the company provided you in response to

18   your initial request for the subcontracting

19   contract to iQor?

20   A.      Yes.

21   Q.      Okay.  And take a look at Exhibit A on

22   this, which is approximately about 10 pages in.

23   These are double-sided.

24   A.      Okay.

25   Q.      You heard me state in my opening that the

1  iQor employees would be doing customer service

2  work 24/7, 365 days a year.  Is this document

3  where we came up with that conclusion?

4  A.      Yes.

5          THE ARBITRATOR:  Are you saying First

6  Contact, LLC is iQor?

7          MR. LEBOWICH:  It is.

8          MR. BLOOM:  Yes.

9          THE ARBITRATOR:  Okay.

10         MR. LEBOWICH:  I don't have a good

11  explanation for that.  It just is.

12         MR. BLOOM:  Sorry I didn't put more detail

13  in that.

14  BY MR. BLOOM:

15  Q.      If you go a few pages, that's where

16  Exhibit B -- it's towards the back.  There's a

17  back page with Exhibit B, and it mentions the

18  $9 million in the pay rates of the workers for

19  iQor.  There's the word iQor, by the way.

20         THE ARBITRATOR:  Thank you.

21  BY MR. BLOOM:

22  Q.      Is that where we got that information?

23  A.      Yes.

24  Q.      Okay.  And there have been invoices that

25  have been referenced, I believe, by both parties

1    at this point, which I'll hand you Union Exhibit

2    No. 15.

3              (Union Exhibit 15, iQor invoices, was

4    marked for identification.)

5    BY MR. BLOOM:

6    Q.       Is this a true and accurate copy of the

7    invoices that you received from the company?

8    A.       Yes.

9    Q.       Do you have an understanding for what time

10   period these invoices pertain to?

11   A.       Yes.

12   Q.       From what time to what time?

13   A.       October 2015 to the final invoice, which

14   is the end of July of 2016.

15   Q.       Okay.

16             MR. LEBOWICH:  Before you move on, it

17   looks like you photocopied perhaps a calculation

18   tape there on the front.  I don't think that was

19   on the original.

20             THE WITNESS:  It was not on the invoice.

21             THE ARBITRATOR:  So we should disregard

22   this tape or what?

23   BY MR. BLOOM:

24   Q.       Well, let me say:  What is that tape?  Who

25   did that tape?  I'm sorry I didn't point that out.

1   A.      I ran that tape.  It's the total -- all

2   totals of the invoices.

3           THE ARBITRATOR:  All right.  So this is

4   Jane's totaling of all invoices.  Okay.

5           MR. BLOOM:  Again, I agree that the

6   document speaks for itself.

7           MR. LEBOWICH:  I think the math is

8   accurate.

9           THE ARBITRATOR:  We can check it.

10          MR. LEBOWICH:  Yeah.

11  BY MR. BLOOM:

12  Q.      Do you recall when the company, PPL,

13  notified the union that it was going to

14  subcontract out customer service work to iQor?

15  A.      Yes.

16  Q.      I'll show you what I'll mark as Union

17  No. 16.

18          (Union Exhibit 16, Notification of

19  contractor work dated 10/21/15, was marked for

20  identification.)

21  BY MR. BLOOM:

22  Q.      Is this the company's notification?

23  A.      Yes.

24          THE ARBITRATOR:  All right.  Company, this

25  is that what you were referring to as prompting

1   the grievance?

2          MR. LEBOWICH:  It is.

3   BY MR. BLOOM:

4   Q.      If you look at the brief description of

5   the work, it states, and I quote, PPL Electric

6   Utilities has signed a contract with First

7   Contact, LLC.

8          And then it states:  IQor to handle

9   inbound and outbound customer service

10  interactions, back office work and provide 24/7

11  support.  iQor provides redundancy and disaster

12  recovery capabilities to meet customer needs if an

13  event impacts PPL facilities.

14         Looking at that first sentence, is that --

15  can you explain what portion of the bargaining

16  unit customer service work that pertains to?  Is

17  it part of it?  All of it?

18  A.      It's all of it.

19         MR. BLOOM:  I don't have anything further.

20         THE ARBITRATOR:  Okay.  Do you want to

21  caucus?

22         MR. LEBOWICH:  If you don't mind, I would

23  like to ask a few questions; and we might have to

24  take a break.

25                        *  *  *

1          CROSS-EXAMINATION

2  BY MR. LEBOWICH:

3  Q.      Okay.  With respect to -- we're going to

4  go in order here -- Union Exhibit 1 --

5  A.      Okay.

6  Q.      -- this is a document that you stated was

7  provided to you by the company?

8  A.      Yes.

9  Q.      I'm not sure you told us who.  By whom?

10  Who was it?

11  A.      It was either Dave Ling --

12          THE ARBITRATOR:  Did you say either?

13          THE WITNESS:  -- either Dave Ling or

14  Shelley Ortiz.  I do not recall specifically.

15          THE ARBITRATOR:  Okay.  Dave is

16  identified.  Was Shelley identified as to what her

17  position was?

18          MR. BLOOM:  I don't think she did.

19  BY MR. LEBOWICH:

20  Q.      What was Shelley's position at the time?

21  A.      Manager, Lehigh customer contact center.

22          THE ARBITRATOR:  She's here.

23  BY MR. LEBOWICH:

24  Q.      And I recognize that this -- well, strike

25  that.

1       This is not what -- the final version of
2    what is now Exhibit P of the collective bargaining
3    agreement; correct?
4    A.       Correct.
5    Q.       So this is not the operative document?
6    A.       Correct.
7    Q.       In the proposal that the company made, am
8    I correct that the last bullet point states that
9    management is responsible to determine the
10   staffing required at all position levels?
11   A.       Yes.  That's what it says.
12   Q.       So the first document that you were
13   provided by the company, they made clear that they
14   would set the number of bargaining unit positions
15   at each level; correct?  That was their proposal,
16   at least?
17            MR. BLOOM:  I would object to the
18   mischaracterization of what it states.
19            THE ARBITRATOR:  Management is responsible
20   to determine staffing required at all position
21   levels.  What are you disputing?
22            MR. BLOOM:  I thought he said it
23   differently.  To the extent he said it like that,
24   I have no objection.
25            THE ARBITRATOR:  Okay.

1    BY MR. LEBOWICH:

2    Q.      And on the second page of this proposal,

3    which is all it was, was a proposal -- again,

4    we're looking at the last big bullet, not the

5    little bullets.  It states as vacancies are

6    declared, employees are to be promoted; is that

7    correct?

8    A.      Are you on this line (indicating)?

9    Q.      I am.

10   A.      Not the inset ones?

11   Q.      Not the inset ones.

12   A.      Can you ask that again?

13   Q.      That bullet point states:  As vacancies

14   are declared, employees are promoted and then

15   based on demonstrated skills and time on job.

16           That was the company's proposal; correct?

17   A.      That's how that reads, correct.

18   Q.      And vacancies are declared by the company;

19   isn't that right?

20   A.      Yes.

21   Q.      Now, Union Exhibit 2 -- I'm doing my best

22   to go in order.

23   A.      That's okay.

24   Q.      This e-mail from Mr. Ling detailed very

25   specific hiring numbers that the union -- that the

1  company was offering you, is that correct, in the

2  first bullet point?

3  A.      Yes.

4  Q.      And your testimony was that the company,

5  in fact, satisfied each of those specific hiring

6  numbers; isn't that right?

7          THE ARBITRATOR:  She said they were

8  filled.

9  BY MR. LEBOWICH:

10 Q.      Okay.  The company hired 18 existing spec

11 temps into CSA-III positions; is that correct?

12 A.      I can't guarantee it was 18, but I know

13 they hired the existing specs.

14         THE ARBITRATOR:  The first time around,

15 you were asked about 18 and 22, and you said yes.

16         THE WITNESS:  That's what this says, yes.

17 BY MR. LEBOWICH:

18 Q.      The company did what they said they were

19 going to do?

20 A.      They did what they said they were going to

21 do.

22 Q.      And with respect to the CSR-Shift

23 position --

24         THE ARBITRATOR:  Are we on 3 now?

25         MR. LEBOWICH:  I don't think so, no.

1  BY MR. LEBOWICH:

2  Q.     You had mentioned the CSR-Shift position;

3  correct?

4  A.     Uh-huh.

5  Q.     And do you know right now how many

6  CSR-Shifts are working today?

7  A.     I believe there are 10.

8  Q.     Okay.  Isn't it true that there are only

9  two people on the second shift, CSR-Shifts?

10        THE ARBITRATOR:  Are you saying instead of

11  10?

12        MR. LEBOWICH:  Instead of 10 total.

13  BY MR. LEBOWICH:

14  Q.     But working second shift -- so not working

15  8:00 a.m. to 5:00 p.m.; but after hours -- isn't

16  it true that there's only actually a total of

17  three people on any given shift?

18  A.     I don't know.  They have a rotating

19  schedule.  I don't know how they staff it.

20  Q.     You don't know how they staff it?

21  A.     I know that there are 10 in the job

22  classification.

23  Q.     Okay.  So it's a total of 10 people; but

24  you don't know how they're staffed between, say,

25  5:00 p.m. and midnight?

1    A.       Correct.

2    Q.       Or between midnight and 7:00 a.m.?

3    A.       Correct.

4    Q.       Okay.  Do you know what their rate of pay

5    is?

6    A.       CS-IV is about $34 an hour.

7    Q.       So that's the highest rate of any customer

8    service position in the customer service

9    progression; correct?

10   A.       No.  I thought the senior was higher.

11   Q.       So it's the second highest rate?

12   A.       I believe so.

13   Q.       Okay.

14            THE ARBITRATOR:  And that rate was what?

15            THE WITNESS:  I think it's around $34 an

16   hour.

17            THE ARBITRATOR:  Thank you.

18            MR. LEBOWICH:  So we actually have -- if

19   we look at Union Exhibit 3, it identifies what

20   the -- where to look on the salary table.

21   BY MR. LEBOWICH:

22   Q.       Is that correct?

23            THE ARBITRATOR:  All right.  In your

24   briefs, if necessary, you'll tell me what the

25   number is.

1        MR. LEBOWICH:  I believe it's the CS-IV.

2        THE WITNESS:  I believe all the figures

3   are noted in Exhibit A of the labor agreement.

4   BY MR. LEBOWICH:

5   Q.      Now, I want to skip a couple of documents

6   and I want to look at -- well, strike that.

7        With Union Exhibits 7 through 9, it was

8   presented to show us that the bargaining unit size

9   in customer care went from 205 to 163; is that

10  correct?

11  A.      Yes.  You're referring to the

12  spreadsheets; correct?

13  Q.      Yes.

14  A.      Yes.

15  Q.      And this grievance was filed in late 2015;

16  correct?  In fact, it was filed on December 3 of

17  2015?

18  A.      I believe so, if that's what's on the

19  grievance form.

20  Q.      Not in 2013 or 2014; correct?

21  A.      Not this grievance, no.

22  Q.      And the attrition that resulted from 205

23  to 163, that is natural attrition; correct?

24  A.      Yes.

25  Q.      Okay.  Nobody was laid off?

1   A.      No.

2   Q.      Now, if you look at Union Exhibit 10,

3   which is the list of promotions -- correct?

4   A.      Yes.

5   Q.      The first promotion -- there's a column

6   that says effective date; correct?  That's one,

7   two, three, four columns in?

8   A.      Yes.

9   Q.      Am I right that the first promotion from

10  Customer Service Assistant-I to Customer Service

11  Assistant-I was on 8/5 of '13?

12  A.      Yes.

13  Q.      And when was the last one?

14  A.      12/8 of '14.

15  Q.      So that was almost a year -- just missed

16  it by five days -- almost a year before the

17  grievance was filed in this case?

18  A.      Yes.

19  Q.      I'm going to look at Union Exhibit 11.

20  This is the document where you pointed out that

21  the numbers went from 156 in 2015 to 148 on 3/23

22  of '16, about a six-month time frame?

23  A.      Correct.

24  Q.      So it went down by eight people?

25  A.      Yes.

1    Q.       Isn't it true that between 7/15 and 10/15,

2    it went down by six people before the contracting?

3    A.       Before the contracting of iQor?

4    Q.       Yes.

5    A.       Yes.

6    Q.       So from 7/15 to 10/15, there was a natural

7    attrition of six people; correct?

8    A.       Yes.  No one was laid off.

9    Q.       And then from that point on to 3/16,

10   another eight people left the bargaining unit for

11   some reason naturally?

12   A.       Yes.

13            MR. LEBOWICH:  Can we take a few minutes?

14            THE ARBITRATOR:  Yes.

15            (A brief recess was taken.)

16            MR. LEBOWICH:  We have no further

17   questions.

18            THE ARBITRATOR:  No further questions?

19            MR. BLOOM:  No follow-up.

20            (The witness was excused.)

21            MR. BLOOM:  We call Steve Knoebel.

22                          *  *  *

23                    STEVEN C. KNOEBEL,

24   having been duly sworn or affirmed, was examined

25   and testified as follows:

1                          * * *

2          THE ARBITRATOR:  State your name and your

3    position.

4          THE WITNESS:  Steven Knoebel, president of

5    IBEW Local 1600; and also in this case, I'm the

6    named grievant for the local.

7                          * * *

8                    DIRECT EXAMINATION

9    BY MR. BLOOM:

10   Q.      How long have you been the president of

11   IBEW Local 1600?

12   A.      Since December of 2014.

13   Q.      And how long have you been employed by

14   Local 1600?

15   A.      Employed by -- well, employed by them,

16   since December of 2014 and prior from November of

17   2002 through -- yeah, 2002 to 2008.

18         THE ARBITRATOR:  You left the company?

19         THE WITNESS:  I was with -- yeah.  I was

20   on a leave of absence.  I was a vice president and

21   business rep for six years and then left.

22         THE ARBITRATOR:  But, technically, you

23   were always an employee?

24         THE WITNESS:  Correct.  I've always been a

25   member.

1          THE ARBITRATOR:  No.  You were always an
2     employee?  You were an employee on leave of
3     absence?
4          THE WITNESS:  I was an employee from PPL;
5     and now, actually, I'm on the spinoff side.
6          THE ARBITRATOR:  That's confusing.
7     BY MR. BLOOM:
8     Q.     When were initially employed by PPL?
9     A.     1978.
10    Q.     And what were the different jobs you held?
11    A.     I was in the construction department, all
12    the way through.  I started in construction, and
13    then it got renamed to mobile workforce field
14    service.  I was in generation, power plants,
15    fossil and then nuclear.
16    Q.     Did you file the grievance in this case
17    that's marked as Joint Exhibit No. 2?
18    A.     Yes, I did.
19    Q.     Could you explain -- well, first of all,
20    what was the date that the grievance was reduced
21    to writing?
22    A.     It was reduced to writing on November 12,
23    2015.
24    Q.     Is that indicated up in the left-hand
25    corner?

1  A.      Yes, it is.

2  Q.      There's been reference in the company's

3  opening statement to the fact that Exhibit P is

4  not printed as Exhibit P on the face of the

5  grievance.  Can you explain why you didn't write

6  Exhibit P?  Let me ask you this:  How long have

7  you been using this form?

8  A.      This form in this format, to my knowledge,

9  probably three to four years is when it was

10  introduced.

11  Q.      Has it been used by PPL?

12  A.      Yes.

13  Q.      And how many grievances do you think have

14  been filed on this form?

15          MR. LEBOWICH:  Oh, it's a lot.

16          THE ARBITRATOR:  It's a lot?

17          MR. NEWMAN:  It's a lot.

18          THE WITNESS:  I don't think anybody is

19  going to argue that it's a lot.

20          MR. NEWMAN:  We'll stipulate to a lot.

21  BY MR. BLOOM:

22  Q.      Do you want to explain why you didn't

23  write down Exhibit P on there?

24  A.      Exhibit P is -- it was written as an

25  article/section/paragraph.  The box put in is the

1  applicable provision, which includes the exhibits.
2  It also included any active MAs.
3  Q.      You're talking about the box that --
4  A.      The box for the other provisions if it
5  does not fall under an article or a section -- or
6  not defined in an article, a section or a
7  paragraph.
8  Q.      Okay.  These other -- where it says
9  article/slot, section/slot, was there any article
10 or section of the exhibit section of the
11 collective bargaining agreement?
12 A.      No.
13 Q.      All right.  Where it says settlement
14 desired, you wrote, maintain proper staffing
15 levels.  What were you pertaining to with that
16 statement?
17 A.      With the level of staffing, as we are
18 attritioning out, being replaced by contractors,
19 in this case, to maintain where our level was with
20 our people to do the bargaining unit work.
21 Q.      Does the word "maintain" find its way into
22 Exhibit P anywhere?
23 A.      Yes, it does.
24         MR. BLOOM:  No further questions.
25         THE ARBITRATOR:  Okay.  Cross?

1          MR. LEBOWICH:  Briefly.

2                    * * *

3                CROSS-EXAMINATION

4     BY MR. LEBOWICH:

5     Q.     I want to get the date straight.

6     A.     Sure.

7     Q.     Okay.  The complaint discussion was

8     11/5/15; is that correct?

9     A.     Yes.

10    Q.     Their grievance was reduced to writing

11    11/12/15?

12    A.     Correct.

13    Q.     The company provided -- what's the

14    12/30/15 date?

15    A.     That is when I submitted it to go to, in

16    this case, directly to third step.

17    Q.     Okay.  So that was after -- okay.  So

18    there was an understanding to take it straight to

19    third step?

20    A.     Yeah.  We had the -- we had the -- once it

21    was reduced to writing, I had the written response

22    from the company.

23           Then I requested if we just send it

24    directly to third.  That's what we agreed, to send

25    it directly to third.  We bypassed step one and

1    two.

2          MR. LEBOWICH:  That was merely for

3    clarification.  No one is suggesting that --

4          THE ARBITRATOR:  Thank you.

5          MR. LEBOWICH:  -- for the contracting out

6    issue, there was a timeliness issue.

7    BY MR. LEBOWICH:

8    Q.    Mr. Knoebel, are you suggesting in your

9    testimony that you've never written that a

10   specific MA has been violated on a grievance form

11   since you've been using this form that says "any

12   other applicable provision"?

13   A.    Since we've been using it, have we written

14   that?

15   Q.    Yes.

16   A.    Myself, personally, filing a grievance, I

17   have not.  Now, I cannot answer --

18          THE ARBITRATOR:  You were asked for

19   yourself.

20          THE WITNESS:  -- for all other stewards.

21   To my knowledge, since I've come in -- I'm really

22   not sure on that, since I've come in, if I've

23   written them or not.

24          THE ARBITRATOR:  You said if it's not an

25   article, a section or a paragraph?

1        THE WITNESS:  That's where the box came

2    in.

3        THE ARBITRATOR:  That's the way you

4    understand it?

5        THE WITNESS:  Correct.

6    BY MR. LEBOWICH:

7    Q.      So you don't know, sitting here today,

8    whether or not, if we looked through the grievance

9    forms over the last three years, whether we would

10   find ones that had exhibits --

11        THE ARBITRATOR:  Signed by him?

12        MR. LEBOWICH:  No.  Now I'm asking about

13   filed by the union that have Exhibit A through O.

14        THE WITNESS:  I cannot answer if you'd

15   find them or not because, like I said, I don't --

16   We have stewards and people all over that write

17   grievances.

18   BY MR. LEBOWICH:

19   Q.      And you don't know whether or not the

20   union has -- the union or anybody has filed

21   grievances that have specifically referenced

22   specific MAs; correct?

23   A.      Correct.  I'm sure if you would go

24   through, you would find some that specifically say

25   that.

1    Q.       Okay.  And isn't it true, sir, that the

2    company has repeatedly informed you that it

3    didn't acknowledge the "any other applicable

4    provision"?

5              THE ARBITRATOR:  Of your grievance form?

6    BY MR. LEBOWICH:

7    Q.       On your grievance form?

8    A.       On this grievance?

9    Q.       At other times.

10             THE ARBITRATOR:  This is your form; right?

11             THE WITNESS:  There might have been a

12   mention, but it was never an argument that was

13   made through it.

14   BY MR. LEBOWICH:

15   Q.       You've been told by the company in the

16   grievance process that you had to actually

17   identify the specific provisions of the collective

18   bargaining agreement and that they were not

19   acknowledging just a general "any other applicable

20   provision;" isn't that correct?

21   A.       I have been told -- I have been made aware

22   of what the language says on identifying the

23   article and section as written in there; but,

24   again, it's not the article or section.

25             MR. LEBOWICH:  Okay.

1          MR. BLOOM:  I have some follow-up.

2                    * * *

3                REDIRECT EXAMINATION

4    BY MR. BLOOM:

5    Q.      Take a look at Joint Exhibit 1, the

6    grievance procedure.  It was referred to --

7    Article III, Section 3-B states it must specify

8    the article and section of the agreement?

9    A.      Correct.

10   Q.      But it doesn't say anything about exhibits

11   or appendices or anything like that?

12   A.      Correct.

13   Q.      Is that what you were referencing when you

14   were talking about arguing with the company?

15   A.      The articles and sections are identified.

16   That block was put in --

17          THE ARBITRATOR:  He said when you said

18   article or section, is that what you were

19   referring to?

20          THE WITNESS:  Correct.

21   BY MR. BLOOM:

22   Q.      Is it oftentimes in grievance procedures

23   that the company tells you that they disagree and

24   you disagree with them?  Did you ever agree with

25   them that, yeah, you're right, it doesn't matter?

1          THE ARBITRATOR:  Is this still your form?

2          THE WITNESS:  Yes, it is.

3          THE ARBITRATOR:  Does it still have that

4    block on it?

5          THE WITNESS:  Yes, it does.

6          MR. BLOOM:  No further questions.

7          MR. LEBOWICH:  Nothing further.

8          THE ARBITRATOR:  All right.  Thank you.

9          (The witness was excused.)

10         MR. BLOOM:  I may be done.  May I take a

11   very brief caucus?

12         THE ARBITRATOR:  Yes.

13         (A brief recess was taken.)

14         MR. BLOOM:  We're going to rest.

15         THE ARBITRATOR:  Okay.  That sounds like a

16   lunch break then.

17         MR. LEBOWICH:  Yes.

18         MR. BLOOM:  We can do it at this time.

19         THE ARBITRATOR:  It is 12:40.  We're going

20   to break for lunch.  I would like you all to be

21   back in an hour or less.

22         (A lunch recess was taken from 12:41 p.m.

23   until 1:54 p.m.)

24         THE ARBITRATOR:  All right.  We're going

25   to get started.

```
1                          *  *  *

2                      SHELLEY ORTIZ,

3    having been duly sworn or affirmed, was examined

4    and testified as follows:

5                          *  *  *

6            THE ARBITRATOR:  State your name and your

7    position.

8            THE WITNESS:  Shelley Ortiz, manager,

9    business process improvements for PPL Electric

10   Utilities.

11           THE ARBITRATOR:  Thank you.

12                         *  *  *

13                  DIRECT EXAMINATION

14   BY MR. LEBOWICH:

15   Q.     Good afternoon, Ms. Ortiz.

16   A.     Hi.

17   Q.     How long have you been employed by PPL?

18   A.     Almost 42 years.

19   Q.     Small timer -- short timer?

20   A.     (Witness nods head.)

21   Q.     Okay.  Your current position again is?

22   A.     Manager, business process improvements.

23   Q.     Okay.  Does that involve customer care?

24   A.     It involves business process improvements

25   for customer care.
```

1   Q.      And prior to your current position, did

2   you -- you, obviously, held another position at

3   PPL.  What was that?

4   A.      Prior to that, I was the customer contact

5   manager of the Lehigh office.

6   Q.      Okay.  And approximately what dates did

7   you hold that position?

8   A.      From 2000 until 2015.

9   Q.      Okay.  And the Lehigh offices was one of

10  the two customer call centers?

11  A.      Correct.

12  Q.      And do you know a gentleman named David

13  Ling?

14  A.      Yes, I do.

15  Q.      Who was Mr. Ling?

16  A.      He was my superior.

17  Q.      And what position did he hold?

18  A.      He was director of customer operations.

19  Q.      Now, you were here earlier today; and you

20  heard some testimony about Exhibit P in the

21  collective bargaining agreement.  Do you recall

22  that?

23  A.      Yes.

24  Q.      Are you familiar with Exhibit P?

25  A.      Yes, I am.

1  Q.      And did you have any role with respect to
2  the negotiations that led to eventually Exhibit P
3  being in the collective bargaining agreement?
4  A.      Yes, I did.  I was on the team.
5  Q.      What role did you play?
6  A.      I was on the team.
7  Q.      Did Mr. Ling play a role?
8  A.      Yes, he did.
9  Q.      Okay.  Is Mr. Ling currently employed by
10 PPL?
11 A.      No, he's not.
12 Q.      Now, I'm going to -- as part of your role
13 in those negotiations, did you have conversations
14 with Mr. Ling about the company's positions in
15 those negotiations that led to Exhibit P?
16 A.      Yes.
17 Q.      And are you familiar with the back and
18 forth generally between the union and the company
19 that eventually led to Exhibit P?
20 A.      Generally.
21 Q.      Based on your knowledge, are you aware of
22 any agreement with the union to guarantee a
23 minimum level of staffing in a customer care
24 position at PPL?
25 A.      No, sir.

1  Q.      I'm going to show you that which was

2  marked as Union Exhibit 2.  I'm giving you my

3  copy.  So, hopefully, I get this right.

4          In the middle of the document, there is

5  some reference to some positions being filled by

6  the company.  Do you see that?

7  A.      Are you referring to the third bold dot

8  under the first one, the additional 22?

9  Q.      Yes.  And I think there's an 18 also.

10  A.      Yes.

11  Q.      Tell us what the 18 and 22 were, just so

12  we're all on the same page.

13  A.      At that time, we were using what was known

14  as spec temps; and we had agreed to hire those

15  existing people into one of the -- into a CSA-III

16  position.

17  Q.      Okay.  And what was the 22?

18  A.      Hire 22 new employees that would begin as

19  a CSA-I.

20  Q.      And did the company make that agreement

21  with the union to do that?

22  A.      Yes, we did.

23  Q.      And did the company fulfill its obligation

24  with respect to the -- to start with the spec

25  temps becoming CSA-Is?  Did that happen?

1    A.      One correction, spec temps becoming

2    CSA-IIIs.

3    Q.      I apologize.

4    A.      Yes.

5    Q.      Okay.  And did that result in there being

6    more bargaining unit employees for Local 1600?

7            THE ARBITRATOR:  If you know.

8    BY MR. LEBOWICH:

9    Q.      If you know.

10   A.      I don't know.

11   Q.      That's fine.  With respect to the 22

12   people, did the company fulfill its obligation

13   with respect to hiring those 22 people?

14   A.      Yes, we did.

15   Q.      Okay.  Were there any other -- other than

16   those obligations that are set forth in that

17   letter, did the company make any other obligations

18   as part of its negotiations with Exhibit P to hire

19   any other additional staff?

20   A.      We did not.

21   Q.      Did the company, at any point in time, as

22   part of these negotiations for Exhibit P, make any

23   commitment whatsoever to assure that the

24   bargaining unit did not -- in customer care -- did

25   not get reduced by attrition?

1    A.        No.

2    Q.        And did the company make any commitment of

3    any kind to fill any future vacancies beyond what

4    might have been set forth in Union Exhibit 2 and

5    those bullets that we were just referring to?

6    A.        No, sir.

7              MR. LEBOWICH:  Nothing further.

8                         * * *

9                    CROSS-EXAMINATION

10   BY MR. BLOOM:

11   Q.        In Union Exhibit 2, the only thing for

12   hiring of 18 spec temps in the full-time position

13   of CSA-III and the 22 new employees that you

14   reference, there's more on this document than

15   that; right?

16   A.        I'm not sure I understand your question.

17   Q.        There's more on this page than you were

18   asked about?

19   A.        There's more words on here, yes.

20             MR. BLOOM:  That's it.  I don't have any

21   further questions.

22                         * * *

23                  REDIRECT EXAMINATION

24   BY MR. LEBOWICH:

25   Q.        Just so we're clear, since the question

1  was raised, did the company fulfill all of its
2  obligations -- to your knowledge, did the company
3  fulfill all of its obligations with respect to
4  Exhibit P?
5  A.      Yes.
6  Q.      Okay.  Thank you.
7          THE ARBITRATOR:  Anything further?
8          MR. BLOOM:  No.  Thank you.
9          (The witness was excused.)
10         MR. LEBOWICH:  I call Chris, but actually
11 I do want Tim to be here for that.
12         (Pause in proceedings.)
13                    * * *
14              CHRIS GRAHAM,
15 having been duly sworn or affirmed, was examined
16 and testified as follows:
17                    * * *
18         THE ARBITRATOR:  State your name and your
19 position.
20         THE WITNESS:  Chris Graham, director of
21 customer service operations with PPL EU.
22                    * * *
23              DIRECT EXAMINATION
24 BY MR. LEBOWICH:
25 Q.      Hello.

1   A.     Hello.

2   Q.     We're very close.  I'm not used to that.

3           Chris, why don't you tell us who you are

4   and what you do at PPL?

5   A.     I'm the director of customer service

6   operations for customer service.  My areas of

7   responsibility are vendor management, workforce

8   management, care budgets, reporting and analytics,

9   IT, customer service liaison.

10  Q.     Okay.  How long have you held that

11  position?

12  A.     About a year and a half.

13  Q.     Okay.  When did you start with PPL?

14  A.     March 30, 2015.

15  Q.     Okay.  Is that how long you've held the

16  position?

17  A.     That position here, yes.

18  Q.     And tell us what your department is

19  responsible for.

20  A.     Well, as I mentioned, vendor management,

21  workforce management.  So vendor management is

22  dealing with the vendors, setting up these

23  contracts, working with them.

24         Workforce management is really looking at

25  the call arrival patterns, determining the

1  staffing needed to support their customers.  The
2  care budget is --
3          THE ARBITRATOR:  The budget for all of
4  that?
5          THE WITNESS:  Within customer service.
6          THE ARBITRATOR:  Right.
7          THE WITNESS:  Reporting and analytics, I
8  have an analytics team that's trying to kind of
9  look at areas of opportunity within the company,
10  within customer service; and then financial, I
11  mentioned that.
12  BY MR. LEBOWICH:
13  Q.      As far as customer service goes, I mean,
14  it's obvious; but tell us what the customer folks
15  do.
16  A.      It's to support our customers, handle
17  those interactions, be it over the phone, through
18  e-mail, through the Web, deal with the IVR, any of
19  the different routings, being able to support our
20  customers.
21  Q.      In the call centers?
22  A.      Yes.
23  Q.      Okay.  And where are your PPL call centers
24  located?
25  A.      We have two centers; one here in

1    Allentown, a second one in Scranton.

2    Q.      Okay.  And are those staffed by bargaining

3    unit -- Local 1600 bargaining unit employees?

4    A.      Yes.

5    Q.      Generally what roles do they have?

6    A.      They're the CSA roles handling inbound

7    calls.

8    Q.      What hours do they work?

9    A.      Monday through Friday, 8:00 to 5:00.

10   Q.      And when do -- there was some reference to

11   Customer Service Rep-Shift.  Have you heard that

12   phrase before?

13   A.      Not really because it's not something that

14   I deal with.

15   Q.      Do they work at the two call centers?

16   A.      No.

17           THE ARBITRATOR:  The Shift?

18           MR. LEBOWICH:  The Shift.

19   BY MR. LEBOWICH:

20   Q.      When you arrived in March of 2015, April

21   of 2015, did PPL use contractors of any kind to

22   perform what is bargaining unit work at the two

23   call centers?

24   A.      Yes.  We had two vendors.

25   Q.      What vendors were those?

1    A.        One was PPL Solutions.  The other one was

2    NCO.

3    Q.        Okay.  If it differs between the two, let

4    me know; but what -- generally, what work did

5    those two contractors perform when you arrived?

6    A.        Pretty much credit and collections is the

7    primary call type.

8              THE ARBITRATOR:  Credit?

9              THE WITNESS:  Credit and collections.

10   Call types that account for anywhere from 30 to

11   50 percent of our volume.  We use them to support

12   seasonal highs.

13   BY MR. LEBOWICH:

14   Q.        What kind of seasonal highs?

15   A.        During April 1 through, basically, the end

16   of November, we have what we call cut season.  We

17   see seasonally high more calls.  So as we now can

18   go out and cut --

19             THE ARBITRATOR:  Cutting service?

20             THE WITNESS:  -- cutting service for

21   nonpayment, we see an increase in calls specific

22   to collections.

23             So when we look at our monthly average, we

24   have about a 30 percent swing from highs during

25   cut season to lows in the off season.

1  BY MR. LEBOWICH:

2  Q.      Does that result in you using contractors

3  more during those time periods?

4  A.      Yes.

5  Q.      And do the contractors have any role with

6  respect to providing assistance to address

7  absences in the bargaining unit?

8  A.      Yes.

9  Q.      What role do they play?

10  A.      We currently have 10 percent absenteeism

11  within our internal agents.  That's typical on a

12  monthly as well as an annual basis, and we've

13  experienced that at least for the last two years.

14  Q.      So what role would the contractors play?

15  A.      Help fill in the gaps to be able to

16  provide appropriate staffing to answer calls.

17  Q.      And is that something that happened --

18  again, that was in existence in March of '15 when

19  you arrived?

20  A.      Yes.  It's -- on a monthly basis, you can

21  pretty much count on a 10 percent absenteeism.

22  Q.      Okay.  And with respect to the -- again,

23  I'm still with the contractors that you had in

24  March of '15 and then until iQor.  What hours did

25  those contracting employees work?

1  A.      NCO supported us Monday through Friday,

2  8:00 to 5:00.  PPL Solutions during cut season was

3  8:00 to 6:00, Monday through Friday.

4  Q.      And PPL Solutions was only during cut

5  season, or is that just that you expanded?

6  A.      No.  We expanded the hours from 5:00 to

7  6:00 for collections because, again, that's our

8  highest call types; and during cut season, that's

9  when we see the increase in call volume.

10  Q.      Now, is NCO still a contractor for PPL?

11  A.      No.

12  Q.      What happened that led to NCO no longer

13  being your contractor?

14  A.      In August, the account manager came out to

15  do a site visit.

16  Q.      August of what year?

17  A.      August of '15.  Basically asking about how

18  it was going with NCO, and I told him the

19  challenges we had with Mondays; and his answer was

20  everybody experiences challenges on Mondays.

21          THE ARBITRATOR:  This was an NCO person

22  you are talking to?

23          THE WITNESS:  Yes.  So the account manager

24  for NCO came out basically --

25          THE ARBITRATOR:  He was no help?

1          THE WITNESS:  He was no help.

2          So after that, I contacted supply chain

3    and asked when can we terminate their contract and

4    look for another vendor.

5    BY MR. LEBOWICH:

6    Q.        Okay.  And did you, in fact, look for

7    another vendor?

8    A.        Yes.

9    Q.        Okay.  And tell us what you were looking

10   for in another vendor.

11   A.        At the time, we were only operating Monday

12   through Friday, 8:00 to 5:00; and we've brought in

13   a director of customer experience.  One of the

14   things that we're looking to do is increase or

15   improve the customer experience, and you can't

16   really do that if you're only operating between

17   Monday through Friday, 8:00 to 5:00.

18          My example is a grocery store.  If a

19   grocery store is only open Monday through Friday,

20   8:00 to 5:00, you're not going to take time off

21   from work to go get food.

22          So you need to be available when the

23   customers want to interact with you.  The thing

24   that we looked at was our people calling.  With

25   the analysis, 85 percent of our customers were

1   calling during core business hours, but we wanted

2   to expand that into outside of those core hours.

3   So that was what we looked for in a vendor,

4   somebody who would --

5           THE ARBITRATOR:  Core business is 8:00 to

6   5:00?

7           THE WITNESS:  8:00 to 5:00.

8           THE ARBITRATOR:  So you were looking for

9   expansion beyond that?

10          THE WITNESS:  Yes, expanded to ultimately

11  24/7 coverage.

12  BY MR. LEBOWICH:

13  Q.      You looked for somebody who could do that?

14  A.      Yes.

15  Q.      Did you find somebody?

16  A.      Yes.

17  Q.      Okay.  Who was that?

18  A.      IQor was the company that we selected.

19  Q.      And what has already been put into

20  evidence -- let me just check the number.  Union

21  put in a copy of the iQor contract, Union

22  Exhibit 14.  I'll show that to you.  Is that, in

23  fact, the iQor contract?

24  A.      Yes.

25  Q.      Okay.  And with respect to the work to be

1    performed by iQor, can you summarize for us what
2    they would be doing for you?
3    A.        IQor was going to take inbound calls
4    specific to all call types; essentially credit,
5    collections, billing, start-stop, essentially
6    everything that we needed coverage, as well as
7    outbound.  It was a new campaign that we were
8    looking to launch.
9             THE ARBITRATOR:  That's everything?
10            THE WITNESS:  Yes.
11            THE ARBITRATOR:  Inbound and outbound?
12            THE WITNESS:  Yes.
13   BY MR. LEBOWICH:
14   Q.        I'm going to show you -- again, I'm
15   looking at Union Exhibit 14.  This was shown in
16   earlier testimony, Exhibit A.
17            Does this accurately reflect, at least in
18   general terms, the work that iQor would be doing?
19   A.        Yes.
20            THE ARBITRATOR:  That's what?
21            MR. LEBOWICH:  Exhibit A of Union
22   Exhibit 14.
23   BY MR. LEBOWICH:
24   Q.        Now, are you familiar with the different
25   levels of customer service agents that are set

1    forth in the collective bargaining agreement?

2    A.      Yes.  The progression line?

3    Q.      Yes.  And let me show you what's part of

4    Joint Exhibit 1 in Exhibit P.  This is page 129 of

5    the full-size printed version.  I think it's the

6    last page, but I want to double-check.  It's the

7    last page of the whole contract, actually; but

8    it's the last page of Exhibit P.  Do you recognize

9    that?

10   A.      Yes.

11   Q.      Are you familiar with that?

12   A.      Yes.

13   Q.      Is that a description of what duties are

14   performed at different levels of the progression

15   line?

16   A.      Yes.

17           THE ARBITRATOR:  This is the table; right?

18           MR. LEBOWICH:  The table, yes.

19   BY MR. LEBOWICH:

20   Q.      Is that cumulative?

21   A.      Yes.  So everything that a CSA-I can do, a

22   II can do that, plus whatever is on the next line

23   and so on.  So a CSA-III should be able to handle

24   everything that a CSA-I, plus a II can do.

25   Q.      Okay.  The work to be performed by iQor

1   contracting employees/individuals, what level of

2   work would it fall into in this progression line?

3   A.      Probably somewhere between a CSA-III and a

4   CSR.

5   Q.      Why do you say between?

6   A.      To give us some flexibility.  What we were

7   looking for is to be able to handle all

8   interaction types.

9   Q.      So you're saying that they could do some,

10   but not all of the CSR work?  Is that -- that they

11   could definitely do all the CSA-III work?

12   A.      I think there's some things that we would

13   probably want to keep them to be able to do.

14   Q.      Okay.  Now, did you, in fact, select a

15   contractor?  We sort of skipped over that.

16   A.      Right.  I selected iQor.

17   Q.      And you informed the union of that?

18   A.      Yes.

19   Q.      Let me show you what the union marked as

20   Union Exhibit 16.  Do you recognize that document?

21   A.      Yes.

22   Q.      Whose signature is at the -- whose name

23   and signature is at the bottom?

24   A.      Chris Graham, and that's me.

25   Q.      That's your signature?

1    A.      Yes.

2    Q.      So that's a contractor notification form

3    that you provided to the union?

4    A.      Yes.

5    Q.      So let's talk about why you checked off

6    the various things that you checked off.

7    A.      Okay.

8    Q.      First, with respect to -- let's do peak

9    work first, and then we'll go back.  Why did you

10   put peak work as -- the contractor iQor doing peak

11   work?

12   A.      Because we have a seasonal influx because

13   of the cut season.  So, again, April through

14   November, we see a higher than normal call volume

15   because of that work.  Outside of that time frame,

16   we see a lower -- again, it's about a 20 percent

17   swing from highs and lows, or a 30 percent swing.

18   Q.      Okay.  And was that any different than

19   what NCO was doing?

20   A.      No.

21   Q.      IQor was simply replacing --

22   A.      Yes.

23   Q.      -- NCO with respect to that?

24   A.      Yes.

25   Q.      Let's make sure I finish the question so

1    the court reporter can get it all down.

2            Okay.  Let's go to emergency.  It says

3    time constraints, but I think you checked off:

4    Contractor required to work during emergency.

5    A.      Yes.

6    Q.      Okay.  What was the purpose of that?

7    A.      Disaster recovery and redundancy.  So one

8    of the challenges that we have is we have two

9    internal centers that sit about an hour and 15

10   minutes away that are in the same weather system.

11           So we needed to have a system or a center

12   outside of that weather system to be able to

13   handle disaster recovery and emergency work.

14   Q.      Is that something you had before you

15   contracted with iQor?

16   A.      No.

17   Q.      It was a new thing that was important to

18   the company?

19   A.      Yes.

20           THE ARBITRATOR:  You've only been here

21   since 2014?

22           THE WITNESS:  Yeah, about a year and a

23   half.

24           THE ARBITRATOR:  Do you know of this ever

25   occurring, this redundancy problem?

1          THE WITNESS:  What I would say is, I have

2     15 years of experience in contact centers.  The

3     last company I worked for was Time Warner Cable.

4     I was in charge of the commercial business piece.

5     I created redundancy across --

6          THE ARBITRATOR:  Was that the issue,

7     weather regions?

8          THE WITNESS:  We experienced -- yes.  In

9     order to be able to ensure that we continued to

10    keep the lights on, we need to be able to provide

11    staffing, regardless of what's going on.

12         THE ARBITRATOR:  You're saying because of

13    that experience, you wanted it here also?

14         THE WITNESS:  Yes.

15    BY MR. LEBOWICH:

16    Q.     Okay.  That was something that

17    specifically you brought to the table?

18    A.     Yes.

19    Q.     Now, let's talk about skills/license not

20    available within PPL.  Tell me why you checked

21    that box?

22    A.     Essentially we were going to expand the

23    hours of support beyond kind of the core business

24    hours and handle all call types or all

25    interactions.

1   Q.      At that time, when you're contracting, was

2   your current staff fully employed doing work from

3   8:00 to 5:00?

4   A.      Yes.

5   Q.      Did you have any excess people to move to

6   other shifts?

7   A.      No.

8   Q.      And if you did move the people, just

9   hypothetically, would that have been on straight

10  time or would you have had to pay overtime?

11  A.      It would have been on overtime.

12  Q.      Is that something that would have been

13  sustainable on an extended basis?

14  A.      No.

15  Q.      Now, let's go back to -- you also checked

16  off that the use of contractor will reduce the

17  cost of work?

18  A.      Yes.

19  Q.      And let's just start with Union

20  Exhibit 14.  Are you familiar with that chart

21  there that's on Exhibit B?

22  A.      Yes.

23  Q.      It says payment schedule?

24  A.      For pricing, yes, for each of the agents.

25  Q.      And can you just explain to us what the

1  cost of agents were for iQor?

2  A.      So under description, it has three

3  categories.  Essentially, it's tiered pricing.  So

4  if you use one to 45 FTEs, it's going to cost

5  22.50.  If you use 45 to 75, it reduces your price

6  by a dollar; and if you're over 75 FTEs, the price

7  comes down to $20.

8          Then we have bilingual, back office work,

9  emergency, QA analyst, AVP, which they call as

10 their supervisor and then a price for training.

11 Q.      QA analyst, is that bargaining unit work?

12 A.      No.

13 Q.      AVP, is that bargaining unit work?

14 A.      No.  That's a supervisor.

15 Q.      Are all the others union work?

16 A.      Yes.

17 Q.      Okay.  Now, prior to entering into this

18 agreement with iQor, did you analyze whether, in

19 fact, the use of a contractor would reduce the

20 cost of work?

21 A.      Yes.

22 Q.      Okay.  How did you do at that?

23 A.      I started by looking at the average price

24 for the job classifications CSR, CSA-I, II, III,

25 what the monthly cost was of those agents.  So

1    their hourly rate, plus their benefits and then

2    also the cost of supervision.

3    Q.      Why did you include the cost of

4    supervision?

5    A.      Because I can't bring on agents without

6    having them being supervised.

7    Q.      What's the typical supervisor-to-employee

8    ratio?

9    A.      I would say industry standard is probably

10   around 14 to one.

11          MR. LEBOWICH:  I'll ask this be marked.

12          (Company Exhibit 1, Cost comparison, was

13   marked for identification.)

14   BY MR. LEBOWICH:

15   Q.      Do you recognize that?

16   A.      Yes.

17   Q.      What is it?

18   A.      It's that comparison.  So, again, it's

19   looking at the monthly cost of each of these agent

20   classifications.  So CSR, CSA-I, II, III, as well

21   as a supervisor.

22          For this example, I used 30 full-time

23   employees and then used three agents -- three

24   supervisors to be able to support that and then

25   did a cost breakout of each of these groups and

1  then compared it against a vendor price of $29 an

2  hour.

3  Q.    So that's the top?

4  A.    Yes.  That's the top one.  The second one

5  is the same comparison, but using a vendor price

6  of $22 an hour.

7  Q.    So it's a little -- I know you sort of

8  multiplied it by 30.  I actually think it's a

9  little easier if we just look at the first column,

10 which has an average dollar per CSR.  There's a

11 number that's 9,000.  Is that a per person number?

12 A.    Yes.

13 Q.    On what basis?

14 A.    On a monthly basis.

15 Q.    Okay.  How many hours of work were you

16 using to make that estimate?

17 A.    On a monthly basis, I used an average of

18 173.3.  So it's 2,080 hours divided by 12.

19 Q.    And what went into the average dollar per

20 CSA?  How did you calculate that?

21 A.    This I asked from a financial analyst to

22 be able to pull the information to look at the

23 averages for these employees.  For these job

24 classifications, she used their wages, as well as

25 a benefit multiplier, which is tax and benefits,

1   as well as -- gosh, what was the other one -- oh,

2   an unproductive loader.

3   Q.      What do you mean unproductive loader?

4   A.      It's vacation, unscheduled time off, those

5   types of things.

6   Q.      Things that are paid but not worked?

7   A.      Yes, exactly.

8   Q.      And do I -- if I'm reading this

9   correctly -- well, actually, strike that.

10          This says vendor partner hourly rate?

11  A.      Yes.

12  Q.      So that was your estimate -- your check,

13  sort of, level as to what it would look?

14  A.      At the time, PPL Solutions was charging us

15  $29 an hour.

16  Q.      What was the average dollar per CSA at $29

17  an hour?

18  A.      What was the average CSA?

19  Q.      Yes, the average dollar per subcontracted

20  employee.

21  A.      We were paying $29 prior to the contract.

22  Q.      Forget that.  What did that come out to be

23  on a monthly basis?

24  A.      $5,027 a month.

25  Q.      And that's the number right below 29?

1    A.      Yes.

2    Q.      And is that number lower than all the

3    other average monthly rates?

4    A.      Yes.

5    Q.      For every piece of the bargaining unit?

6    A.      Yes.

7    Q.      I hate to ask you to do the obvious math;

8    but, also, if you compared it to $22 an hour to

9    $29 an hour, is that lower than all of the rates

10   for the bargaining units?

11   A.      Yes.

12   Q.      What is iQor's actual average rate?

13   A.      At the time, I think it was $29 an hour

14   calculated against PPL Solutions.  Twenty-two

15   dollars was what I was estimating I could probably

16   get in the negotiation as a blended rate from

17   iQor.  This gave me the range to see what is

18   acceptable.

19   Q.      And would anything between 22 and $29 an

20   hour as a blended rate have been acceptable?

21   A.      Yes.  It would have been a savings.

22   Q.      It would have been a savings?

23   A.      Yes.

24   Q.      So did you, in fact, achieve those savings

25   that you anticipated?

1    A.      Yes.

2    Q.      Earlier today, we marked -- the Union

3    marked invoices from iQor as Exhibit 15.  Those

4    are, in fact, the invoices; is that correct?

5    A.      That's correct.

6    Q.      Okay.  Who has the pleasure of receiving

7    those invoices?

8    A.      I get them.

9    Q.      You approve them to be paid?

10   A.      Yes.

11   Q.      Okay.  And are they, in fact, the invoices

12   that you received and the accurate costs?

13   A.      Yes.

14   Q.      Okay.  In preparation for the hearing

15   today, after the union requested these invoices,

16   did you do anything to confirm that the cost of

17   contracting was, in fact, more economical?

18   A.      Yes.

19   Q.      What did you do?

20   A.      I started by looking at each of the

21   invoices and built a spreadsheet looking at each

22   line item, the billable hours, as well as the rate

23   that we're paying.

24          I categorized them under the locations of

25   Bethlehem, as well as Florida, under training,

1   productivity, any of the different line items.

2          So, like, the first one on the first

3   invoice is training hours.  So this was actually

4   Bethlehem's training hours.  The second one was

5   Bethlehem agent collection's training hours; and

6   so in the spreadsheet, it goes month by month, row

7   by row, looking at what the costs are for this.

8   It's a straight line comparison.

9   Q.      Okay.  Let me show you what we'll mark as

10  Employer Exhibit 2.

11         (Company Exhibit 2, Spreadsheet of

12  invoices, was marked for identification.)

13  BY MR. LEBOWICH:

14  Q.      Do you recognize that?

15  A.      Yes.

16  Q.      What is it?

17  A.      It's all the invoices on a single

18  spreadsheet.  So, again, October, November,

19  December, every month, each of the line items.

20         So, like, on the first one, October,

21  Bethlehem training carried over to October, it

22  gives the volume of 1566 hours.  So these are the

23  billable hours for the training at a rate of $19

24  an hour to come up with a total of $29,754.  I did

25  this with each invoice.

1 Q.      Okay.  And what is this on this right-hand
2 side that says circuit hardware?
3 A.      On the far end, the circuit hardware is to
4 move these agents onto our switch.  So it was one
5 of the problems that we had with NCO.
6           THE ARBITRATOR:  Onto your switch?
7           THE WITNESS:  Onto our switch, our ACDs,
8 onto our phone switch.
9           So it gives us control over the reporting,
10 the visibility, the ability to skill and see
11 things realtime.
12           So this is a one-time cost to move people
13 onto our switch.  So there's a circuit hardware
14 cost, and then there's two circuits at each of the
15 sites for redundancy.
16 BY MR. LEBOWICH:
17 Q.      Did you allocate that cost?
18 A.      Yes.
19 Q.      How did you do that?
20 A.      Well, the total of the hardware, plus the
21 circuits at each of the locations, added up to
22 $88,450.  The contract is over a three-year
23 period.
24           So if I look at that over a three-year
25 period, it works out to about $13 an hour.  The

1    average number of agents that we anticipate with

2    this contract should put us up around like 75

3    agents.  So that adds an additional 18 cents per

4    hour to those agents.  So I applied that cost over

5    the --

6    Q.      You spread the fixed cost?

7    A.      Spread the fixed cost over that three-year

8    life of the contract.

9    Q.      And did you then compare that to what it

10   would cost for the bargaining unit?

11   A.      Yes.

12   Q.      The bargaining unit directly and their

13   supervision?

14   A.      Yes.

15   Q.      Where is that?

16   A.      The next row down.  So we have --

17           THE ARBITRATOR:  The next row?

18           THE WITNESS:  Below the second --

19           THE ARBITRATOR:  Where are you pointing

20   to?

21           THE WITNESS:  It's down here (indicating).

22   BY MR. LEBOWICH:

23   Q.      Between the two lines?

24   A.      Yes.  So I took the exact billable hours

25   that iQor charged us, applied it against CSA-IIIs,

1   the rate that we were charged in '15, as well as

2   what we were charged in '16 when that changed as

3   of May this year.

4          I then applied the benefit multiplier.

5   Then looked at the billable productive hours and

6   applied the shift differential to that because

7   these agents are working outside of core business

8   hours and would be eligible for a shift

9   differential.

10         Then I looked at the number of billable

11  hours that iQor charged us for overtime and then

12  applied a 1.5 multiplier against the hourly rate

13  to come up with a total of how much it would cost

14  for the agents in-house if we were to do that.

15         THE ARBITRATOR:  And the 1.5 multiple is?

16         THE WITNESS:  Is for overtime.

17         THE ARBITRATOR:  I understand.  So on one,

18  you had a difference of 729,000?

19         THE WITNESS:  Yes, from October to July,

20  $729,590.

21         THE ARBITRATOR:  Then the bottom is the

22  supervisors?

23         THE WITNESS:  Yes.  So this -- what I

24  wanted to do is add in the cost of supervision

25  because I can't bring on the agents without any

1    supervision.

2           So I compared the hourly rate that the

3    vendor is charging us against all our in-house

4    kind of hourly rate for a supervisor and then

5    applied that against the number of hours.  So that

6    works out to another $454,923.  So combined it's

7    well over a million dollar savings.

8           MR. LEBOWICH:  Can we have a couple of

9    minutes?

10          THE ARBITRATOR:  So you're saying on a

11   $3 million contract, you believed you saved a

12   million dollars?

13          THE WITNESS:  Yes.

14          THE ARBITRATOR:  That would have been four

15   million?

16          THE WITNESS:  It would have been four --

17          THE ARBITRATOR:  Three million with iQor?

18   You're saying if you did it with your own people,

19   it would have been four million?

20          THE WITNESS:  Yes.

21          (A brief recess was taken.)

22          THE ARBITRATOR:  Okay.  We're going to

23   begin again.  Do you still have some more

24   questions?

25          MR. LEBOWICH:  Yes.

1    BY MR. LEBOWICH:

2    Q.      Mr. Graham, just before we leave, I just

3    want to make sure we're all clear about a couple

4    of things.

5            Union Exhibit 15 has totals for each

6    invoice; correct?

7    A.      Yes.

8    Q.      Does that include just for the bargaining

9    unit work or is there more to it than that?

10   A.      There's probably more included in this.  I

11   didn't calculate the total amounts.  If I look at

12   the calculations -- so, like, the first month is

13   probably not a good example because it only shows

14   training hours; but if I look at the following

15   invoice, it shows $99,404, which is the same

16   number that they use on the second line item.

17   However, this one includes supervision.  So, like,

18   Beth AVP, that's a supervisor.

19           THE ARBITRATOR:  You're looking at a

20   document that iQor created; correct?

21           THE WITNESS:  Yes.  These are their

22   invoices.

23           So the last two line items, Bethlehem AVP,

24   that's their supervisor.  Florida AVP, that's

25   their supervisor.  Bethlehem QA, that's our

1   quality assessment program.  That's not work

2   that's handled by the bargaining unit.  So if I go

3   off of just that one, I would say your numbers are

4   wrong.

5   BY MR. LEBOWICH:

6   Q.      For the bargaining unit?

7   A.      For the bargaining unit.

8   Q.      That's the total invoice that you were

9   charged?

10  A.      That's correct.

11  Q.      And assuming that the math is added

12  correctly of 2.8 million and your total of

13  2.2 million, that was only for the bargaining

14  unit; correct?

15  A.      Bargaining unit work.

16  Q.      Okay.

17          THE ARBITRATOR:  Okay.  So you would

18  explain the difference that way?

19          THE WITNESS:  Yes.

20  BY MR. LEBOWICH:

21  Q.      And the supervision costs are down below?

22  A.      Yes.

23  Q.      That is included in the invoice as well?

24  A.      Correct.

25  Q.      With respect to what has been marked as

1    Company Exhibit 2, does that -- the costing of the

2    bargaining unit, right, tell me again how you did

3    that.

4    A.       So you start with the CSA-III because I

5    believe that's the work that I initially needed

6    them to do to be able to support all interaction

7    call types.

8            So I used the CSA-III as the starting

9    point.  I used the hourly rate to start with,

10   which was the 20.59.  Then I carried that through

11   April, and then in May switched it to when it

12   would increase to 21.15.

13           Then I applied the benefit multiplier and

14   then, again, followed the same pattern with the

15   shift differential because these shifts are

16   outside of core business hours.  They would

17   require shift differential.  Then overtime, I

18   applied, again, the overtime to the billable

19   hours, specific overtime.

20   Q.       With respect to the shift differential,

21   you just used a contractual shift differential; is

22   that correct?

23   A.       Yes.

24   Q.       You didn't use overtime for all of those

25   hours?

1  A.      No.  Within the contract, we have overtime

2  where we can pay at, like, two times for, like,

3  Sundays and so forth.  I didn't include that at

4  all.

5  Q.      And with respect -- now, when you did your

6  original analysis, you had mentioned the wages,

7  the benefit loader and also nonproductive time.

8         Did you use nonproductive time in this

9  analysis?

10 A.      No.

11 Q.      So that would be in addition -- that would

12 be an additional savings?

13 A.      Yes.

14 Q.      Okay.  Other than nonproductive time that

15 you did not count for, is there anything else --

16 any other additional costs that you would have had

17 to expend if you did this work yourself?

18 A.      We'd have to keep the buildings open.

19 Q.      Okay.  And you accounted for the

20 supervision?

21 A.      Yes.

22 Q.      Okay.  And at any point in the time that

23 you began with PPL in the current position, have

24 any customer care agents or customer service

25 representatives been laid off by the company?

1  A.      No.

2          MR. LEBOWICH:  Nothing further.

3                        * * *

4                  CROSS-EXAMINATION

5  BY MR. BLOOM:

6  Q.      Looking at Exhibit No. 15, the invoices,

7  it says in October of 2015, there was $29,754

8  charged for training, 1,566 hours; is that right?

9  A.      Yes.

10  Q.     That's what it was?

11  A.     Yes.

12  Q.     Did PPL have to spend 1,566 hours training

13  the bargaining unit employees to do customer

14  service work?

15  A.     This would represent the total billable

16  hours for the agents.  All we do is train -- have

17  one trainer provide that training.  So it's only

18  one trainer.

19  Q.     What I'm talking about --

20         THE ARBITRATOR:  He's saying in the

21  bargaining unit, you wouldn't have to train the

22  ones that were already working; but you'd have to

23  train the new ones, I guess; right?

24         THE WITNESS:  Yes.  Any new employee we

25  would have to train.

1   BY MR. BLOOM:

2   Q.      All right.  But did you do that training?

3   Because you're using current employees in this?

4   A.      Yes.  You would have to do -- to launch a

5   program, you have to use your own trainers.

6   Q.      What I'm asking you is:  Did you have to

7   do 1,566 hours of training to the current

8   bargaining unit employees who were employed in

9   Scranton and Lehigh?  Just that question.  That's

10  the only question.

11  A.      No.

12  Q.      Okay.

13          THE ARBITRATOR:  They were already

14  working; correct?

15          MR. BLOOM:  Yes.

16  BY MR. BLOOM:

17  Q.      There were numerous of these other

18  invoices.  I'll ask you about training.  That was

19  a large part of -- it speaks for itself.

20          That was a large part of what you paid

21  over this first nine months that are in these

22  invoices; is that correct?

23  A.      Yes.

24  Q.      All right.  Supervisor costs were still

25  paid by PPL regardless of whether they're

1    bargaining unit; right?

2            THE ARBITRATOR:  Regardless of what?

3    BY MR. BLOOM:

4    Q.      Whether it was bargaining unit people

5    doing it, PP&L still had to pay for the

6    supervisors; right?

7    A.      Pay for our own supervisors?

8    Q.      Yes.

9    A.      We paid for our own supervisors.

10   Q.      No, no.  You still had to pay the costs

11   for these supervisors that iQor billed you for?

12   There still was a cost to PPL?

13   A.      Yes.

14           THE ARBITRATOR:  Were these supervisors

15   iQor or were they --

16           THE WITNESS:  Yes.

17           THE ARBITRATOR:  IQor individuals?

18           THE WITNESS:  Yes.

19           THE ARBITRATOR:  They were employed by

20   iQor?

21           THE WITNESS:  IQor.

22           THE ARBITRATOR:  So iQor is simply

23   transferring their cost to you?

24           THE WITNESS:  Yes.

25           THE ARBITRATOR:  Since you were using

1   them?

2           THE WITNESS:  Yes.

3           THE ARBITRATOR:  Fine.

4   BY MR. BLOOM:

5   Q.      Now, you had testified you had years of

6   experience in training and management, managing

7   large numbers of employees; right?

8   A.      Yes.

9   Q.      And it's not quite so simple as an

10  employee that gets paid a wage and benefit

11  package, let's say, for example, that $35 an hour

12  is more expensive than an employee who gets paid

13  $25 an hour.  It's not that simple.

14          There are other things you have to take

15  into consideration in determining whether the work

16  is a better value overall.  Would you agree with

17  that?

18  A.      It's a better value?

19  Q.      Yes.

20          THE ARBITRATOR:  He's saying the quality

21  of work that you're getting out of the in-house

22  employee versus the contractor employee.

23          THE WITNESS:  I would say based on my

24  experience, that's not always a true statement.

25  Is quality considered?

1    BY MR. BLOOM:

2    Q.       That's something that you have to consider

3    in the value of whether you're getting the most

4    value for your --

5           MR. LEBOWICH:  I'm going to object to the

6    ambiguous and vague view of value.  The question

7    isn't about whether the company values -- the

8    question is whether it's cheaper.

9           THE ARBITRATOR:  We know that this witness

10   made a value judgment on the two contractors and

11   got rid of one and then got another one.  So we

12   know that he was doing that.  Are you asking him

13   did he see value differences?

14          MR. BLOOM:  No.

15          THE ARBITRATOR:  You're not asking him

16   that?

17          MR. BLOOM:  No.

18          THE ARBITRATOR:  You're asking him if

19   he'll agree generally that --

20          MR. BLOOM:  What I'm asking him is --

21   BY MR. BLOOM:

22   Q.       You would disagree with me that to

23   determine whether something is more economical

24   overall, just the wage and benefit versus wage and

25   benefit package is not the only consideration?

1    A.        I would agree with that.

2    Q.        Okay.  And where in Company Exhibit 2 do

3    you take into account the many, many more years

4    experience of the current employees working at

5    Scranton and Lehigh versus the new employees

6    working for iQor down in Florida?

7              MR. LEBOWICH:  Objection.  Assumes that's

8    one of the elements that should be taken into

9    consideration.

10             MR. BLOOM:  He can answer the question.

11             THE COURT:  If you can answer the

12   question, you can answer it.  If he has an answer,

13   he can give it to me.  If he doesn't, he can say

14   that.  Restate your question.

15   BY MR. BLOOM:

16   Q.        In Company Exhibit 2, did you take

17   productivity anywhere into account in this, in

18   Company Exhibit 2, in your calculations?

19   A.        Productivity?  Yes.

20   Q.        You took it into account where in the

21   document?

22   A.        That's what determines the number of

23   staff that I would need.  Productivity is a

24   function of how many head count I need.  That's

25   productivity.

1             THE ARBITRATOR:  Based on your work level?
2             THE WITNESS:  Yes.
3    BY MR. BLOOM:
4    Q.        Would you agree with me that an
5    employee -- generally speaking, an employee that's
6    done a job for, let's say, 10 to 20 years is able
7    to do more work in less time than an employee
8    that's done the work for four months, generally?
9    I know there's exceptions, but generally?
10   A.        I would say in my experience, no.
11   Q.        In your experience, brand-new employees
12   are more productive than --
13   A.        Not brand-new employees.
14   Q.        Employees of four months are more
15   productive and get more actual work done for the
16   company than an employees who are there for 10 to
17   20 years?
18   A.        In my experience, I've seen the opposite.
19   Q.        That's a general rule for you?
20            THE ARBITRATOR:  In your experience,
21   you've seen the opposite?
22            THE WITNESS:  Typically, what I've seen is
23   a three-year threshold.  Three years, you're at
24   your most productive state.  After that, you tend
25   to be less productive within the context and based

1  on my years of experience.

2          THE ARBITRATOR:  And your years of

3  experience have been at Time Warner, which was

4  cable?

5          THE WITNESS:  Cable, as well as Comcast.

6          THE ARBITRATOR:  Which requires monthly

7  payments and you need credit people calling?

8          THE WITNESS:  They handle billing calls.

9  They handle repair calls, yeah.

10 BY MR. BLOOM:

11 Q.      I asked you about four months, not three

12 years.  The contract is over in three years;

13 right?  Maybe you might -- you might have a new

14 contract?  You might not?

15 A.      Right.

16 Q.      So I'm asking you about an employee that's

17 been there for four months that's hired at this

18 much lower pay scale in Florida.

19 A.      I can't answer that as to say yes or no.

20 Q.      All right.  But you would agree with me

21 that you didn't take any -- you compared employee

22 versus employee or contractor versus bargaining

23 unit employee on this, one person for one person?

24          THE ARBITRATOR:  You seem to be asking in

25 an area that may be somewhat intangible.  I think

1    I understand what you're saying.  You're saying

2    here we have a company where people work 40 years.

3             MR. BLOOM:  Right.

4             THE ARBITRATOR:  And he may have been

5    working at a company that may have had no unions

6    and may have had people working four or five

7    years, and then they move on.  So, yes, I

8    understand you're saying there are cultural

9    differences that you might expect more loyalty

10   from a 40-year company than a five-year

11   transitional company.  I understand that.

12            MR. BLOOM:  Right.

13            THE ARBITRATOR:  But it's kind of hard to

14   prove.

15            MR. BLOOM:  Well, I'm trying to prove the

16   negative, that he didn't take it into

17   consideration in his calculation.  That's all I'm

18   trying to prove.

19            MR. LEBOWICH:  The math is the math.

20            MR. BLOOM:  I'm trying to get him to admit

21   that he did not take that into account one way or

22   the other, and he won't answer the question.

23            THE ARBITRATOR:  He's saying that he's

24   basing it on the numbers that he knew in dealing

25   with people that do this type of work and that in

1   his experience, he's found that he can get

2   productive contractors.  Is that essentially

3   what --

4           THE WITNESS:  Yeah.  This comparison is if

5   I were to bring people in-house versus that of

6   doing a contractor.  I'm still going to have to do

7   all the same training.

8           THE ARBITRATOR:  Because they would be

9   new --

10          THE WITNESS:  They're all new employees.

11          THE ARBITRATOR:  Understood.

12          THE WITNESS:  So you're --

13          THE ARBITRATOR:  You didn't have enough --

14  you didn't have enough human bodies to do what you

15  did with the contractor at that moment?

16          THE WITNESS:  Yes.

17  BY MR. BLOOM:

18  Q.      Would you agree with me that it is harder

19  to retain employees that are paid significantly

20  less and have lesser benefits?

21          MR. LEBOWICH:  Objection to relevance.

22          MR. BLOOM:  Do you want me to explain the

23  relevance?

24          THE ARBITRATOR:  You can make the argument

25  in your brief.  I mean, someone making less money

1    is going to want to go to a job making more.

2          MR. BLOOM:  When they get good enough,

3    they move on.  Then they have to train new people.

4    The turnover is more.  So the productivity isn't

5    as much.

6          THE ARBITRATOR:  Understood.

7    BY MR. BLOOM:

8    Q.     I believe you said if you did it with your

9    own people, you estimate it would cost four

10   million.  Did you say that?

11         THE ARBITRATOR:  I asked him if the

12   difference was a million, and he said yes.  I said

13   looking at where the union calculated around three

14   million and looking at your numbers, it looks like

15   you believe you saved a million --

16         THE WITNESS:  Yes.

17         THE ARBITRATOR:  -- by going your route

18   and he said yes.

19         MR. BLOOM:  Where does it say a million?

20   I'm sorry.  I don't see it.

21         THE ARBITRATOR:  I took the two numbers,

22   the one where he had the supervisors on the

23   legal-sized sheet.

24         MR. BLOOM:  I see.

25         THE ARBITRATOR:  You take the 729,000 and

1    the 454,000 and you're up over a million.

2              MR. BLOOM:  Okay.

3    BY MR. BLOOM:

4    Q.        Now, you were not here when Exhibit P was

5    agreed to and negotiated?

6    A.        Correct.

7    Q.        So would you agree that in October of

8    2015, or leading up to October of 2015, you had

9    analyzed the call arrival patterns and you

10   determined that there were more staffing needs to

11   handle the customer service work for PPL.

12             Without regard to whether it was contract

13   or bargaining unit employees, you needed more

14   staffing?

15   A.        Based on future plans, yes.

16             MR. MUFFLEY:  Are you saying the level of

17   work?  What he testified to was that he believed

18   they were covering 85 percent; and the company

19   wanted to cover, basically, 100 percent.

20             MR. BLOOM:  I was asking him whether he

21   agreed -- that he came to the conclusion either

22   immediately before or around October of 2015 that

23   he needed to increase staffing needs, without

24   regard to whether it was going to be a contractor

25   or a bargaining unit, just that he needed more

1    staffing needs.

2            THE WITNESS:  Yes.

3    BY MR. BLOOM:

4    Q.        Okay.  You said that the peak work started

5    in April; correct?

6    A.        Yes.

7    Q.        But you entered into -- the agreement with

8    iQor started in -- during October?

9    A.        Yes.

10   Q.        And the peak work was, did you say,

11   20 percent more?  You said 20 and then 30.

12   A.        The 30-percent swing -- if you look at the

13   monthly average, there's a 30 percent swing from

14   highs and lows.  So when you get to the month of

15   April, we're about 150 percent of our monthly

16   average, where like at December, we're about

17   75 percent.

18   Q.        And the contract that you agreed to with

19   iQor was to go year-round with the staffing;

20   correct?

21   A.        Yes.

22   Q.        365 days a year?

23   A.        To provide 24/7, 365, yes.

24   Q.        It wasn't just for April through November?

25   A.        Correct.

1    Q.       And how many times since you've worked for

2    the company has it been that both Lehigh and

3    Scranton customer call centers were unable to

4    accept phone calls because of any kind of natural

5    disaster, losing power or any other reason?

6            THE ARBITRATOR:  In his two years?

7    BY MR. BLOOM:

8    Q.       In your two years of working there.

9    A.       Repeat the question one more time.

10   Q.       Were the Lehigh or Scranton customer call

11   centers ever shut down that you needed to have

12   them duplicated somewhere else because both of

13   them were shut down, or either of them?

14   A.       We've had storm events where we've used

15   the contractors during their normal scheduled

16   shifts to be able to provide support.

17   Q.       That wasn't the question.

18           THE ARBITRATOR:  He's saying where both

19   Scranton and Allen were down.

20           THE WITNESS:  No.

21   BY MR. BLOOM:

22   Q.       Has it happened that either of them have

23   been down?

24   A.       Not yet.

25   Q.       Are you aware of any time in PPL's history

1   that both Scranton and Lehigh customer call

2   centers were down together simultaneously?

3   A.      Yes.

4   Q.      When was that?

5   A.      I can't remember the time, but the whole

6   phone was crippled for several hours.

7   Q.      Was it before your time?

8   A.      No.

9   Q.      It was during your time?

10  A.      It's been since I've been here.

11  Q.      So the phone system went down for a few

12  hours?

13  A.      Yes.

14  Q.      That happened once?

15  A.      Probably more than once.  I can think of

16  at least two times.

17  Q.      Okay.

18          MR. LEBOWICH:  That is a different

19  question.

20  BY MR. BLOOM:

21  Q.      Has it ever been down -- have the

22  contractors ever had their phone system go down?

23  A.      Yes, because we're on the same switch.

24  Q.      So they went out as well?

25  A.      Yes.

1  Q.      Do you happen to know what the employees

2  are paid at iQor?

3  A.      Yes.

4  Q.      Can you tell me what the range is, the

5  hourly rate?

6  A.      Eleven dollars.  Then they get

7  stair-stepped up when they learn more skill sets.

8  Q.      Do you know what they step up to?

9  A.      I think it's a quarter for each level.

10  Q.      So they get up to maybe 11.75 an hour?

11  A.      I know we have six levels.  They have the

12  opportunity to advance into QA programs, as well

13  as supervisor and other performance opportunities.

14  Q.      But doing the customer call work, the same

15  work the bargaining unit does, the most they can

16  get for an hourly rage is 12.50 an hour?

17          THE ARBITRATOR:  That would be 25 cents

18  six times.

19          THE WITNESS:  I don't determine what they

20  pay their agents.  I know what they start at, and

21  I know what they progress at when we add layers,

22  but I don't remember what their max is.

23  BY MR. BLOOM:

24  Q.      Do you know if they get healthcare

25  benefits?

1  A.      I believe so.

2          MR. LEBOWICH:  Relevance?  They get paid

3  less.  We can stipulate to that.

4          THE ARBITRATOR:  Do you know whether they

5  get healthcare benefits?

6          THE WITNESS:  I don't know with a hundred

7  percent certainty.

8  BY MR. BLOOM:

9  Q.      Between $11 and $12.50 an hour, do you

10  believe that the attrition rate for doing customer

11  service call work is lower than what the

12  bargaining unit employees get paid at PPL?

13          THE ARBITRATOR:  Well --

14          MR. BLOOM:  I mean, I think it's obvious.

15          THE ARBITRATOR:  You can certainly make an

16  argument and I can take certain arbitrable notice

17  that somebody making twice or three times that

18  amount is going to stay where someone who is not

19  is not.  That's fine.

20          MR. LEBOWICH:  We wouldn't dispute that.

21  BY MR. BLOOM:

22  Q.      You would agree with me that the skills

23  that are used by the iQor staff members are not

24  superior to the skills that are held by the PPL

25  bargaining unit employees?  In other words, they

1  don't have higher skills?  That's all I'm asking.

2  A.      They don't have higher skills.

3          MR. BLOOM:  Okay.  Do you mind if we take

4  a quick caucus?

5          THE ARBITRATOR:  Sure.

6          (A brief recess was taken.)

7          THE ARBITRATOR:  Okay.

8          MR. BLOOM:  I have a few more questions.

9  BY MR. BLOOM:

10  Q.      As long as you've been working for PPL,

11  how many CSA-IIs have been promoted to become

12  CSA-IIIs?

13  A.      None.

14  Q.      Do you have some of those CSA-IIs that are

15  performing at a satisfactory level?

16  A.      To be honest, I don't know.  I don't deal

17  with the internal agents.

18  Q.      And so if you were going to bring in new

19  employees, just like iQor brought in new people,

20  to be trained, they would start out as CSA-I?

21          THE ARBITRATOR:  Isn't that correct?

22  BY MR. BLOOM:

23  Q.      Is that right?

24  A.      Would they start out at CSA-I?

25  Q.      With the training at PPL?

1  A.      They would put them in as a CSA-I.

2  Q.      And they would be hired as a CSA-I?

3  A.      Yes.

4  Q.      They would be paid as a CSA-I?

5  A.      Yes.

6  Q.      And then after six months, they would be a

7  CSA-II?

8  A.      Yes.

9  Q.      But you assumed, looking at person to

10  person, that they would be CSA-III in Company

11  Exhibit 2, didn't you?

12  A.      I compared it to the work that I needed

13  them to do.

14  Q.      All right.  So you're saying that iQor are

15  doing CSA-III -- the iQor staff are doing CSA-III?

16  Is that what you're testifying to?

17  A.      That's what we trained them for in the

18  first three classes.

19  Q.      Do you know what the turnover has been

20  there, one way or the other?

21  A.      It's been high.

22  Q.      At iQor?

23  A.      Yes.

24  Q.      You would agree with me that these

25  positions, both whether you're doing it at iQor or

1   PPL, are quite stressful, dealing with customers
2   calling in constantly all day?
3   A.       Any contact center, I would agree with
4   that.
5            MR. BLOOM:  No further questions.
6            MR. LEBOWICH:  Just give us a second.
7            (Pause in proceedings.)
8                        * * *
9                REDIRECT EXAMINATION
10  BY MR. LEBOWICH:
11  Q.       Mr. Graham, just to pick up on a point
12  that you were just asked, you compared to the
13  CSA-III; correct?
14  A.       Yes.
15  Q.       And that's because that was the work that
16  all customer service agents engaged by iQor you
17  needed them to be able to do?
18  A.       Yes.
19  Q.       Despite that, in anticipation of this
20  case, did you have an opportunity to evaluate the
21  economics if people were valued as CSA-Is, IIs and
22  IIIs?
23  A.       Yes.
24           (Company Exhibit 3, Three-year staffing
25  plan, was marked for identification.)

1           (Discussion held off the record.)

2     BY MR. LEBOWICH:

3     Q.      I'll show you what's been marked as

4     Company Exhibit 3.  Tell us what this is.

5     A.      This is a three-year staffing plan,

6     looking at bringing people in as a CSA-I, moving

7     them to -- covering them in training, moving them

8     to productive, followed by moving them to a

9     CSA-II, training and then moving them to

10    productive, and then ultimately moving them to a

11    CSA-III, training and then productive.

12          So the first part, I used an attrition

13    rate of five percent per month for a CSA-I.  The

14    second for CSA-II, I used a three percent

15    attrition a month.  CSA-III, I used a two percent

16    attrition a month.

17          Again, the number of training classes I

18    would need, move them into production after they

19    completed the training; and this is over a

20    three-year period.

21          So where it says one, two, three, four,

22    five, six, seven, eight, nine, ten, eleven,

23    twelve, that's year one.  Thirteen through 24 is

24    year two, and so forth.

25          So then I applied the hourly rates of a

1  CSA-I, CSA-II, CSA-II against either the training
2  or productive hours for each of them, applied the
3  benefit multiplier, added in the shift
4  differential, came up with a fully loaded price
5  and then compared that against the prices that we
6  were paying at iQor.
7       So they charged us $19 an hour for
8  training.  They charged us -- I raised it to the
9  highest of $25 for productive.  Over the course of
10 the first three years -- over the three-year
11 period in-house, it would cost us $15 million.
12 In-house, it would cost us 12.4 million.
13 Q.       In-house or outside?
14 A.       With the vendor.  So in-house cost us
15 $15 million to do this, following the same exact
16 staffing plan.  With the vendor, it would cost us
17 12.4 million.  So the variance is, essentially, a
18 $2.7 million savings.
19       I said, all right, let's assume that we
20 have a higher attrition rate with the vendor.  So
21 the next tier down is being more aggressive with
22 our attrition.
23       So CSA-Is, I assumed a 10 percent
24 attrition every month.  CSA-IIs, I assumed
25 five percent attrition a month; and CSA-IIIs, I

1    assumed a two percent attrition a month.  I

2    followed this out again --

3            THE ARBITRATOR:  You're actually saying

4    attrition.  You have some real numbers on

5    attrition; right?

6            THE WITNESS:  Yes.

7            THE ARBITRATOR:  And what are they?

8            THE WITNESS:  We're averaging about

9    15 percent.

10           THE ARBITRATOR:  A month?

11           THE WITNESS:  Yes.

12           MR. BLOOM:  Forgive me.  I mean, attrition

13   at the higher positions or at the lower positions?

14           THE ARBITRATOR:  At iQor.

15           MR. BLOOM:  Oh, were you talking about

16   iQor?

17           THE ARBITRATOR:  I'm just talking about

18   iQor.

19           MR. BLOOM:  I didn't understand.

20           THE ARBITRATOR:  He was saying he upped

21   the attrition rate for iQor.  I just said:  You

22   have real numbers.  What are they?

23           MR. BLOOM:  Okay.  Thank you.  I'm sorry.

24           THE WITNESS:  So, again, I used the same

25   pricing for training, as well as productivity.

1    When I carried that out, it actually lowers the

2    price if that's $11.9 million and the savings is

3    over three million.

4           The reason for that is you can continue to

5    bring people in at a lower cost.  It actually

6    lowers your cost over the life of that contract.

7           THE ARBITRATOR:  But your differential is

8    down -- oh, it's up to three --

9           THE WITNESS:  Three million.

10          THE ARBITRATOR:  3.2, roughly.

11          THE WITNESS:  I also carried out a

12   sup-to-agent ratio of 14-to-one, using a

13   supervisor cost of $25, what the vendor charges

14   us, as well as in-house.  I didn't include the

15   benefit multiplier on this one, and used 38.65.

16   That's an additional half a million dollars.

17   Q.      So that doesn't include benefits?

18   A.      That's correct.

19   Q.      None of this includes nonproductive time?

20   A.      Correct.

21          MR. LEBOWICH:  We have nothing further.

22                      * * *

23                  RECROSS-EXAMINATION

24   BY MR. BLOOM:

25   Q.      I don't understand Company Exhibit 3.

1   Where is the in-house versus the iQor?  The CSA-I,

2   II, III, is that iQor?

3   A.      CSA-I, II and III is in-house on the top

4   chart.  So where it says year one, that is the

5   hourly rate.  Year two is the hourly rate based on

6   the contract.  Year three, because it's not in

7   there, I just applied the same percentage

8   increase, compared to one and two, to give me a

9   year three price.

10  Q.      IQor --

11          THE ARBITRATOR:  The upper half where it

12  says vendor, that's iQor?

13          THE WITNESS:  Yes.

14          THE ARBITRATOR:  Do you see the two

15  yellow --

16          MR. BLOOM:  Yes.  Can I quickly let my

17  people look at this?

18          THE ARBITRATOR:  Yes.

19          (A brief recess was taken.)

20          THE ARBITRATOR:  All right.  We'll pick it

21  up with the union.

22          MR. BLOOM:  No further questions.

23          MR. LEBOWICH:  Can we talk?

24          THE ARBITRATOR:  Sure.

25          (A brief recess was taken.)

1          THE ARBITRATOR:  Do you want to enter a
2   stipulation?
3          (Discussion held off the record.)
4          THE ARBITRATOR:  The company is putting in
5   Exhibit -- what is it?
6          MR. LEBOWICH:  Company 4.
7          (Company Exhibit 4, PPL EU Benefits
8   Budget, was marked for identification.)
9          THE ARBITRATOR:  Do you want to offer that
10  with the agreement --
11         MR. BLOOM:  The union doesn't object to
12  Company Exhibit No. 4.  However, we would like
13  to --
14         THE ARBITRATOR:  With the understanding
15  that --
16         MR. BLOOM:  -- with the understanding that
17  new hires and new employees do not get the
18  retirement defined benefit plan, nor do they get
19  post retirement medical and life, which are two at
20  the top.
21         THE ARBITRATOR:  And the company
22  acknowledges that they do not get that.  They get
23  something, but it's less than that?
24         MR. LEBOWICH:  That's correct.
25         THE ARBITRATOR:  Okay.  Is that accurate?

1        MR. BLOOM:  When you say the company gets
2    something --
3        THE ARBITRATOR:  You're saying there's a
4    401(k)?
5        MR. LEBOWICH:  There's a DC plan.
6        MR. GRAHAM:  Defined contribution.
7        THE ARBITRATOR:  Is that the bottom number
8    on that under the defined savings plan, that
9    7,000, 7,350, 7,718?
10        MR. LEBOWICH:  I believe that's correct,
11    but I'd have to check and confirm that.  If you
12    want, we can go off the record and confirm if you
13    think it's important.  I mean, the fact -- this is
14    argument, but what we do is we spread the cost
15    over everybody.  That's how we do it.  Otherwise,
16    people's costs would be higher.
17        THE ARBITRATOR:  You're both going to
18    submit briefs, I assume, 30 days after receipt of
19    the transcript.  You can both contact each other
20    with regard to what this is.  If there's an issue,
21    let me know.  If not, simply agree to it and make
22    reference to in your brief.  Okay?
23        MR. BLOOM:  Okay.
24        MR. LEBOWICH:  Okay.  All right.  That's
25    fine.

1          THE ARBITRATOR:  Anything else as far as

2    testimony?

3          MR. LEBOWICH:  We rest on our affirmative

4    case.

5          MR. BLOOM:  We need to caucus again.

6          (A brief recess was taken.)

7          THE ARBITRATOR:  Okay.  Where are we?

8          MR. BLOOM:  Union rests.

9          THE ARBITRATOR:  Okay.  You remain rested?

10         MR. LEBOWICH:  Yes.

11         THE ARBITRATOR:  All right.  Briefing

12   schedules?  30 days after receipt of the

13   transcript?

14         MR. LEBOWICH:  Yes.  We'll just confirm a

15   specific date once we get it.

16         THE ARBITRATOR:  That would help AAA.

17   Also, you're going to agree regarding that issue

18   about that last exhibit?

19         MR. LEBOWICH:  Yes.

20         MR. BLOOM:  Yes.

21         THE ARBITRATOR:  If there's any issue,

22   you'll let me know?

23         MR. LEBOWICH:  Yes.

24         MR. BLOOM:  Yes.

25         THE ARBITRATOR:  All right.  That

1    concludes the hearing.

2            (The hearing was concluded at 3:49 p.m.)

3                         * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I do hereby certify that I am a

4    Notary Public in good standing, that the

5    aforesaid proceedings were taken before me; that

6    said proceedings were correctly recorded in

7    machine shorthand by me and thereafter transcribed

8    under my supervision with computer-aided

9    transcription; that the transcript is a true and

10   correct record of the proceedings; and that I am

11   neither of counsel, nor kin to any party in said

12   action, nor interested in the outcome thereof.

13

14           WITNESS my hand and official seal this

15   7th day of October, 2016.

16

17

     _____

18                  Notary Public

19

20

21

22

23

24

25

| & |
|---|
| **&** 2:11 |

| 0 |
|---|
| **01-16-000-3483** 1:8 |
| **01-16-0000-3483** 7:6 |
| **035** 1:9 7:6 |

| 1 |
|---|
| **1** 4:19 5:5 6:14 7:19,22 11:2 17:4 22:22 23:8,11 25:19 39:1,2 40:14 47:14 48:6 56:2 66:4 83:5 95:15 101:4 108:12 |
| **1,566** 122:8,12 123:7 |
| **1.5** 116:12,15 |
| **1/1/2012** 5:19 55:19 56:20 |
| **10** 5:18 18:10,13 23:4 24:19 38:11 45:6 55:17,18 61:14,22 70:7,11 70:12,21,23 73:2 96:10,21 128:6,16 143:23 |
| **10/15** 74:1,6 |
| **10/21/15** 6:10 64:19 |
| **100** 133:19 |
| **10036-8299** 2:8 |
| **108** 6:14 |
| **10:00** 1:19 60:13 |
| **11** 5:20 52:19 57:18,19 73:19 138:9 |

**11.75** 137:10
**11.9** 145:2
**11/12/15** 79:11
**11/18/2015** 8:22
**11/5/15** 79:8
**113** 6:15
**12** 5:22 14:9 44:6 58:21,22 76:22 109:18
**12.4** 143:12,17
**12.50** 137:16 138:9
**12/30/15** 79:14
**12/8** 73:14
**122** 4:13
**127** 11:1
**129** 11:1 101:4
**12:40** 84:19
**12:41** 84:22
**13** 5:23 59:20,21 73:11 114:25
**14** 1:12 6:5 45:6 47:5 61:4,5,11 73:14 99:22 100:15,22 106:20 108:10 145:12
**141** 4:14 6:16
**145** 4:14
**147** 6:17
**148** 58:11 73:21
**15** 6:8 63:2,3 96:18,24 97:17 104:9 105:2 112:3 116:1 118:5 122:6 143:11,15 144:9
**150** 134:15
**15219** 2:13
**156** 15:2 18:25 24:23 58:9 73:21
**1566** 113:22
**16** 6:9 64:17,18 73:22 102:20

116:2
**1600** 1:4,9 2:15,18 5:8 7:3,6 9:6 10:17 20:9 21:11 21:13 27:20 37:11 37:17,20,21,23 43:18,23 75:5,11 75:14 89:6 94:3
**163** 55:9 72:9,23
**173.3.** 109:18
**18** 42:13 56:3,20 69:10,12,15 88:9 88:11 90:12 115:3
**18031** 1:17
**18106** 1:24
**19** 113:23 143:7
**19403** 2:3
**1978** 76:9
**1:54** 84:23

| 2 |
|---|
| **2** 4:21 5:7 6:15 7:25 8:1,20 22:15 23:7 35:13 41:3,4 41:8 43:25 68:21 76:17 88:2 90:4 90:11 113:10,11 120:1 127:2,16,18 140:11 |
| **2,080** 109:18 |
| **2.2** 119:13 |
| **2.7** 143:18 |
| **2.8** 119:12 |
| **20** 12:18 42:24 47:9,17 103:16 107:7 128:6,17 134:11,11 |
| **20.59.** 120:10 |
| **200** 1:24 |
| **2000** 86:8 |
| **2002** 75:17,17 |

**2005** 38:13
**2008** 75:17
**2010** 9:16 10:15 38:21 39:8 40:3
**2012** 5:14,16 10:22 13:20 15:5 19:14 43:4 44:5,6 53:8 54:6,11,16 56:2
**2013** 72:20
**2014** 9:14 72:20 75:12,16 104:21
**2015** 15:1,7 18:24 25:10 29:8,20 30:2 58:2,8,14 61:14 63:13 72:15 72:17 73:21 76:23 86:8 92:14 94:20 94:21 122:7 133:8 133:8,22
**2016** 1:12 5:17 19:6 55:3,8,14 56:3,21 58:2,10 63:14 151:15
**205** 13:20 53:14 54:7 72:9,22
**21** 42:24
**21.15.** 120:12
**212** 2:8 13:23 15:4 24:23 54:20
**22** 10:20 12:19 42:21 69:15 88:8 88:11,17,18 89:11 89:13 90:13 109:6 111:8,19
**22.50.** 107:5
**24** 16:3,9 17:23 19:23 29:22 30:3 35:23 142:23
**24/7** 62:2 65:10 99:11 134:23

**2417** 2:2
**25** 125:13 137:17
  143:9 145:13
**27** 39:8
**28** 10:15
**288-6000** 2:14
**29** 109:1 110:15,16
  110:21,25 111:9
  111:13,19
**29,754** 113:24
  122:7

**3**

**3** 4:22 5:8 6:16 8:5
  8:6,19,21 15:25
  22:19,21 35:11
  43:14,17,19 45:21
  69:24 71:19 72:16
  83:7 117:11
  141:24 142:4
  145:25
**3.2** 145:10
**3.75** 19:12
**3/16** 74:9
**3/2016** 5:21 57:21
**3/23** 73:21
**3/28/12** 5:7 41:4
**30** 10:22 44:5
  92:14 95:10,24
  103:17 108:22
  109:8 134:11,12
  134:13 148:18
  149:12
**310** 2:13
**312,017** 19:13
**3204** 2:12
**34** 71:6,15
**35** 125:11
**365** 16:2,8 17:23
  19:23 29:22 62:2
  134:22,23

**37** 4:4
**38.65.** 145:15
**39** 5:5
**3:49** 150:2

**4**

**4** 5:10 6:17 40:1
  48:14,15 147:6,7
  147:12
**40** 130:2,10
**401** 148:4
**41** 5:7
**412** 2:14
**42** 85:18
**43** 5:8
**434-8588** 1:25
**45** 107:4,5
**454,000** 133:1
**454,923** 117:6
**48** 5:10
**484** 2:3
**49** 5:11
**4949** 1:24

**5**

**5** 5:11 16:16 17:5
  20:12 23:10 25:18
  49:24,25 51:20
**5,027** 110:24
**5/11/16** 5:13 51:13
**50** 95:11
**51** 5:12
**53** 5:14
**54** 5:15
**55** 5:17,18
**57** 5:20
**58** 5:22
**59** 5:23
**5:00** 28:8 29:11
  30:5 32:14 70:15
  70:25 94:9 97:2,6
  98:12,17,20 99:6,7

106:3

**6**

**6** 5:12 51:11,12
**6/5/12** 5:10 48:15
**60** 12:14 33:6
**61** 6:5
**610** 1:25
**63** 6:8
**64** 6:9
**66** 4:4
**6:00** 97:3,7

**7**

**7** 4:19 5:14 53:7
  53:12 72:7
**7,000** 148:9
**7,350** 148:9
**7,718** 148:9
**7/15** 74:1,6
**7/2015** 5:21 57:20
**70** 33:6
**729,000** 116:18
  132:25
**729,590** 116:20
**74** 4:7
**75** 107:5,6 115:2
  134:17
**765,000** 35:8
**7736** 1:16
**78** 4:7
**7:00** 60:13 71:2
**7th** 151:15

**8**

**8** 4:21,22 5:15
  54:9,10
**8/5** 73:11
**80** 33:6,23 34:7,11
**800,000** 35:7
**81** 16:7,7 18:18
  19:7,22

**83** 4:8
**85** 4:10 98:25
  133:18
**88,450** 114:22
**8:00** 28:8 29:10
  30:5 32:13 70:15
  94:9 97:2,3 98:12
  98:17,20 99:5,7
  106:3

**9**

**9** 5:17 55:1,2
  62:18 72:7
**9,000** 109:11
**9/10/15** 6:7 61:7
**90** 4:10,11
**91** 4:13 38:7
**919-4031** 2:3
**95** 38:13
**96** 38:13
**969-3217** 2:8
**99,404** 118:15

**a**

**a.m.** 1:19 28:8
  29:10 70:15 71:2
**aaa** 7:5 149:16
**ability** 22:11
  114:10
**able** 33:13 93:19
  96:15 101:23
  102:7,13 104:12
  105:9,10 108:24
  109:22 120:6
  128:6 135:16
  141:17
**absence** 38:8
  75:20 76:3
**absences** 96:7
**absent** 32:19
**absenteeism** 96:10
  96:21

**absolutely** 14:16 22:17 33:5
**accept** 135:4
**acceptable** 111:18 111:20
**accepted** 39:11
**accomplished** 12:12
**account** 95:10 97:14,23 127:3,17 127:20 130:21
**accounted** 121:19
**accurate** 39:6 43:22 50:3 51:16 58:2 63:6 64:8 112:12 147:25
**accurately** 100:17
**acds** 114:7
**achieve** 111:24
**acknowledge** 82:3
**acknowledges** 147:22
**acknowledging** 82:19
**acronyms** 11:19
**action** 151:12
**active** 78:2
**actual** 17:13 35:3 47:13 111:12 128:15
**add** 19:1 30:9 116:24 137:21
**added** 23:18 51:7 114:21 119:11 143:3
**adding** 32:17,18
**addition** 42:20 121:11
**additional** 9:23 10:20 29:10 30:5 30:24 42:21 88:8

89:19 115:3 121:12,16 145:16
**additionally** 20:6
**address** 21:10 22:1 23:15 96:6
**addressed** 25:5,6
**adds** 115:3
**adjustment** 22:24
**admit** 130:20
**admitted** 40:18
**admittedly** 27:9
**adrienne** 1:16
**advance** 137:12
**affirmative** 149:3
**affirmed** 37:6 74:24 85:3 91:15
**aforesaid** 151:5
**afternoon** 85:15
**agent** 27:25 28:4 108:19 113:5 145:12
**agents** 21:20 29:10 31:12 96:11 100:25 106:24 107:1,25 108:5,23 114:4 115:1,3,4 116:7,14,25 121:24 122:16 137:20 139:17 141:16
**aggressive** 143:21
**aggrieved** 22:25
**agis** 25:20
**ago** 61:1
**agree** 7:15 11:16 44:18 45:13 64:5 83:24 125:16 126:19 127:1 128:4 129:20 131:18 133:7 138:22 140:24

141:3 148:21 149:17
**agreed** 10:4,17 13:8,10,16 14:24 19:3 20:21 79:24 88:14 133:5,21 134:18
**agreeing** 17:14
**agreement** 4:20 5:8 6:6 7:17,23 10:23,24,25 11:24 11:25 12:5,15,17 12:19 13:19,22,25 14:9,10 17:4 21:17 22:19 23:1 30:16 36:7 42:18 43:2,7,17,23,24 44:1,3,23 45:14,20 46:16,25 47:2,13 57:6,8 61:6,12 67:3 72:3 78:11 82:18 83:8 86:21 87:3,22 88:20 101:1 107:18 134:7 147:10
**ahead** 42:23 51:8
**aided** 151:8
**al** 1:10 7:7
**allegation** 31:4
**allen** 135:19
**allentown** 1:24 94:1
**allocate** 114:17
**allocating** 34:18
**allowed** 36:6
**alternative** 21:25 25:12,13 26:12
**alternatively** 16:15 20:6
**ambiguous** 126:6

**american** 1:1
**amount** 16:22 30:25 138:18
**amounts** 118:11
**analysis** 34:4 35:24 98:25 121:6 121:9
**analyst** 107:9,11 109:21
**analytics** 92:8 93:7,8
**analyze** 107:18
**analyzed** 35:2 133:9
**annual** 96:12
**answer** 21:21 80:17 81:14 96:16 97:19 127:10,11 127:12,12 129:19 130:22
**anticipate** 115:1
**anticipated** 111:25
**anticipation** 141:19
**anybody** 59:13 77:18 81:20
**apologize** 89:3
**appearances** 2:5 3:1
**appears** 41:9
**appendices** 83:11
**applicable** 23:21 30:18 78:1 80:12 82:3,19
**applied** 115:4,25 116:4,6,12 117:5 120:13,18 142:25 143:2 146:7
**approached** 9:17 38:20 40:3

**appropriate** 96:16
**approve** 21:14
  112:9
**approximately**
  9:13,16 10:15
  13:19,23 15:2,4
  38:11,21 39:7
  42:24 61:22 86:6
**april** 10:22 44:5,6
  94:20 95:15
  103:13 120:11
  134:5,15,24
**arbitrable** 138:16
**arbitration** 1:1,3
  7:3
**arbitrator** 2:1 7:2
  7:19 8:8,12,21,25
  9:3 11:7 14:4
  20:10,23 21:1,5,7
  21:8 23:21 25:20
  26:4 27:10 28:10
  28:13 29:4,7 36:4
  36:12,20 37:1,8,12
  40:17 41:11,15,20
  42:1 43:19 44:18
  45:24 46:5,8,15
  49:2,7,12 50:19
  51:8 52:7,16
  53:16,24 54:21
  55:22 60:13 62:5
  62:9,20 63:21
  64:3,9,24 65:20
  66:12,15,22 67:19
  67:25 69:7,14,24
  70:10 71:14,17,23
  74:14,18 75:2,18
  75:22 76:1,6
  77:16 78:25 80:4
  80:18,24 81:3,11
  82:5,10 83:17
  84:1,3,8,12,15,19

84:24 85:6,11
  89:7 91:7,18 93:3
  93:6 94:17 95:8
  95:19 97:21,25
  99:5,8 100:9,11,20
  101:17 104:20,24
  105:6,12 114:6
  115:17,19 116:15
  116:17,21 117:10
  117:14,17,22
  118:19 119:17
  122:20 123:13
  124:2,14,17,19,22
  124:25 125:3,20
  126:9,15,18 128:1
  128:20 129:2,6,24
  130:4,13,23 131:8
  131:11,13,24
  132:6,11,17,21,25
  135:6,18 137:17
  138:4,13,15 139:5
  139:7,21 144:3,7
  144:10,14,17,20
  145:7,10 146:11
  146:14,18,20,24
  147:1,4,9,14,21,25
  148:3,7,17 149:1,7
  149:9,11,16,21,25
**arbitrators** 21:15
  21:16 25:17 36:8
**area** 28:19,20
  129:25
**areas** 17:2 92:6
  93:9
**argue** 24:5 77:19
**arguing** 83:14
**argument** 21:25
  22:5 24:2,3,8
  25:16 32:21,21
  49:8 82:12 131:24
  138:16 148:14

**arguments** 25:11
  25:14 26:11
**arrival** 92:25
  133:9
**arrived** 53:23
  94:20 95:5 96:19
**article** 16:16 17:5
  20:11 22:18,19,21
  23:1,8,9,11,24
  25:18,19 77:25
  78:5,6,9,9 80:25
  82:23,24 83:7,8,18
**articles** 83:15
**articulate** 23:24
**aside** 22:8
**asked** 34:24 69:15
  80:18 90:18 98:3
  109:21 129:11
  132:11 141:12
**asking** 8:9 81:12
  97:17 123:6
  126:12,15,18,20
  129:16,24 133:20
  139:1
**asserted** 52:18
**assessment** 119:1
**assistance** 96:6
**assistant** 48:5,6,7
  48:9 56:10,15,21
  56:22 73:10,11
**assistants** 46:17
**associates** 2:11
**association** 1:1
**assume** 143:19
  148:18
**assumed** 140:9
  143:23,24 144:1
**assumes** 127:7
**assuming** 119:11
**assure** 89:23

**atlantic** 1:23
**attached** 5:7 41:5
**attachment** 5:11
  5:13 50:1 51:13
**attachments** 50:6
**attempt** 21:10
  32:24
**attempts** 12:15
**attention** 18:5
**attrition** 24:22
  72:22,23 74:7
  89:25 138:10
  142:12,15,16
  143:20,22,24,25
  144:1,4,5,12,21
**attritioning** 78:18
**attritted** 19:8
**august** 39:8 97:14
  97:16,17
**authority** 21:19
  31:16
**automatic** 14:8,11
  14:19 57:5
**available** 17:10
  30:20 98:22
  105:20
**average** 33:18
  34:14,17 95:23
  107:23 109:10,17
  109:19 110:16,18
  110:19 111:3,12
  115:1 134:13,16
**averages** 109:23
**averaging** 144:8
**avp** 107:9,13
  118:18,23,24
**aware** 82:21 87:21
  135:25

**b**

**b** 22:21 37:11 48:6
62:16,17 83:7
106:21
**back** 21:24 23:5
50:14 51:4 62:16
62:17 65:10 84:21
87:17 103:9
106:15 107:8
**backfilled** 15:18
**background** 27:18
49:11 50:25
**bargain** 15:17
**bargaining** 4:19
7:16,22 10:3,5,25
13:18 14:14,15
15:15 16:1,7,13
17:3,8,11,17,22
18:7,13,24 19:15
21:17 22:19 27:21
28:6 29:4 30:15
35:4 36:7 39:25
47:2,13 56:14,16
59:8,12 65:15
67:2,14 72:8
74:10 78:11,20
82:18 86:21 87:3
89:6,24 94:2,3,22
96:7 101:1 107:11
107:13 111:5,10
115:10,12 118:8
119:2,6,7,13,15
120:2 122:13,21
123:8 124:1,4
129:22 133:13,25
137:15 138:12,25
**based** 10:14 13:5
16:4 17:1 19:10
23:2 53:21,22
54:4 56:18 57:2
58:5 68:15 87:21

125:23 128:1,25
133:15 146:5
**basically** 15:16
16:10 19:17 29:12
43:25 60:9 95:15
97:17,24 133:19
**basing** 130:24
**basis** 33:19,21
96:12,20 106:13
109:13,14,17
110:23
**bassem** 3:5
**becoming** 45:17
88:25 89:1
**began** 58:13
121:23
**beiver** 4:3 37:5
**believe** 19:2 24:22
28:3 30:14 35:6
36:5 48:4 50:5
62:25 70:7 71:12
72:1,2,18 120:5
132:8,15 138:1,10
148:10
**believed** 117:11
133:17
**benefit** 109:25
116:4 120:13
121:7 125:10
126:24,25 143:3
145:15 147:18
**benefits** 6:17
20:18 34:17 108:1
109:25 131:20
137:25 138:5
145:17 147:7
**best** 35:16 68:21
**beth** 118:18
**bethlehem** 112:25
113:5,21 118:23
118:25

**bethlehem's** 113:4
**better** 29:21 48:8
48:9 125:16,18
**beyond** 90:3 99:9
105:23
**biever** 2:20 37:2
37:10
**big** 68:4
**bilingual** 107:8
**billable** 112:22
113:23 115:24
116:5,10 120:18
122:15
**billed** 124:11
**billing** 21:22 26:22
100:5 129:8
**bit** 30:7 48:25
**blatantly** 16:10
**blended** 111:16,20
**block** 83:16 84:4
**blocks** 60:7,8
**bloom** 2:11,12,14
4:4,8,10,13,14
7:11,16,24 8:4,13
9:2,5,5 11:11 14:6
36:14,22 37:2,15
39:4 40:13,22
41:6,16 42:2
43:21 44:21 46:12
48:17 49:3,10,15
50:2,21 51:9,15
52:12,18,20 53:10
53:18,20 54:2,3,13
54:22,24 55:5,10
55:15,16,21 57:13
57:16,22 58:19,24
59:23 60:15 61:9
62:8,12,14,21 63:5
63:23 64:5,11,21
65:3,19 66:18
67:17,22 74:19,21

75:9 76:7 77:21
78:24 83:1,4,21
84:6,10,14,18
90:10,20 91:8
122:5 123:1,15,16
124:3 125:4 126:1
126:14,17,20,21
127:10,15 128:3
129:10 130:3,12
130:15,20 131:17
131:22 132:2,7,19
132:24 133:2,3,20
134:3 135:7,21
136:20 137:23
138:8,14,21 139:3
139:8,9,22 141:5
144:12,15,19,23
145:24 146:16,22
147:11,16 148:1
148:23 149:5,8,20
149:24
**bloomlawyers.c...**
2:14
**blunt** 33:15
**bodies** 131:14
**bold** 88:7
**book** 11:5
**bottom** 47:4 56:16
60:8 102:23
116:21 148:7
**box** 77:25 78:3,4
81:1 105:21
**brand** 128:11,13
**break** 65:24 84:16
84:20
**breakout** 108:25
**breinigsville** 1:17
**brief** 16:19 36:18
36:25 65:4 74:15
84:11,13 117:21
131:25 139:6

146:19,25 148:22
149:6
**briefing** 149:11
**briefly** 79:1
**briefs** 71:24
148:18
**bring** 108:5
116:25 131:5
139:18 145:5
**bringing** 18:18
29:17 142:6
**broad** 21:11 28:6
**broken** 59:6
**brooks** 2:23
**brought** 8:14 18:5
19:4,20 98:12
105:17 139:19
**budget** 6:17 93:2,3
147:8
**budgets** 92:8
**building** 2:12
35:21
**buildings** 121:18
**built** 112:21
**bullet** 39:22 47:8
67:8 68:4,13 69:2
**bullets** 68:5 90:5
**burden** 16:21
**business** 2:20,21
9:8 37:11,24,24
38:14 75:21 85:9
85:22,24 99:1,5
105:4,23 116:7
120:16
**bypassed** 79:25

**c**

**c** 2:19 4:6 74:23
151:1,1
**cable** 105:3 129:4
129:5

**calculate** 109:20
118:11
**calculated** 111:14
132:13
**calculation** 53:22
63:17 130:17
**calculations** 35:14
35:17 118:12
127:18
**call** 11:22 19:20
25:12 27:1,19,22
29:10 31:17 32:16
35:19 37:2 74:21
86:10 91:10 92:25
93:21,23 94:15,23
95:7,10,16 97:8,9
100:4 103:14
105:24 107:9
120:7 133:9 135:3
135:10 136:1
137:14 138:11
**called** 10:7,11 12:6
15:13 18:9 27:5,6
43:7
**calling** 98:24 99:1
129:7 141:2
**calls** 5:22 18:17,19
28:7,21 58:22
59:7,7,11 60:18,21
94:7 95:17,21
96:16 100:3 129:8
129:9 135:4
**campaign** 100:7
**capabilities** 65:12
**capable** 33:2
**care** 2:22,23 3:5,6
21:20 26:21 27:23
27:25 28:16,17,24
31:12 33:3 54:1,5
72:9 85:23,25
87:23 89:24 92:8

93:2 121:24
**carried** 113:21
120:10 145:1,11
**case** 1:8 9:7 10:10
21:20 23:25 24:7
25:20 26:20 32:3
34:23 36:16 49:17
53:17 73:17 75:5
76:16 78:19 79:16
141:20 149:4
**cases** 26:1
**cash** 38:4
**categories** 107:3
**categorized**
112:24
**caucus** 36:24
65:21 84:11 139:4
149:5
**cba** 16:17,18
**cease** 20:12 31:16
**center** 27:1 32:16
46:18 66:21
104:11 141:3
**centers** 11:14
27:19,22 35:19
41:14 56:1 86:10
93:21,23,25 94:15
94:23 104:9 105:2
135:3,11 136:2
**cents** 115:3 137:17
**certain** 52:5
138:16
**certainly** 138:15
**certainty** 138:7
**certify** 151:3
**cetera** 20:18 35:22
**chain** 98:2
**challenges** 97:19
97:20 104:8
**change** 39:16

**changed** 29:17,18
116:2
**changes** 38:22
**changing** 45:16
**charge** 105:4
**charged** 115:25
116:1,2,11 119:9
122:8 143:7,8
**charges** 145:13
**charging** 110:14
117:3
**chart** 106:20
146:4
**charts** 50:22
**cheaper** 33:16
48:8,10 126:8
**check** 64:9 99:20
101:6 110:12
148:11
**checked** 32:10
103:5,6 104:3
105:20 106:15
**chris** 3:4 4:12 8:22
30:10 31:7 91:10
91:14,20 92:3
102:24
**circuit** 114:2,3,13
**circuits** 114:14,21
**circumvent** 20:14
**circumvented**
16:12
**claim** 18:2,3 51:5
**clarification** 80:3
**classes** 140:18
142:17
**classification**
48:11 70:22
**classifications**
27:24,24 40:8
107:24 108:20
109:24

clause 23:11,12 25:22,22
clear 26:1 27:18 33:8 67:13 90:25 118:3
clearly 21:17 23:23 24:24 32:12 36:5
clerk 11:25 38:5 46:18
close 92:2
closing 16:19
coal 9:12
collection 21:22 26:22 46:17 48:5
collection's 113:5
collections 95:6,9 95:22 97:7 100:5
collective 4:19 7:16,22 10:25 13:18 17:3 21:17 22:18 30:15 36:7 47:2,13 67:2 78:11 82:17 86:21 87:3 101:1
column 73:5 109:9
columns 73:7
combined 117:6
comcast 129:5
comcast.net 2:4
come 23:3,5 80:21 80:22 110:22 113:24 116:13
comes 107:7
comment 31:23 32:11
commercial 105:4
commitment 89:23 90:2
commonly 31:14

companies 10:9
company 5:5 6:13 7:9 9:10,17,18,20 10:1,7,11,13,16 13:8,15,21,24 14:2 14:17,20,22 15:12 15:13,16,23 16:5 16:10,16,20 17:7 17:14,21 18:1,5,23 19:5,11,11 20:1,11 20:12,19 21:18 22:6 25:23 27:5,6 38:20 39:2,7,16 40:3,4,6,23,24 41:18 42:12,14,23 43:6 44:8 45:13 48:22 49:18,20 50:23,24 51:2 52:19 55:24 56:4 56:19 57:25 58:25 59:9,17,24 61:17 63:7 64:12,24 66:7 67:7,13 68:18 69:1,4,10,18 75:18 79:13,22 82:2,15 83:14,23 87:18 88:6,20,23 89:12,17,21 90:2 91:1,2 93:9 99:18 104:18 105:3 108:12 113:11 120:1 121:25 126:7 127:2,16,18 128:16 130:2,5,10 130:11 133:18 135:2 140:10 141:24 142:4 145:25 147:4,6,7 147:12,21 148:1
company's 4:22 8:4,6 10:14 12:9

15:23 21:11 30:16 30:23 40:20 51:18 58:5 64:22 68:16 77:2 87:14
comparable 48:4 48:5
compare 115:9
compared 35:3 109:1 111:8 117:2 129:21 140:12 141:12 143:5 146:8
comparing 34:6
comparison 6:14 35:8 108:12,18 109:5 113:8 131:4
compiled 54:15
complaint 79:7
completed 142:19
completely 19:19 22:9
completing 18:6
complex 48:12
comply 20:7,19
computer 55:12 151:8
concerns 9:15 22:1
concluded 150:2
concludes 150:1
conclusion 62:3 133:21
conference 21:2
confirm 44:11 112:16 148:11,12 149:14
confirming 48:21
confusing 76:6
conservative 35:12,15

consider 45:19 126:2
consideration 125:15 126:25 127:9 130:17
considered 13:13 22:23 125:25
constantly 141:2
constraints 104:3
construction 76:11,12
consultant 3:7
contact 6:6 11:14 15:13 26:21 41:14 46:18 56:1 61:6 61:13 62:6 65:7 66:21 86:4 105:2 141:3 148:19
contacted 98:2
contain 42:18
contained 46:25
context 128:25
continue 40:25 51:22 145:4
continued 3:1,2 5:3 6:3 14:22 105:9
continues 29:18
continuing 20:13
continuously 23:12
contract 7:12 9:7 10:8 15:22,23 23:23 33:8 35:11 61:10,19 65:6 98:3 99:21,23 101:7 110:21 114:22 115:2,8 117:11 121:1 129:12,14 133:12 134:18 145:6

146:6
**contracted** 17:21
104:15
**contracting** 10:8
16:24 25:6 26:15
26:25 31:1,6
33:11 34:21 36:5
58:12 74:2,3 80:5
96:25 102:1 106:1
112:17
**contractor** 6:9
16:13 18:19 20:13
25:9 27:3,13
31:20 32:1,18
34:11,20 64:19
97:10,13 102:15
103:2,10 104:4
106:16 107:19
125:22 129:22
131:6,15 133:24
**contractors** 1:10
7:7 10:5,21 20:14
29:24 31:18 33:23
34:3 39:25 40:12
42:6 78:18 94:21
95:5 96:2,5,14,23
126:10 131:2
135:15 136:22
**contracts** 92:23
**contractual** 21:12
120:21
**contrary** 32:11
**contribution**
148:6
**control** 114:9
**conversations**
87:13
**copies** 7:21 8:15
**copy** 8:8 39:6
43:22 50:3 51:16
63:6 88:3 99:21

**core** 99:1,2,5
105:23 116:7
120:16
**corner** 53:13
76:25
**corporate** 27:14
**corporation** 1:6
2:10 3:3 6:7 7:4
61:7,14
**correct** 28:2 29:6
33:20 45:2 46:11
54:2 55:15 67:3,4
67:6,8,15 68:7,16
68:17 69:1,11
70:3 71:1,3,9,22
72:10,12,16,20,23
73:3,6,23 74:7
75:24 79:8,12
81:5,22,23 82:20
83:9,12,20 86:11
112:4,5 118:6,20
119:10,14,24
120:22 123:14,22
133:6 134:5,20,25
139:21 141:13
145:18,20 147:24
148:10 151:10
**correction** 89:1
**correctly** 48:20
110:9 119:12
151:6
**correspondence**
48:18,21
**cost** 6:14 33:18
34:14,17,21 35:3
35:18,25 106:17
107:1,4,20,25
108:2,3,12,19,25
112:16 114:12,14
114:17 115:4,6,7
115:10 116:13,24

124:12,23 132:9
143:11,12,14,16
145:5,6,13 148:14
**costing** 120:1
**costs** 112:12 113:7
119:21 121:16
123:24 124:10
148:16
**counsel** 22:4 24:21
29:23 30:8 34:13
151:11
**counsel's** 21:25
26:17
**count** 96:21
121:15 127:24
**couple** 20:25 34:4
72:5 117:8 118:3
**course** 32:8 33:7
143:9
**court** 8:14 104:1
127:11
**cover** 133:19
**coverage** 30:3
99:11 100:6
**covering** 133:18
142:7
**crawford** 2:20
**create** 11:16 13:25
19:14
**created** 12:12
45:25 46:2,9,22
47:25 105:5
118:20
**credit** 95:6,8,9
100:4 129:7
**crippled** 136:6
**criteria** 30:18
**critical** 28:5 49:10
**cross** 4:4,7,10,13
40:21 66:1 78:25
79:3 90:9 122:4

**crucial** 49:11
**cs** 11:25 71:6 72:1
**csa** 11:19,19,20
12:19 13:10 14:8
14:9,12,23 34:15
34:20 42:13,22
43:1 46:4 47:9
69:11 88:15,19,25
89:2 90:13 94:6
101:21,23,24
102:3,11 107:24
108:20 109:20
110:16,18 115:25
120:4,8 139:11,12
139:14,20,24
140:1,2,4,7,10,15
140:15 141:13,21
142:6,9,11,13,14
142:15 143:1,1,1
143:23,24,25
146:1,3
**csr** 5:5 11:21,22
11:25,25 18:9
28:9,15 34:1,15
39:2,16 40:1
45:11,16 46:7
48:10 60:20 69:22
70:2,6,9 102:4,10
107:24 108:20
109:10
**cultural** 130:8
**cumulative** 101:20
**curious** 50:9
**current** 28:3 29:24
31:1,2 85:21 86:1
106:2 121:23
123:3,7 127:4
**currently** 30:4
37:16 87:9 96:10
**customer** 2:22,23
3:4,5 5:20 8:23

9:15,18 11:14,20
11:21,22 12:3
13:20,23 15:1
16:1 18:1 20:3
21:20 26:20,21
27:23,25 28:1,2,3
28:16,17,24 29:1
29:21 30:11 31:12
33:3,25,25 38:5,9
38:15,23 41:14,25
45:8,15 46:17
47:7 48:4,7,8 54:1
54:5,15 55:7 56:1
56:10,15,20,21,22
57:20 58:1,7
59:13 60:5 62:1
64:14 65:9,12,16
66:21 71:7,8 72:9
73:10,10 85:23,25
86:4,10,18 87:23
89:24 91:21 92:5
92:6,9 93:5,10,13
93:14 94:11 98:13
98:15 100:25
121:24,24 122:13
133:11 135:3,10
136:1 137:14
138:10 141:16
**customers** 93:1,16
93:20 98:23,25
141:1
**cut** 31:15,16 95:16
95:18,25 97:2,4,8
103:13
**cutting** 95:19,20

**d**

**d** 16:16 17:5 20:12
23:10,11 25:18,19
**date** 24:17 53:6
56:2 73:6 76:20
79:5,14 149:15

**dated** 5:7,10,12,14
5:15,17,19 6:7,10
8:21 41:4 48:15
51:13 53:8 54:11
55:3,19 61:7,14
64:19
**dates** 86:6
**dave** 66:11,13,15
**david** 41:9,10
86:12
**day** 16:3,9 17:23
23:4,4 32:17
141:2 151:15
**days** 12:14 16:2,3
16:8 17:23,24
19:23,23 24:17,19
29:22 62:2 73:16
134:22 148:18
149:12
**dc** 148:5
**deal** 15:12 19:14
28:21 93:18 94:14
139:16
**dealing** 92:22
130:24 141:1
**december** 5:16
13:20 15:4 54:11
54:16,21,22 72:16
75:12,16 113:19
134:16
**decided** 21:16
29:20,25 31:8
**declared** 68:6,14
68:18
**defense** 19:18
**deffler** 3:6
**defined** 78:6
147:18 148:6,8
**definitely** 18:14
19:25 102:11

**demonstrated**
68:15
**demonstrating**
48:22
**denied** 36:10
**department** 9:16
9:19 13:21,24
15:2 38:16,23
55:7 58:7 76:11
92:18
**description** 4:18
5:4 6:4,13 17:19
45:3,5 46:11 53:5
65:4 101:13 107:2
**descriptions** 45:1
45:19,25
**designate** 45:25
**desired** 78:14
**desist** 20:12
**despite** 141:19
**detail** 26:25 62:12
**detailed** 68:24
**determine** 67:9,20
126:23 137:19
**determined** 32:2
133:10
**determines** 127:22
**determining** 92:25
125:15
**dialogue** 50:14
**difference** 116:18
119:18 132:12
**differences** 126:13
130:9
**different** 11:9
76:10 93:19
100:24 101:14
103:18 113:1
136:18
**differential** 116:6
116:9 120:15,17

120:20,21 143:4
145:7
**differently** 67:23
**differs** 95:3
**direct** 3:4 4:4,7,10
4:13 16:14 37:14
75:8 85:13 91:23
**directly** 79:16,24
79:25 115:12
**director** 8:23
30:11 41:14,24
44:14 86:18 91:20
92:5 98:13
**disagree** 83:23,24
126:22
**disaster** 65:11
104:7,13 135:5
**discussed** 43:25
**discussion** 37:3
43:16 79:7 142:1
147:3
**dismissed** 30:8
**dispatch** 28:18
45:17
**dispute** 32:20
50:12,18 138:20
**disputing** 67:21
**disregard** 63:21
**distribution** 9:9
**diverting** 16:12
**divested** 9:13
**divided** 109:18
**docketed** 7:5
**document** 17:14
23:19 39:5 40:15
44:4,23 48:24
53:24 54:14 55:23
56:19 57:24 58:25
59:16,24 62:2
64:6 66:6 67:5,12
73:20 88:4 90:14

102:20 118:20
127:21
**documents** 15:14
19:10 51:1,6,25
52:5 72:5
**doing** 9:21 10:5,7
15:20 16:6,9
17:22 18:7 19:7,8
19:23,24 29:12,14
30:4 31:11,19
34:6 62:1 68:21
100:2,18 103:10
103:19 106:2
124:5 126:12
131:6 137:14
138:10 140:15,15
140:25
**dollar** 107:6
109:10,19 110:16
110:19 117:7
**dollars** 111:15
117:12 137:6
145:16
**dot** 42:9,10 88:7
**double** 61:23
101:6
**doubt** 21:18
**drive** 1:16 2:2
**duly** 37:6 74:24
85:3 91:15
**duplicated** 135:12
**duties** 38:14 45:15
46:20 101:13
**duty** 16:12 20:15

**e**

**e** 5:7,10 37:10,11
37:11 41:4,9 42:3
42:17 48:15,18
52:1,5 68:24
93:18 151:1,1

**earlier** 86:19
100:16 112:2
**early** 18:10 60:10
**easier** 109:9
**easy** 23:25
**economical** 18:23
30:21 112:17
126:23
**economics** 141:21
**effect** 47:11 57:8
**effective** 53:6 73:6
**effort** 20:14
**eight** 19:6,8 33:22
34:5 73:24 74:10
142:22
**either** 36:1 66:11
66:12,13 133:21
135:13,22 143:1
**electric** 6:6 61:7
61:13 65:5 85:9
**electricity** 9:9
31:17 35:21
**element** 34:9
**elements** 127:8
**eleven** 2:7 37:19
137:6 142:22
**eligible** 116:8
**eliminated** 46:15
**embodies** 11:12
**emergencies** 28:21
30:6 31:24 32:10
**emergency** 19:18
19:21 31:25 32:3
104:2,4,13 107:9
**employed** 37:16
37:18,25 38:6,8
54:6 55:6 58:6
75:13,15,15 76:8
85:17 87:9 106:2
123:8 124:19

**employee** 22:25
31:1,3,5 75:23
76:2,2,4 108:7
110:20 122:24
125:10,12,22,22
128:5,5,7 129:16
129:21,22,23
**employees** 5:23
9:21 10:3,20
13:14,20,23 15:3
16:6,7 17:10,18,22
18:4,6,7,9,11,13
18:19,25 19:2,6,7
19:8,22 20:17
27:21 28:6 29:14
30:20 32:23 33:13
34:22 35:4 39:25
40:10 42:21 43:1
46:21 53:2 54:5
55:6 58:6 59:8,12
59:22 60:4,17
62:1 68:6,14
88:18 89:6 90:13
94:3 96:25 102:1
108:23 109:23
122:13 123:3,8
125:7 127:4,5
128:11,13,14,16
131:10,19 133:13
137:1 138:12,25
139:19 147:17
**employer** 113:10
**employment** 53:4
**ended** 13:22
**engaged** 26:16
29:9 30:1 35:4
141:16
**ensue** 39:11
**ensued** 39:13
**ensure** 17:16
105:9

**enter** 49:5,7 147:1
**entered** 134:7
**entering** 49:4
107:17
**entirety** 36:10
**entry** 13:13
**esquire** 2:2,7,12
7:10,11
**essentially** 16:1
18:12 54:14 100:4
100:5 105:22
107:3 131:2
143:17
**established** 36:8
**establishes** 30:16
**estimate** 35:12
109:16 110:12
132:9
**estimated** 15:24
34:21 35:12
**estimating** 111:15
**et** 1:10 7:7 20:18
35:22
**eu** 6:17 91:21
147:7
**evaluate** 141:20
**evaluated** 29:24
31:7
**event** 19:20 32:4
65:13
**events** 135:14
**eventually** 30:3,9
50:16 87:2,19
**everybody** 97:20
148:15
**evidence** 14:2
17:11 40:14,15
99:20
**exact** 115:24
143:15

exactly 54:2 110:7
examination 37:14
66:1 75:8 79:3
83:3 85:13 90:9
90:23 91:23 122:4
141:9 145:23
examined 37:6
74:24 85:3 91:15
example 31:10
35:19 98:18
108:22 118:13
125:11
exceptions 128:9
excess 106:5
exchange 40:5,9
52:3
excused 74:20
84:9 91:9
executed 43:11
exhibit 4:18,19,21
4:22 5:4,5,7,8,10
5:11,12,14,15,17
5:18,20,22,23 6:4
6:5,8,9,13,14,15
6:16,17 7:22 8:1,6
11:7,12 13:19
15:18 16:14 17:13
19:4 20:1,11,16,19
22:7,10,15,18,22
23:7,8,17,25 24:1
24:10 25:15 39:1
39:2 41:3,4,8
43:14,17,25 45:21
48:14,15 49:25
51:5,11,12,20 53:7
54:9,10 55:1,2,18
57:18,19 58:22
59:21 61:5,11,21
62:16,17 63:1,3
64:18 66:4 67:2
68:21 71:19 72:3

73:2,19 76:17
77:3,4,6,23,24
78:10,22 81:13
83:5 86:20,24
87:2,15,19 88:2
89:18,22 90:4,11
91:4 99:22 100:15
100:16,21,22
101:4,4,8 102:20
106:20,21 108:12
112:3 113:10,11
118:5 120:1 122:6
127:2,16,18 133:4
140:11 141:24
142:4 145:25
147:5,7,12 149:18
exhibits 4:17 5:2
6:2 7:15 72:7 78:1
81:10 83:10
exist 25:4 27:15
28:23
existence 96:18
existing 42:13
48:1 69:10,13
88:15
expand 40:6 99:2
105:22
expanded 97:5,6
99:10
expanding 27:9
expansion 99:9
expect 130:9
expend 121:17
expensive 125:12
experience 98:13
98:15 105:2,13
125:6,24 127:4
128:10,11,18,20
129:1,3 131:1
experienced 96:13
105:8

experiences 97:20
explain 15:8 46:14
50:25 51:1 55:22
65:15 76:19 77:5
77:22 106:25
119:18 131:22
explaining 52:5
explanation 62:11
expressly 10:2
extended 106:13
extent 51:24 67:23

**f**

f 151:1
face 77:4
facets 15:25 16:6
19:24
facilities 9:11 32:4
65:13
fact 22:9,14 25:3,8
26:17 33:21 52:11
69:5 72:16 77:3
98:6 99:23 102:14
107:19 111:24
112:4,11,17
148:13
failed 16:11
failing 20:2 24:9
25:15 26:7,8
fair 56:18
fall 30:2 78:5
102:2
falls 36:6
familiar 86:24
87:17 100:24
101:11 106:20
far 34:22 35:5
93:13 114:3 149:1
felt 9:20
fewer 10:4 39:25
40:1,11

field 28:19,20
76:13
fifth 19:16
figures 72:2
file 76:16
filed 9:8 49:16
72:15,16 73:17
77:14 81:13,20
filing 20:20 80:16
fill 12:22 13:9,16
14:1,18,24 15:10
20:2,4,15 22:12
23:13,14 24:9,11
24:12 25:15,24
32:13,23 90:3
96:15
filled 12:25 13:14
14:20 24:21 69:8
88:5
filling 20:2 24:25
25:21
final 42:18 44:1
63:13 67:1
finally 33:15
financial 2:19
93:10 109:21
find 20:10 78:21
81:10,15,24 99:15
fine 8:3,16,24
23:15 89:11 125:3
138:19 148:25
finish 103:25
firmly 30:16
first 6:6 7:13
15:13 17:9 19:12
24:18 26:23 31:9
35:8 37:1 39:20
42:9 44:23,24
47:9 50:21 61:6
61:12 62:5 65:6
65:14 67:12 69:2

69:14 73:5,9
76:19 88:8 103:8
103:9 109:9 113:2
113:2,20 118:12
123:21 140:18
142:12 143:10
**fitzgerald** 2:21
**five** 16:17 17:6
18:11 22:22 23:4
23:4 24:16 56:17
60:19,24 61:1
73:16 130:6,10
142:13,22 143:25
**fixed** 115:6,7
**fleshed** 25:17
**flexibility** 102:6
**florida** 15:21
112:25 118:24
127:6 129:18
**folks** 93:14
**follow** 26:7 74:19
83:1
**followed** 120:14
142:8 144:2
**following** 11:17
12:13 13:1 47:11
118:14 143:15
**follows** 37:7 39:18
74:25 85:4 91:16
**food** 98:21
**force** 32:14
**forces** 30:23,24
**forget** 110:22
**forgive** 144:12
**form** 4:21 8:1
23:19,20 32:1
72:19 77:7,8,14
80:10,11 82:5,7,10
84:1 103:2
**formal** 38:21 47:1

**formally** 9:17
**format** 77:8
**forms** 81:9
**forth** 50:14 87:18
89:16 90:4 101:1
121:3 142:24
**forward** 26:6 31:8
35:10
**fossil** 76:15
**found** 131:1
**four** 8:15 45:1
60:24 61:1 73:7
77:9 117:14,16,19
128:8,14 129:11
129:17 130:6
132:9 142:21
**frame** 73:22
103:15
**frankly** 24:5 25:13
50:16
**friday** 28:7 94:9
97:1,3 98:12,17,19
**front** 63:18
**ftes** 107:4,6
**fulfill** 15:17 88:23
89:12 91:1,3
**full** 42:9,9 90:12
101:5 108:22
**fully** 25:17 106:2
143:4
**function** 127:24
**fundamental** 22:1
26:14
**further** 23:6 24:8
65:19 74:16,18
78:24 84:6,7 90:7
90:21 91:7 122:2
141:5 145:21
146:22
**future** 12:24 90:3
133:15

**g**

**g15leh** 1:9 7:6
**gaps** 96:15
**gas** 9:11
**general** 38:5 47:24
82:19 100:18
128:19
**generalists** 40:1
**generally** 8:14
87:18,20 94:5
95:4 126:19 128:5
128:8,9
**generation** 9:11
76:14
**gentleman** 86:12
**getting** 18:25 19:9
48:25 125:21
126:3
**give** 11:6 26:11
50:25 58:17 102:6
127:13 141:6
146:8
**given** 70:17
**gives** 21:18 113:22
114:9
**giving** 8:8 88:2
**go** 7:13 11:11
12:10,16 18:18
20:24 21:9 23:6
26:6 42:14,23
43:15 46:21 47:11
50:10 51:8 62:15
66:4 68:22 79:15
81:23 95:18 98:21
103:9 104:2
106:15 119:2
132:1 134:19
136:22 148:12
**goes** 12:5,20 21:9
52:14 56:10 93:13
113:6

**going** 8:13 11:19
12:18,21 14:2
17:15,17 20:25
23:17 24:3,23
25:25 29:16 31:21
35:10 37:2 38:25
43:13 49:8,23
50:22 51:22 53:11
56:2 57:17 58:15
60:24 61:3 64:13
66:3 69:19,20
73:19 77:19 84:14
84:19,24 87:12
88:1 97:18 98:20
100:3,14 105:11
105:22 107:4
117:22 126:5
131:6 132:1,17
133:24 138:18
139:18 148:17
149:17
**good** 32:2 62:10
85:15 118:13
132:2 151:4
**gosh** 110:1
**graham** 3:4 4:12
8:22 30:11 31:7
33:17 34:14 35:2
91:14,20 102:24
118:2 141:11
148:6
**grant** 2:12,13
**graph** 44:25
**graphs** 50:22
**grievance** 1:9 4:21
7:5,6,24 8:1 9:15
22:16,20 23:2,19
23:20 24:14,16
25:8 26:7 27:2
36:9,18 49:16
50:11 51:6 65:1

72:15,19,21 73:17
76:16,20 77:5
79:10 80:10,16
81:8 82:5,7,8,16
83:6,22
**grievances** 22:23
25:1 77:13 81:17
81:21
**grievant** 75:6
**grocery** 98:18,19
**grounds** 26:7
36:11
**group** 27:23 29:3
29:5
**groups** 108:25
**guarantee** 69:12
87:22
**guess** 32:24 35:5
122:23
**guessing** 44:14

**h**

**half** 92:12 104:23
145:16 146:11
**hand** 24:4 38:25
41:2 43:13 48:13
49:23 51:10 53:11
53:13 54:8,25
55:11,17 57:17
58:15,20 59:19
61:3 63:1 76:24
114:1 151:14
**handed** 41:7 48:18
61:10
**handle** 26:22 65:8
93:16 101:23
102:7 104:13
105:24 129:8,9
133:11
**handled** 119:2
**handling** 94:6

**handwriting**
55:11
**handwritten**
53:13
**hanna** 3:5
**hanson** 27:5,14
**happen** 12:22 44:9
88:25 137:1
**happened** 27:4
33:24 96:17 97:12
135:22 136:14
**happens** 17:1 32:8
32:15
**hard** 130:13
**harder** 131:18
**hardware** 114:2,3
114:13,20
**hate** 111:7
**he'll** 126:19
**head** 85:20 127:24
**healthcare** 137:24
138:5
**hear** 31:25 40:18
**heard** 21:15,19
24:8,11 25:19
26:5 27:17 30:1
30:15 31:4 33:6
61:25 86:20 94:11
**hearing** 36:9
112:14 150:1,2
**hearsay** 51:23
**held** 17:17 37:3
43:16 76:10 86:2
92:10,15 138:24
142:1 147:3
**hello** 91:25 92:1
**help** 21:21 50:24
51:1 96:15 97:25
98:1 149:16
**hi** 85:16

**high** 15:3 95:17
140:21
**higher** 9:20 12:2
14:14 28:1 40:10
48:1,11 71:10
103:14 139:1,2
143:20 144:13
148:16
**highest** 71:7,11
97:8 143:9
**highs** 95:12,14,24
103:17 134:14
**hire** 10:19 12:18
14:22 32:22,23
33:9 42:12,20,24
47:10,10,16 48:22
88:14,18 89:18
**hired** 13:14 14:13
47:9,17 69:10,13
129:17 140:2
**hires** 15:19 20:16
20:21 47:10,11
147:17
**hiring** 12:23 15:11
16:12 20:4 34:22
42:12 68:25 69:5
89:13 90:12
**history** 135:25
**hold** 8:11 38:3
86:7,17
**holiday** 1:15
**honest** 139:16
**honor** 13:25
**honorable** 20:10
**hope** 32:8
**hopefully** 48:19
88:3
**hour** 29:22 30:3
35:23 71:6,16
84:21 104:9 109:2
109:6 110:15,17

111:8,9,13,20
113:24 114:25
115:4 125:11,13
137:10,16 138:9
143:7
**hourly** 108:1
110:10 116:12
117:2,4 120:9
137:5,16 142:25
146:5,5
**hours** 16:3,9 17:23
18:10,10 19:23
60:9,10,17 70:15
94:8 96:24 97:6
99:1,2 105:23,24
109:15,18 112:22
113:3,4,5,22,23
115:24 116:5,8,11
117:5 118:14
120:16,19,25
122:8,12,16 123:7
136:6,12 143:2
**house** 116:14
117:3 125:21
131:5 143:11,12
143:13,14 145:14
146:1,3
**hr** 3:6,7
**huh** 70:4
**human** 44:14
131:14
**hundred** 138:6
**hydro** 9:11
**hypothetically**
106:9

**i**

**ibew** 1:4 2:15,18
5:8 7:3 9:6 37:11
37:17,20 43:17,23
75:5,11

**idea** 32:2
**identification** 7:23
8:2,7 39:3 41:5
43:18 48:16 50:1
51:14 53:9 54:12
55:4,20 57:21
58:23 59:22 61:8
63:4 64:20 108:13
113:12 141:25
147:8
**identified** 66:16
66:16 83:15
**identifies** 71:19
**identify** 82:17
**identifying** 82:22
**identity** 41:21
**ii** 11:19 14:9,19
16:16 17:5 20:11
23:9 25:18 27:25
46:4 48:5 56:11
56:11,11,15
101:22,24 107:24
108:20 140:7
142:9,14 143:1,1
146:2,3
**iii** 11:20 22:18,19
22:21 27:25 42:13
46:4 48:9 56:11
56:11 69:11 83:7
88:15 90:13
101:23 102:3,11
107:24 108:20
120:4,8 140:10,15
140:15 141:13
142:11,15 146:2,3
**iiis** 89:2 115:25
139:12 141:22
143:25
**iis** 56:22 139:11,14
141:21 143:24

**immediately** 39:10
133:22
**impacts** 65:13
**important** 15:7
26:13 32:9 104:17
148:13
**importantly** 11:17
**improve** 98:15
**improvement** 2:22
**improvements**
85:9,22,24
**inappropriate**
24:5
**inbound** 65:9 94:6
100:3,11
**include** 35:17,18
35:24,25 108:3
118:8 121:3
145:14,17
**included** 78:2
118:10 119:23
**includes** 78:1
118:17 145:19
**increase** 10:17
19:17 30:23 42:5
95:21 97:9 98:14
120:12 133:23
146:8
**increased** 35:25
**increases** 31:17
**independently**
16:15
**index** 4:1,17 5:2
6:2
**indicated** 76:24
**indicates** 12:17
**indicating** 8:19
68:8 115:21
**individual** 13:4
24:20 41:21

**individuals** 21:21
26:21 27:22 102:1
124:17
**industry** 31:15
108:9
**influx** 103:12
**inform** 25:23
**information** 5:11
5:12 16:4,23
18:15 19:5 26:18
49:17,25 50:4,13
50:14,15,17,20
51:3,12,19 52:21
53:5 56:5 57:25
58:5 59:1,25
62:22 109:22
**informed** 82:2
102:17
**initial** 12:10,11,20
48:23,23 61:18
**initially** 13:21
14:1,12 57:5 59:6
76:8 120:5
**inn** 1:15
**inset** 68:10,11
**insists** 23:12
**intangible** 129:25
**interact** 98:23
**interaction** 102:8
120:6
**interactions** 65:10
93:17 105:25
**interested** 151:12
**intern** 3:6
**internal** 96:11
104:9 139:17
**interpretation**
7:13 9:7 25:18
**introduced** 77:10
**invalid** 19:19

**invoice** 63:13,20
113:3,25 118:6,15
119:8,23
**invoices** 6:8,15
34:25 62:24 63:3
63:7,10 64:2,4
112:3,4,7,11,15,21
113:12,17 118:22
122:6 123:18,22
**involve** 85:23
**involves** 21:20
26:20 85:24
**iqor** 5:23 6:8
10:12 15:15,24
16:6,13 17:22
18:11 19:4,7,12,13
19:22 20:13 26:16
27:3,7,10,12,16,16
29:17,19 30:1,10
31:6,8,19 33:7
58:13 59:7,12,21
60:4,16 61:19
62:1,6,19,19 63:3
64:14 65:8,11
74:3 96:24 99:18
99:21,23 100:1,3
100:18 101:25
102:16 103:10,21
104:15 107:1,18
111:17 112:3
115:25 116:11
117:17 118:20
124:11,15,17,20
124:21,22 127:6
134:8,19 137:2
138:23 139:19
140:14,15,22,25
141:16 143:6
144:14,16,18,21
146:1,2,10,12

**iqor's** 111:12
**irrelevant** 50:16
51:3
**issue** 10:9 24:18
25:5 34:24 50:19
51:6 80:6,6 105:6
148:20 149:17,21
**issues** 21:22 26:21
36:18 43:8 51:19
**item** 112:22
118:16
**items** 52:17 113:1
113:19 118:23
**iv** 71:6 72:1
**ivr** 93:18

**j**

**j** 2:7 7:9,19 37:10
**jane** 2:20 4:3 37:2
37:5,10
**jane's** 64:4
**january** 5:17 55:3
55:7,14 56:2
**jesse** 3:6
**job** 9:23,24 13:5
17:16,19 27:23,24
29:2 34:15 40:8
41:11 45:1,3,5,19
46:10,22 48:11
53:5 56:12 68:15
70:21 107:24
109:23 128:6
132:1
**jobs** 76:10
**john** 2:2
**joint** 4:18 7:14,22
7:24 8:1,5,6,21
11:2 17:4 22:15
22:22 23:7 47:14
76:17 83:5 101:4
**joints** 9:1

**joshua** 2:12 7:10
9:5
**judgment** 126:10
**july** 35:6 58:2
63:14 116:19
**june** 5:14 53:8
54:6
**jurisdictions**
38:18
**justification** 17:25
18:22 19:16
**justifications**
16:18,21 17:7

**k**

**k** 148:4
**keep** 52:22 53:1
102:13 105:10
121:18
**keeping** 35:19
**kelley** 3:7
**kent** 44:10
**kent's** 44:20
**key** 34:9
**kin** 151:11
**kind** 90:3 93:8
94:21 95:14
105:23 117:4
130:13 135:4
**knew** 130:24
**knoebel** 2:19 4:6,7
8:20,22 11:9
74:21,23 75:4
80:8
**know** 8:13 16:25
21:13 25:4,24
30:14 35:15 36:14
36:17 41:11 44:9
44:12 46:13 57:15
58:12 69:12 70:5
70:18,19,20,21,24
71:4 81:7,19

86:12 89:7,9,10
95:4 104:24 109:7
126:9,12 128:9
137:1,8,11,20,21
137:24 138:4,6
139:16 140:19
148:21 149:22
**knowledge** 77:8
80:21 87:21 91:2
**known** 31:14
88:13

**l**

**labor** 3:4 44:16,17
72:3
**lack** 48:7,9
**laid** 31:1,3,5 72:25
74:8 121:25
**lane** 1:24
**language** 23:23
33:11,12 82:22
**large** 40:4 123:19
123:20 125:7
**late** 25:10 60:17
60:21 72:15
**launch** 100:8
123:4
**laura** 2:21
**layers** 137:21
**layoff** 30:24
**lays** 11:18 17:6
**leading** 49:1 133:8
**learn** 137:7
**learned** 16:5
**leave** 38:8 75:20
76:2 118:2
**lebowich** 2:7 4:4,7
4:10,11,13,14 7:9
7:18,20 8:3,11,16
8:24 11:6 20:24
21:3,6,8 27:12
28:12,14,20 29:6,8

40:20 41:22 43:15
44:16,20 48:24
49:14 50:9 51:22
52:9 53:25 57:11
57:15 58:17 62:7
62:10 63:16 64:7
64:10 65:2,22
66:2,19,23 68:1
69:9,17,25 70:1,12
70:13 71:18,21
72:1,4 74:13,16
77:15 79:1,4 80:2
80:5,7 81:6,12,18
82:6,14,25 84:7,17
85:14 89:8 90:7
90:24 91:10,24
93:12 94:18,19
95:13 96:1 98:5
99:12 100:13,21
100:23 101:18,19
105:15 108:11,14
113:13 114:16
115:22 117:8,25
118:1 119:5,20
122:2 126:5 127:7
130:19 131:21
136:18 138:2,20
141:6,10 142:2
145:21 146:23
147:6,24 148:5,10
148:24 149:3,10
149:14,19,23
**led** 87:2,15,19
97:12
**left** 74:10 75:18,21
76:24
**legal** 1:23 31:16
132:23
**lehigh** 11:15 39:17
55:25 66:21 86:5
86:9 123:9 127:5

135:2,10 136:1
**lesser** 131:20
**letter** 8:21 12:6
13:17 43:8,20
57:1,4 89:17
**letters** 12:7
**level** 13:13 28:1
34:10,15 48:10
67:15 78:17,19
87:23 102:1
110:13 128:1
133:16 137:9
139:15
**levels** 34:20 67:10
67:21 78:15
100:25 101:14
137:11
**liaison** 92:9
**liberty** 1:24
**license** 105:19
**life** 115:8 145:6
147:19
**lights** 105:10
**limit** 21:11 30:25
**limited** 25:16
**limits** 22:11
**line** 5:6 28:25 39:3
40:7,9 44:25 68:8
101:2,15,22 102:2
112:22 113:1,8,19
118:16,23
**lines** 11:14 39:17
42:21 47:10
115:23
**ling** 41:10,10 42:4
66:11,13 68:24
86:13,15 87:7,9,14
**list** 55:25 73:3
**little** 27:8 30:7
48:25 68:5 109:7
109:9

**llc** 6:6 15:14 61:6
61:13 62:6 65:7
**llp** 2:6
**loaded** 143:4
**loader** 110:2,3
121:7
**local** 1:4,9 2:15,18
7:3,6 10:17 20:9
21:11,13 27:20
37:11,17 43:23
75:5,6,11,14 89:6
94:3
**located** 11:14
60:12 93:24
**locations** 112:24
114:21
**long** 8:18 29:16
31:1 37:18 38:6,9
75:10,13 77:6
85:17 92:10,15
139:10
**longer** 27:13 28:17
97:12
**look** 11:3 12:20
34:16,16,25 35:2
39:5,14 42:3 45:6
47:4,6 48:3 56:9
60:7 61:21 65:4
71:19,20 72:6
73:2,19 83:5 93:9
95:23 98:4,6
109:9,22 110:13
114:24 118:11,14
134:12 146:17
**looked** 33:16 81:8
98:24 99:3,13
116:5,10
**looking** 33:20 40:5
40:6 44:3,22 46:4
65:14 68:4 92:24
98:9,14 99:8

100:8,15 102:7
107:23 108:19
112:20,21 113:7
118:19 122:6
132:13,14 140:9
142:6
**looks** 63:17 132:14
**lori** 2:22
**loses** 31:2,3
**losing** 135:5
**lost** 20:17 31:5
**lot** 33:15 77:15,16
77:17,19,20
**lou** 5:7 12:8 17:12
19:15 41:5
**lower** 9:19,22 12:1
12:16 40:8 47:25
103:16 111:2,9
129:18 138:11
144:13 145:5
**lowers** 145:1,6
**lowest** 34:20
**lows** 95:25 103:17
134:14
**loyalty** 130:9
**lunch** 84:16,20,22

## m

**m** 2:2,12 7:10
**ma** 80:10
**machine** 151:7
**mail** 5:7,10 41:4,9
42:3,17 48:15,18
52:5 68:24 93:18
**mails** 52:1
**main** 38:16
**maintain** 11:17
16:11 19:15 78:14
78:19,21
**maintained** 14:3,4
14:6

**maintenance**
35:22
**making** 38:22
131:25 132:1
138:17
**management**
56:17 67:9,19
92:7,8,20,21,21,24
125:6
**manager** 2:21,22
3:5 41:17,22
66:21 85:8,22
86:5 97:14,23
**managing** 125:6
**manger** 2:23
**manner** 12:13
13:1 59:4
**march** 10:15 19:6
56:3,20 58:2,10
92:14 94:20 96:18
96:24
**mark** 39:1 41:3
43:13 48:14 49:23
54:8,25 55:17
57:17 58:16,20
59:19 61:3 64:16
113:9
**marked** 7:23 8:2,7
8:18 39:3 41:5,7
43:18 45:21 48:16
50:1 51:11,13
53:8,11 54:11
55:3,19 57:21
58:23 59:22 61:8
61:11 63:4 64:19
76:17 88:2 102:19
108:11,13 112:2,3
113:12 119:25
141:25 142:3
147:8

**mas** 78:2 81:22
**math** 64:7 111:7
  119:11 130:19,19
**matter** 1:3 22:6,16
  34:16 52:2 83:25
**matters** 7:14
**max** 137:22
**mean** 50:11 52:1
  93:13 110:3
  131:25 138:14
  144:12 148:13
**meaning** 28:10
**means** 32:25
**medical** 147:19
**meet** 16:17 18:4
  65:12
**meets** 30:17
**member** 75:25
**members** 138:23
**membership** 5:14
  5:17 10:18 42:5
  52:23 53:4,7 55:2
**mention** 22:17
  82:12
**mentioned** 38:19
  70:2 92:20 93:11
  121:6
**mentions** 23:7
  62:17
**merely** 80:2
**merits** 23:16 36:16
**met** 16:21
**michael** 2:7 7:9
**mid** 1:23
**middle** 18:12 56:9
  88:4
**midnight** 60:9
  70:25 71:2
**million** 15:25
  19:12 35:11,13
  62:18 117:7,11,12

117:15,17,19
  119:12,13 132:10
  132:12,14,15,19
  133:1 143:11,12
  143:15,17,18
  145:2,3,9,16
**mind** 20:8 65:22
  139:3
**mine** 54:19
**minimum** 87:23
**minute** 46:3
**minutes** 20:25
  74:13 104:10
  117:9
**mischaracterizat...**
  67:18
**missed** 73:15
**misunderstandin...**
  26:14
**mlebowich** 2:9
**mobile** 76:13
**moment** 131:15
**monday** 28:7 94:9
  97:1,3 98:11,17,19
**mondays** 97:19,20
**money** 35:1 36:2,2
  131:25
**monica** 2:23
**month** 19:13 35:7
  73:22 110:24
  113:6,6,19 118:12
  134:14 142:13,15
  142:16 143:24,25
  144:1,10
**monthly** 33:18
  34:17 53:3 95:23
  96:12,20 107:25
  108:19 109:14,17
  110:23 111:3
  129:6 134:13,15

**months** 14:10,11
  42:22 57:7,9,15
  123:21 128:8,14
  129:11,17 140:6
**moot** 47:19
**morning** 18:10
  60:10
**move** 29:1,22 31:8
  63:16 106:5,8
  114:4,12 130:7
  132:3 142:18
**moving** 142:6,7,8
  142:9,10
**muffley** 55:14
  133:16
**multiple** 116:15
**multiplied** 109:8
**multiplier** 109:25
  116:4,12 120:13
  143:3 145:15

**n**

**n** 37:10
**name** 9:5 11:5
  37:8 75:2 85:6
  91:18 102:22
**named** 75:6 86:12
**natural** 24:22
  72:23 74:6 135:4
**naturally** 74:11
**nature** 26:15
  50:11 51:23
**nco** 27:6,8,9,13,15
  27:16 29:8,25
  30:4 31:10,21
  95:2 97:1,10,12,18
  97:21,24 103:19
  103:23 114:5
**necessary** 17:16
  71:24
**need** 10:21 18:18
  20:25 21:1 31:13

40:14 57:2 98:22
  105:10 127:23,24
  129:7 142:18
  149:5
**needed** 19:1 29:25
  30:19 93:1 100:6
  104:11 120:5
  133:13,23,25
  135:11 140:12
  141:17
**needs** 50:23 65:12
  133:10,23 134:1
**negative** 130:16
**negotiate** 40:24
**negotiated** 10:13
  133:5
**negotiation** 111:16
**negotiations** 10:23
  39:11,13 87:2,13
  87:15 89:18,22
**neither** 151:11
**never** 14:2,4,6,20
  14:22 18:5 32:8
  80:9 82:12
**new** 2:8,8 15:19
  19:1 20:14,16,20
  27:3 32:23 33:9
  42:21,21 43:1
  45:3 46:10 47:9
  47:10,16 56:13
  88:18 90:13 100:7
  104:17 122:23,24
  127:5 128:11,13
  129:13 131:9,10
  132:3 139:18,19
  147:17,17
**newer** 46:2
**newly** 12:12 13:14
  46:22 47:24
**newman** 3:4 28:19
  77:17,20

**newman's** 50:4
**night** 18:12 28:21
**nine** 123:21
  142:22
**nods** 85:20
**nonpayment**
  95:21
**nonproductive**
  121:7,8,14 145:19
**normal** 103:14
  135:15
**norristown** 2:3
**northeast** 32:6
**notary** 151:4,18
**noted** 13:18 72:3
**notice** 138:16
**notification** 6:9
  18:2 25:9 31:20
  32:1 64:18,22
  103:2
**notified** 64:13
**november** 35:6
  58:14 75:16 76:22
  95:16 103:14
  113:18 134:24
**nuclear** 9:11 76:15
**number** 1:8 5:20
  11:6,9 12:18
  33:17 34:12,13
  40:11 53:2,13,18
  53:21 54:5,18
  56:7 57:19 58:1
  59:11 67:14 71:25
  99:20 109:11,11
  110:25 111:2
  115:1 116:10
  117:5 118:16
  127:22 142:17
  148:7
**numbers** 11:5
  24:23 68:25 69:6

73:21 119:3 125:7
  130:24 132:14,21
  144:4,22
**numerous** 123:17

**o**

**o** 81:13
**oakland** 2:2
**object** 51:23 52:14
  67:17 126:5
  147:11
**objection** 40:16,18
  40:19 48:24 49:14
  67:24 127:7
  131:21
**obligated** 19:3
**obligation** 33:9,10
  88:23 89:12
**obligations** 12:9
  89:16,17 91:2,3
**obvious** 93:14
  111:7 138:14
**obviously** 86:2
**occurrence** 24:17
**occurring** 104:25
**october** 15:1,6,7
  18:24 58:7,14
  63:13 113:18,20
  113:21 116:19
  122:7 133:7,8,22
  134:8 151:15
**offer** 4:22 8:4,7
  38:22 40:13,15
  49:20 50:6,22
  147:9
**offered** 5:22 10:1
  13:4 52:13 58:22
  59:1,7,7,12
**offering** 40:5
  52:12 69:1
**office** 65:10 86:5
  107:8

**offices** 86:9
**official** 151:14
**oftentimes** 83:22
**oh** 8:11 77:15
  110:1 144:15
  145:8
**okay** 8:17,17,25
  9:3 21:5 28:13
  29:17 34:25 36:22
  37:22,25 38:19,25
  39:10,14,24 40:2
  40:13 41:15 43:6
  44:8 45:7,23,24
  47:22 48:13 49:20
  52:16 53:1 54:8
  54:18 56:9,24,24
  58:10,12,15 60:12
  61:21,24 62:9,24
  63:15 64:4 65:20
  66:3,5,15 67:25
  68:23 69:10 70:8
  70:23 71:4,13
  72:25 78:8,25
  79:7,17,17 82:1,25
  84:15 85:21,23
  86:6,9 87:9 88:17
  89:5,15 91:6
  92:10,13,15 93:23
  94:2 95:3 96:22
  98:6,9 99:17,25
  101:25 102:14
  103:7,18 104:2,6
  105:16 107:17,22
  109:15 112:6,11
  112:14 113:9
  114:1 117:22
  119:16,17 121:14
  121:19,22 123:12
  127:2 133:2 134:4
  136:17 139:3,7
  144:23 147:25

148:22,23,24
  149:7,9
**once** 21:10 44:18
  79:20 136:14,15
  149:15
**ones** 30:18 46:2
  68:10,11 81:10
  122:22,23
**open** 14:23 35:19
  98:19 121:18
**opening** 9:4 36:18
  38:20 46:14 61:25
  77:3
**operating** 98:11
  98:16
**operations** 3:5,6
  8:23 30:12 41:25
  86:18 91:21 92:6
**operative** 67:5
**operator** 38:4
**opportunities**
  12:25 20:18
  137:13
**opportunity** 13:5
  13:11 93:9 137:12
  141:20
**opposite** 128:18
  128:21
**options** 31:7
**order** 22:23 29:21
  36:24 66:4 68:22
  105:9
**organization**
  28:16,17,24
**original** 63:19
  121:6
**ortiz** 2:21 4:9
  48:19 66:14 85:2
  85:8,15
**outbound** 65:9
  100:7,11

outcome 151:12
outside 32:6 99:2
  103:15 104:12
  116:7 120:16
  143:13
overall 125:16
  126:24
overgeneralistic
  27:8
overheard 35:18
overnight 29:11
overtime 32:24
  33:10 106:10,11
  116:11,16 120:17
  120:18,19,24
  121:1

**p**

p 11:7 13:19 15:18
  16:14 17:13 19:4
  20:1,11,16,19 22:7
  22:10,18 23:8,17
  24:1,10 25:15
  51:5 67:2 77:3,4,6
  77:23,24 78:22
  86:20,24 87:2,15
  87:19 89:18,22
  91:4 101:4,8
  133:4
p.m. 28:8 29:11
  70:15,25 84:22,23
  150:2
pa 1:24
package 125:11
  126:25
page 4:2,18 5:4
  6:4,13 11:5,9
  12:20,24 17:3,6
  22:22 44:4 45:5
  47:4,7 62:17 68:2
  88:12 90:17 101:4
  101:6,7,8

pages 11:1 44:24
  44:24 61:22 62:15
paid 9:20,22 35:17
  110:6 112:9
  123:20,25 124:9
  125:10,12 131:19
  137:2 138:2,12
  140:4
paragraph 23:10
  39:19,21 77:25
  78:7 80:25
paragraphs 12:11
parcel 45:20
part 10:10 29:3,5
  29:23 45:20 47:1
  51:4 55:12 65:17
  87:12 89:18,22
  101:3 123:19,20
  142:12
particular 13:6
  22:12
particularly 31:13
  50:13
parties 11:13,16
  21:16 43:9 62:25
partner 110:10
parts 11:1
party 151:11
patently 26:1
pattern 120:14
patterns 92:25
  133:9
pause 21:4 58:18
  91:12 141:7
pay 9:19,23 12:1,2
  31:2,3,6 34:19
  48:1,6 53:6 62:18
  71:4 106:10 121:2
  124:5,7,10 129:18
  137:20

paying 110:21
  112:23 143:6
payment 106:23
payments 129:7
peak 19:21,25
  30:7 31:10,11,22
  103:8,10,10 134:4
  134:10
peaks 19:16 30:6
  30:21,22 31:13
pennsylvania 1:17
  2:3,13 27:19 32:5
people 8:9,10
  28:23 32:12,14,22
  33:2,4,6,9,22 34:1
  34:1,4,5,7,11 70:9
  70:17,23 73:24
  74:2,7,10 78:20
  81:16 88:15 89:12
  89:13 98:24 106:5
  106:8 114:12
  117:18 124:4
  129:7 130:2,6,25
  131:5 132:3,9
  139:19 141:21
  142:6 145:5
  146:17
people's 31:16
  148:16
percent 95:11,24
  96:10,21 98:25
  103:16,17 133:18
  133:19 134:11,12
  134:13,15,17
  138:7 142:13,14
  142:15 143:23,25
  144:1,9
percentage 146:7
perform 33:1
  48:12 94:22 95:5

performance 57:2
  137:13
performed 46:20
  100:1 101:14,25
performing 33:3
  60:5 139:15
period 15:7 23:4,5
  63:10 114:23,25
  142:20 143:11
periods 96:3
permanent 10:19
  12:16
permits 18:22
permitted 17:7
person 29:1 33:18
  33:21 97:21
  109:11 129:23,23
  140:9,10
personally 80:16
pertain 63:10
pertaining 78:15
pertains 60:9
  65:16
pertinent 53:5
ph 25:20
phone 93:17 114:8
  135:4 136:6,11,22
phones 21:21
photocopied 63:17
phrase 94:12
pick 141:11
  146:20
picture 40:4
piece 105:4 111:5
pittsburgh 2:13
place 27:6 56:25
placed 10:24 32:1
plan 6:16 141:25
  142:5 143:16
  147:18 148:5,8

**plans** 133:15
**plants** 9:13 76:14
**play** 87:5,7 96:9
  96:14
**please** 11:3 39:5
  39:14,19
**pleasure** 112:6
**plus** 101:22,24
  108:1 114:20
**point** 10:6 16:19
  23:17 26:17 28:5
  28:15 29:15 44:22
  47:8 63:1,25 67:8
  68:13 69:2 74:9
  89:21 120:9
  121:22 141:11
**pointed** 9:6 73:20
**pointing** 115:19
**points** 29:23 39:22
**portion** 65:15
**position** 12:3 13:4
  13:6,12,13 14:14
  14:15,23 22:13
  24:24 28:9,15
  33:8 37:9 41:12
  42:13 51:2 52:8
  52:10,13,17 53:2
  66:17,20 67:10,20
  69:23 70:2 71:8
  75:3 85:7,21 86:1
  86:2,7,17 87:24
  88:16 90:12 91:19
  92:11,16,17
  121:23
**positions** 9:19,22
  11:18,18 12:2,12
  12:16,22 13:3,10
  13:25 14:3,5,7
  16:11 19:15 38:3
  46:15,21 47:25
  48:2,2,23 53:19,21

56:13,14,16,17
  67:14 69:11 87:14
  88:5 140:25
  144:13,13
**positively** 22:17
**possibility** 33:12
**possible** 28:25
  36:23
**post** 47:10 147:19
**power** 9:10,12
  76:14 135:5
**pp&l** 124:5
**ppl** 1:6 2:10 3:3
  5:9,14,17 6:6,17
  7:3 9:8 10:7 26:23
  27:2,4,4,13,19
  29:9,13,18,20 30:1
  30:11 32:2,12
  37:25 38:3,6,8
  43:18,24 52:24
  53:7 54:5,15 55:2
  55:6 58:6,13 61:6
  61:13 64:12 65:5
  65:13 76:4,8
  77:11 85:9,17
  86:3 87:10,24
  91:21 92:4,13
  93:23 94:21 95:1
  97:2,4,10 105:20
  110:14 111:14
  121:23 122:12
  123:25 124:12
  133:11 138:12,24
  139:10,25 141:1
  147:7
**ppl's** 135:25
**pre** 48:1
**precluding** 25:3
**preliminary** 7:14
**preparation** 34:23
  53:15,16 112:14

**prepared** 21:24
**present** 2:17 3:2
  17:10 18:3 26:4
  26:19 30:20 33:13
**presented** 22:15
  25:9 72:8
**presenting** 22:5
  52:3
**president** 2:19
  75:4,10,20
**presumably** 30:12
**pretty** 18:20 29:13
  95:6 96:21
**previous** 48:2
**previously** 9:10
**price** 107:5,6,10
  107:23 109:1,5
  143:4 145:2 146:9
**prices** 143:5
**pricing** 106:24
  107:3 144:25
**primary** 22:5 95:7
**prime** 32:15,16
**printed** 77:4 101:5
**printout** 55:12
**prior** 11:24 29:8
  75:16 86:1,4
  107:17 110:21
**probably** 7:20
  77:9 102:3,13
  108:9 111:15
  118:10,13 136:15
**problem** 18:8
  57:11 104:25
**problems** 114:5
**procedural** 26:6
  36:10
**procedure** 22:20
  24:16 26:7 83:6
**procedures** 83:22

**proceed** 26:10
  36:13
**proceeding** 22:2
**proceedings** 21:4
  58:18 91:12 141:7
  151:5,6,10
**process** 17:15
  29:24 42:12 82:16
  85:9,22,24
**production** 142:18
**productive** 116:5
  128:12,15,24,25
  131:2 142:8,10,11
  143:2,9
**productivity**
  113:1 127:17,19
  127:23,25 132:4
  144:25
**professional** 6:5
  61:5,12
**program** 119:1
  123:5
**programs** 137:12
**progress** 137:21
**progression** 5:6
  9:24 11:13 14:15
  28:25 39:3,17
  40:7,9 44:25 71:9
  101:2,14 102:2
**prohibit** 24:12
**projected** 35:10
**promised** 14:3
  15:11
**promote** 13:5
**promoted** 13:12
  68:6,14 139:11
**promoting** 16:11
  20:4
**promotion** 14:9
  15:11 57:5 73:5,9

promotional 12:25
promotions 5:18
  12:22 13:9 14:12
  14:13,18,19,21
  15:19 20:15,20
  55:18,25 56:7,19
  56:24,25 73:3
prompting 64:25
pronounced 48:20
proper 78:14
proposal 5:5 10:4
  39:2,6,10,12,15
  40:21,23 67:7,15
  68:2,3,16
proposed 40:1
proposing 39:16
proskauer 2:6
proskauer.com
  2:9
prove 16:21
  130:14,15,18
provide 29:9,21
  30:2 31:21 34:10
  36:15,17 50:15,17
  65:10 96:16
  105:10 122:17
  134:23 135:16
provided 30:2,17
  50:15,20 56:4
  59:25 61:17 66:7
  67:13 79:13 103:3
provides 33:11
  65:11
providing 30:5
  96:6
provision 17:5
  20:7 23:21 78:1
  80:12 82:4,20
provisions 78:4
  82:17

public 17:25 151:4
  151:18
pull 109:22
purpose 57:10
  104:6
pursuant 13:22
  19:2
put 22:8 24:5,19
  31:20 36:4 47:20
  62:12 77:25 83:16
  99:19,21 103:10
  115:2 140:1
putting 34:6 147:4

**q**

qa 107:9,11
  118:25 137:12
quality 119:1
  125:20,25
quarter 137:9
question 33:14,22
  36:24 90:16,25
  103:25 123:9,10
  126:6,8 127:10,12
  127:14 130:22
  135:9,17 136:19
questions 65:23
  74:17,18 78:24
  84:6 90:21 117:24
  139:8 141:5
  146:22
quick 139:4
quickly 146:16
quite 125:9 141:1
quote 65:5

**r**

r 37:11 151:1
rage 137:16
raised 24:18 34:24
  51:5 91:1 143:8

ran 64:1
range 28:7 29:11
  111:17 137:4
rate 48:6 53:5 71:4
  71:7,11,14 108:1
  110:10 111:12,16
  111:20 112:22
  113:23 116:1,12
  117:2,4 120:9
  137:5 138:10
  142:13 143:20
  144:21 146:5,5
rated 40:8
rates 62:18 111:3
  111:9 142:25
ratification 12:14
  42:11,22
ratio 108:8 145:12
reach 43:7
reached 43:2,23
read 20:8 39:20
reading 110:8
reads 68:17
ready 9:4 21:7
  36:13
real 144:4,22
reality 34:8
realize 42:17
really 80:21 92:24
  94:13 98:16
realtime 114:11
reason 20:8 31:25
  74:11 135:5 145:4
reasonable 32:25
reasons 31:24
rebuttal 36:15,17
recall 38:12,19,23
  64:12 66:14 86:21
receipt 148:18
  149:12

receipts 38:4
receive 53:3 59:16
received 19:10
  55:23,24 56:3
  57:24 63:7 112:12
receiving 112:6
recess 36:25 74:15
  84:13,22 117:21
  139:6 146:19,25
  149:6
recognize 66:24
  101:8 102:20
  108:15 113:14
record 7:8 20:24
  37:3 43:15,16
  142:1 147:3
  148:12 151:10
recorded 151:6
records 15:4 54:4
recovery 65:12
  104:7,13
recross 4:14
  145:23
redirect 4:8,11,14
  83:3 90:23 141:9
reduce 10:20 42:5
  106:16 107:19
reduced 76:20,22
  79:10,21 89:25
reduces 107:5
redundancy 32:5
  65:11 104:7,25
  105:5 114:15
refer 10:10 12:7
reference 10:6
  15:14 26:24 44:22
  49:4 50:7 77:2
  88:5 90:14 94:10
  148:22
referenced 46:13
  51:19 62:25 81:21

**referencing** 11:2 83:13

**referred** 83:6

**referring** 64:25 72:11 83:19 88:7 90:5

**reflect** 100:17

**regard** 10:11 38:15,22 133:12 133:24 148:20

**regarding** 43:8,24 149:17

**regardless** 105:11 123:25 124:2

**region** 1:23

**regions** 105:7

**rejected** 24:4 26:6

**relations** 3:4 18:1 44:16,17

**relative** 11:13

**relevance** 50:10 51:18 131:21,23 138:2

**relevant** 11:1 34:2 52:6

**remain** 149:9

**remained** 18:20

**remedy** 20:9

**remember** 136:5 137:22

**remote** 17:1

**renamed** 76:13

**rep** 28:1,2 29:1 37:11,24 41:22 75:21 94:11

**repair** 129:9

**repeat** 135:9

**repeatedly** 25:21 82:2

**replace** 29:25 30:4 31:21

**replaced** 78:18

**replacing** 27:8 31:9 103:21

**reply** 51:17

**reporter** 8:14 104:1

**reporting** 92:8 93:7 114:9

**represent** 9:6 39:15 41:8 42:4 47:14 53:12 55:10 57:23 59:5 122:15

**representation** 10:14

**representative** 2:20 11:20,21,23 12:4 27:20 37:24 38:5,10,15,16 41:17 45:9,16

**representatives** 121:25

**represented** 10:2 10:16 58:3

**representing** 2:10 2:15 7:9,10

**request** 5:11,12 16:4 26:10 49:17 49:25 50:4,13,24 51:12 52:21 56:5 57:25 59:2 60:1,4 61:18

**requested** 18:16 59:5,6 79:23 112:15

**requesting** 20:10

**requests** 51:3,19

**require** 18:1 22:12 23:14 25:21 30:22 120:17

**required** 20:16,19 35:21 67:10,20

104:4

**requires** 23:13 24:10,11,12,16 129:6

**requisite** 17:12

**resources** 44:15

**respect** 66:3 69:22 87:1 88:24 89:11 89:13 91:3 96:6 96:22 99:25 103:8 103:23 119:25 120:20 121:5

**respectfully** 19:18 20:9

**responded** 50:23

**response** 4:22 8:4 8:6 26:11 39:12 40:23 49:21 50:4 50:5,24 51:17 56:5 57:25 58:6 59:1,25 60:3 61:17 79:21

**responses** 51:18

**responsibility** 92:7

**responsible** 67:9 67:19 92:19

**rest** 84:14 149:3

**restate** 127:14

**rested** 149:9

**rests** 149:8

**result** 31:6,17 89:5 96:2

**resulted** 10:23 12:1 72:22

**retain** 131:19

**retirement** 147:18 147:19

**reviewed** 33:17 34:14

**revised** 11:13 46:1

**rid** 126:11

**right** 7:2,12 9:3 29:7 30:16,22 41:2 42:19 47:6 49:12 51:10 52:7 52:9,18 53:13 54:1 55:11 56:12 56:14 64:3,24 68:19 69:6 70:5 71:23 73:9 78:13 82:10 83:25 84:8 84:24 88:3 90:15 93:6 101:17 102:16 110:25 114:1 120:2 122:8 122:23 123:2,24 124:1,6 125:7 129:13,15,20 130:3,12 139:23 140:14 143:19 144:5 146:20 148:24 149:11,25

**rights** 21:12 25:16

**role** 87:1,5,7,12 96:5,9,14

**roles** 94:5,6

**rose** 2:6

**rotating** 70:18

**roughly** 145:10

**round** 134:19

**route** 132:17

**routine** 19:25

**routinely** 16:8

**routings** 93:19

**row** 113:6,7 115:16,17

**rule** 128:19

**s**

**salary** 71:20
**satisfactory**
　139:15
**satisfied** 69:5
**save** 36:2 40:21
**saved** 35:7 117:11
　132:15
**saving** 35:13
**savings** 111:21,22
　111:24 117:7
　121:12 143:18
　145:2 148:8
**saying** 21:9 27:10
　52:2,14 62:5
　70:10 102:9
　105:12 117:10,18
　122:20 125:20
　130:1,1,8,23
　133:16 135:18
　140:14 144:3,20
　148:3
**says** 11:11 12:11
　13:6 14:9 17:9
　23:20 39:15,15
　42:20 46:1,8 49:2
　49:2 53:14 56:10
　56:12 57:9 67:11
　69:16 73:6 78:8
　78:13 80:11 82:22
　104:2 106:23
　110:10 114:2
　122:7 142:21
　146:4,12
**scale** 9:19 12:1
　48:1 129:18
**scaled** 9:22 12:3
**schedule** 70:19
　106:23
**scheduled** 1:19
　135:15

**schedules** 149:12
**scope** 36:18
**scranton** 11:15
　39:17 56:1 94:1
　123:9 127:5 135:3
　135:10,19 136:1
**seal** 151:14
**season** 31:15
　95:16,25,25 97:2,5
　97:8 103:13
**seasonal** 95:12,14
　103:12
**seasonally** 95:17
**second** 17:25 23:5
　27:6 29:11 30:7,9
　32:13,18 33:4,19
　35:20 42:9 47:8,8
　58:17 68:2 70:9
　70:14 71:11 94:1
　109:4 113:4
　115:18 118:16
　141:6 142:14
**secretary** 2:19
**section** 16:16 17:5
　20:12 22:19,21
　23:1,8,10,11 25:18
　77:25 78:5,6,9,10
　78:10 80:25 82:23
　82:24 83:7,8,18
**sections** 83:15
**security** 35:20
**see** 15:8 23:9,9,11
　35:25 53:24 88:6
　95:17,21 97:9
　103:14,16 111:17
　114:10 126:13
　132:20,24 146:14
**seen** 128:18,21,22
**select** 102:14
**selected** 27:2
　99:18 102:16

**selection** 30:10
**send** 79:23,24
**senior** 11:22 12:3
　28:1 46:6 71:10
**seniority** 13:5
**sense** 16:22
**sent** 41:9 42:3
**sentence** 39:20
　47:8,12 65:14
**separate** 57:6
**september** 1:12
　61:14
**service** 3:3 5:20
　8:23 9:16,18
　11:20,21,23 12:4
　13:20,24 15:1
　16:2 20:3 21:22
　26:22 28:1,2,4
　29:1,10,21,22
　30:11 34:1,10
　38:5,10,15,23 45:8
　45:15 46:17 47:7
　48:4,7,8 54:16
　55:7 56:10,15,20
　56:21,22 57:20
　58:1,7 59:14 60:5
　62:1 64:14 65:9
　65:16 71:8,8
　73:10,10 76:14
　91:21 92:5,6,9
　93:5,10,13 94:11
　95:19,20 100:25
　121:24 122:14
　133:11 138:11
　141:16
**services** 1:6 2:10
　6:5 7:4 28:19,20
　61:5,12
**set** 67:14 89:16
　90:4 100:25

**sets** 137:7
**setting** 92:22
**settled** 10:9
**settlement** 78:13
**seven** 16:3,8 17:23
　19:23 29:22
　142:22
**sheet** 132:23
**shelley** 2:21 4:9
　48:19 66:14,16
　85:2,8
**shelley's** 66:20
**shift** 11:21,22,25
　18:9 28:9,15
　29:12,12 30:9
　32:13,16,17,18
　33:5,25 34:1,1
　45:9,11,16,16
　69:22 70:2,9,14,17
　94:11,17,18 116:6
　116:8 120:15,17
　120:20,21 143:3
**shifts** 35:20,23
　60:20 70:6,9
　106:6 120:15
　135:16
**short** 20:1 85:19
**shorthand** 151:7
**show** 14:2 15:4
　17:11 18:15 64:16
　72:8 88:1 99:22
　100:14 101:3
　102:19 113:9
　142:3
**shown** 100:15
**shows** 17:19 35:12
　36:5 44:25 118:13
　118:15
**shut** 135:11,13
**side** 14:10 55:11
　76:5 114:2

**sided** 61:23
**signature** 44:9,10
  44:19,20 102:22
  102:23,25 151:17
**signed** 22:25 43:9
  44:5,8 65:6 81:11
**significant** 21:18
**significantly**
  131:19
**simple** 125:9,13
**simply** 26:4 27:7
  103:21 124:22
  148:21
**simultaneously**
  136:2
**single** 113:17
**sir** 82:1 87:25 90:6
**sit** 104:9
**site** 97:15
**sites** 114:15
**sitting** 81:7
**situation** 17:20
  19:19
**six** 9:10 11:18
  14:11 42:22 57:7
  57:9,15 73:22
  74:2,7 75:21
  137:11,18 140:6
  142:22
**size** 72:8 101:5
**sized** 132:23
**skill** 48:10 114:10
  137:7
**skills** 17:9,12,16
  17:20 30:19 68:15
  105:19 138:22,24
  139:1,2
**skip** 72:5
**skipped** 102:15
**skonier** 2:2

**slot** 78:9,9
**small** 85:19
**smart** 16:25
**solutions** 1:23
  10:7 27:4,13 29:9
  29:18 95:1 97:2,4
  110:14 111:14
**somebody** 99:4,13
  99:15 138:17
**somewhat** 129:25
**sorry** 44:24 47:23
  48:3 62:12 63:25
  132:20 144:23
**sort** 102:15 109:7
  110:13
**sounds** 84:15
**speaking** 128:5
**speaks** 48:25 64:6
  123:19
**spec** 42:13 69:10
  88:14,24 89:1
  90:12
**specific** 68:25 69:5
  80:10 81:22 82:17
  95:21 100:4
  120:19 149:15
**specifically** 47:22
  47:23 66:14 81:21
  81:24 105:17
**specify** 22:25 83:7
**specs** 69:13
**spend** 19:11 35:1
  122:12
**spending** 19:13
**spinoff** 76:5
**spread** 115:6,7
  148:14
**spreadsheet** 5:14
  5:15,17,18,20,22
  5:23 6:15 53:3,8
  54:10 55:3,19

  57:20 58:23 59:21
  112:21 113:6,11
  113:18
**spreadsheets**
  72:12
**spring** 29:20
**springtime** 31:14
**square** 2:7
**sr.'s** 44:10
**staff** 5:20,23 31:18
  57:20 58:1 59:22
  60:4 70:19,20
  89:19 106:2
  127:23 138:23
  140:15
**staffed** 13:21
  27:20 70:24 94:2
**staffing** 5:15 6:16
  12:10,11,21 40:11
  48:23 54:10,15
  67:10,20 78:14,17
  87:23 93:1 96:16
  105:11 133:10,14
  133:23 134:1,19
  141:24 142:5
  143:16
**stair** 137:7
**standard** 108:9
**standing** 151:4
**start** 22:14 31:15
  60:23 88:24 92:13
  100:5 106:19
  120:4,9 137:20
  139:20,24
**started** 38:7 58:13
  76:12 84:25
  107:23 112:20
  134:4,8
**starting** 120:8
**state** 7:8 37:8
  47:22 49:7 61:25

  75:2 85:6 91:18
  128:24
**stated** 57:5 59:9
  66:6
**statement** 38:20
  46:14 77:3 78:16
  125:24
**states** 11:16 12:24
  13:12 22:21 23:23
  42:11 44:4 47:9
  49:8 53:18 57:4
  65:5,8 67:8,18
  68:5,13 83:7
**status** 53:4
**stay** 138:18
**stayed** 18:19
**steno** 38:4
**stenographer** 8:9
**step** 79:16,19,25
  137:8
**stepped** 137:7
**steps** 9:23,25
**steve** 8:22 74:21
**steven** 2:19 4:6
  74:23 75:4
**steward** 2:20,21
**stewards** 80:20
  81:16
**stipulate** 57:13
  77:20 138:3
**stipulation** 41:20
  147:2
**stop** 33:19 60:23
  100:5
**store** 98:18,19
**storm** 135:14
**straight** 31:2,3,5
  79:5,18 106:9
  113:8
**street** 2:13