Approved 6/13/16

## Invoice


iQor

One Progress Plaza
St. Petersburg, FL 33701

May 31, 2016

**PPL Electric Utilities**
**ATTN: Chris Graham**
827 Hausman Rd.,
Allentown,
PA 18106

| | |
|---|---|
| **Ref PO#** | |
| **Entity** | First Contact LLC |
| **Program code** | PPE.USUT.FE.OBFPCOLL |
| **Program Name** | PPL Electric Utilities |
| **Invoice Period** | 5/01/2016 to 5/31/2016 |
| **Invoice Number** | PPE.06062016.42379225 |
| **Due Date** | 6/30/2016 |

| Item | Volume | Price | Amount |
|---|---|---|---|
| Collections | 1920 | $22.50 | $43,200.00 |
| Inbound Production | 600 | $25.00 | $15,000.00 |
| Memorial Day - 5/30 | 120 | $37.50 | $4,500.00 |
| Quality | 1120 | $23.00 | $25,760.00 |
| Quality - Inbound Line Coverage 5/31 | 56 | $25.00 | $1,400.00 |
| Memorial Day - 5/30 | 56 | $34.50 | $1,932.00 |
| Inbound Production | 10777 | $25.00 | $269,425.00 |
| Memorial Day - 5/30 | 427.66 | $37.50 | $16,037.25 |
| AVP | 528 | $25.00 | $13,200.00 |
| AVP | 1232 | $25.00 | $30,800.00 |
| Scranton Circuit - Ongoing Cost   ($13536.00/12)=$1128.00 | | $13,536.00 | $1,128.00 |
| Allentown Circuit - Ongoing Cost  ($16920.00/12)=$1410.00 | | $16,920.00 | $1,410.00 |

| Total Due | | | $423,792.25 |
|---|---|---|---|
| Wire Payment To: | Bank Account:   4210024922 | Routing No: | 041000124 |

Please remit the payment to: PO Box 951480, Cleveland, OH 44193

iQor.Receivables@iQor.com

REDEFINING CUSTOMER EXPERIENCE        WWW.IQOR.COM

3723113 00000    Approved 7/19/16

## Invoice

One Progress Plaza
St. Petersburg, FL 33701

iqor

June 30, 2016

**PPL Electric Utilities**
**ATTN: Chris Graham**
827 Hausman Rd.,
Allentown,
PA 18106

**Ref PO#**
**Entity**              First Contact LLC
**Program code**        PPE.USUT.FE.OBFPCOLL
**Program Name**        PPL Electric Utilities
**Invoice Period**      6/01/2016 to 6/30/2016
**Invoice Number**      PPE.07142016.38396143
**Due Date**            7/30/2016

| Item | Billable Hours | Total Hours | Rate | Total |
|------|---------------:|------------:|-----:|------:|
| Collections - Beth | 2,640.00 | 2,995.19 | $22.50 | $59,400.00 |
| Collections Overtime - Beth | 54.42 | 54.42 | $33.75 | $1,836.68 |
| Quality - Beth | 1,232.00 | 1,461.98 | $23.00 | $28,336.00 |
| Inbound Production - FL | 12,469.00 | 9,914.03 | $25.00 | $247,850.75 |
| AVP - Beth | 528 | 528 | $25.00 | $13,200.00 |
| AVP - FL | 1,232.00 | 1,232.00 | $25.00 | $30,800.00 |
| Scranton Circuit - Ongoing Cost $13,536.00/12 = $1,128.00 | | | | $1,128.00 |
| Allentown Circuit - Ongoing Cost $16,920.00/12 = $1,410.00 | | | | $1,410.00 |

| Total Due | $383,961.43 |
|-----------|------------:|

| Wire Payment To: | Bank Account: | 4210024922 | Routing No: | 041000124 |
|---|---|---|---|---|

Please remit the payment to: PO Box 951480, Cleveland, OH 44193

iQor.Receivables@iQor.com


REDEFINING CUSTOMER EXPERIENCE    WWW.IQOR.COM

# Invoice

One Progress Plaza
St. Petersburg, FL 33701



July 31, 2016

**PPL Electric Utilities**
**ATTN: Chris Graham**

827 Hausman Rd.,
Allentown,
PA 18106

| | |
|---|---|
| **Ref PO#** | |
| **Entity** | First Contact LLC |
| **Program code** | PPE.USUT.FE.OBFPCOLL |
| **Program Name** | **PPL Electric Utilities** |
| **Invoice Period** | 7/01/2016 to 7/31/2016 |
| **Invoice Number** | PPE.08082016.37639315 |
| **Due Date** | 8/30/2016 |

| Item | Billable Hours | Total Hours | Rate | Total |
|---|---|---|---|---|
| Collections - Beth | 2,400.00 | 2,220.44 | $22.50 | $49,959.90 |
| Back Office - Beth | 320 | 321 | $25.00 | $8,000.00 |
| Quality - Beth | 1,120.00 | 1,365.75 | $23.00 | $25,760.00 |
| Inbound Training - Beth | 1,505.00 | 1,505.00 | $19.00 | $28,595.00 |
| Inbound Production - Beth | 560 | 506 | $25.00 | $12,650.00 |
| Inbound Production - FL | 8,568.00 | 8,179.61 | $25.00 | $204,490.25 |
| AVP - Beth | 600 | 600 | $25.00 | $15,000.00 |
| AVP - FL | 1176 | 1176 | $25.00 | $29,400.00 |
| Scranton Circuit - Ongoing Cost - $13,536.00/12 | | | | $1,128.00 |
| Allentown Circuit - Ongoing Cost - $16,920.00/12 | | | | $1,410.00 |

| | |
|---|---|
| Total Due | $376,393.15 |

| Wire Payment To: | Bank Account: | 4210024922 | Routing No: | 041000124 |
|---|---|---|---|---|

Please remit the payment to: PO Box 951480, Cleveland, OH 44193

iQor.Receivables@iQor.com



# EXHIBIT J

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

IN THE MATTER OF ARBITRATION BETWEEN

INTERNATIONAL BROTHERHOOD OF :
ELECTRICAL WORKERS, LOCAL 1600   :
                               : Case No. 01-16-0000-3483
         and         : Grievance # G15LEH-035
                               : (Customer Call Center Contractors)
PPL SERVICES CORPORATION      :

GRIEVANCE:     The grievance asserts that the Company is violating the collective bargaining agreement by contracting bargaining unit work.

HEARING:     September 14, 2016
Breinigsville, PA

ARBITRATOR:     John M. Skonier, Esq.

APPEARANCES

FOR THE UNION:                       FOR THE COMPANY:

Joshua M. Bloom, Esq.               Michael J. Lebowich, Esq.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

Procedural History

The undersigned was notified by letter of his selection by the International Brotherhood of Electrical Workers, Local 1600 (Union) and PPL Services Corporation (Company or Employer) to hear and decide a matter then in dispute.  Pursuant to due notice, a hearing was held on September 14, 2017, in Breinigsville, Pennsylvania; at which time both parties were afforded a full opportunity to present testimony, examine and cross-examine witnesses, and introduce documentary evidence in support of their respective positions.  Following the receipt of the transcribed notes of testimony[1], and following the agreement of the parties on the appropriate "loader rate"[2], the parties submitted post hearing briefs.  The matter is now ready for final disposition.

Background Facts

The Company provides public services, primarily the transmission and distribution of electricity, to its customers in central and eastern Pennsylvania.  The parties

---

[1]   References to the transcribed notes of testimony will be by "NT" followed by the relevant page number(s).

[2]   The loader rate is a percentage added to the hourly rate of the employee to account for the costs of benefits provided to the employees.

2

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

have a long history of collective bargaining.  The collective bargaining agreement relevant to the instant matter is for the period from May 12, 2014 to May 21, 2017. (Exhibit J-1)

In August 2010, the Company submitted a proposal to the Union to change the CSR (Customer Service Representative) progression lines in Lehigh and Scranton.  This proposal specifically stated that "ultimately, there would be more bargaining unit employees, fewer contractors and fewer generalists (proposed CSR-4)."  (Exhibit U-1) The parties negotiated this issue and, by email memorandum dated March 28, 2012, from then Director of Customer Operations David Ling to Union Business Representative Jane Biever, the Company submitted "the updated LOU [Letter of Understanding] based on our recent telephone discussions."  Mr. Ling called it a "win/win proposition" and stated that "it provides the opportunity for increased 1600 [Union] membership" in that the "structure allows for a reduced #s [sic] of contractors."  He further stated that upon ratification, the Company would "begin the hiring process to hire 18 existing spec temps into the CSA-III position" and that the Company "will hire an additional 22 new employees into the new lines at CSA-I within 6 months of ratification."  He indicated that "this is our best and final offer".  (Exhibit U-2) The parties ratified this LOU on April 12, 2012.  (Exhibit U-3) By its terms, it became a part of the 2014 contract, and is now Exhibit P in the collective bargaining agreement.

3

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

Exhibit P provided for a new progression of 6 positions, some of which were existing positions, while the remainder were new and two previously existing positions were eliminated.  Although the four incumbent Customer Service Clerks, one of the eliminated positions, were given the option of promoting to CSA-III, Step 5, without testing, none did.  They were allowed to remain as Customer Service Clerks, to eventually be eliminated though attrition, at which time their duties will revert to the appropriate job classification in the new progression line.    The incumbent Customer Service Representatives and Customer Service Representatives - Shift remained in their positions at their current salary.  A new Senior Customer Service Representative position was created.  The incumbent part-time CSRs were given the option of converting to a full-time CSR position, while retaining their Local 1600 seniority date.

Exhibit P further provides for the filling of "future promotional opportunities".  Each position would be "offered the opportunity to promote, based upon job seniority, to [the next higher position], as vacancies arise."  (Exhibit J-1, Exhibit P)  The parties also agreed "to meet and discuss staffing plans for the CCC [Customer Call Center] per Article II, Section 7E . . . generally . . . on an annual basis unless there are substantial changes in work load and/or staffing, causing the parties to meet sooner."  (*Id.*)

4

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

The Company fulfilled the initial agreed-upon staffing requirements and its other obligations under the 2012 LOU.  (Exhibit U-4, NT- 42-43, 68-69, 87-89)


On March 30, 2015, Mr. Chris Graham, was employed by the Company as Director of Customer Service Operations.  At the time of his hire, the Company was utilizing two contractors, NCO and PPL Solutions, to supplement the CCC.  NCO was utilized year round to fill in for absent employees.  The Company was currently experiencing an absentee rate in the CCC of 10%.  (NT-96)   PPL Solutions was used to supplement the CCC during the "cut season" from April 1 to November 30, which is the period during which the Company cuts service for nonpayment.  The number of customer calls usually increases by about 30%.  (NT-94-97)


In August, 2015, Mr. Graham terminated the contract with NCO.  In looking for a new contractor, the Company also sought contractors "that could expand PPL's operations to provide 24/7 year-round customer service and provide emergency coverage. (Tr. 98-100, 103-04)" (Company's Brief, p. 4)  On September 10, 2015, the Company signed a three-year contract with First Contact LLC, (iCor) for an estimated value of $3,000,000. (Exhibit U-14)  iCor would provide the full range of call service, 24/7 year round, and

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

would provide a redundant location in the event of an emergency that would cause the closure of the Lehigh and Scranton CCC's.  (NT-99-100)

Mr. Graham informed the Union of this contractor work by notice dated October 21, 2015.   He checked off four "justification[s] for contractor work" on the form. He indicated that the contractor would "provide employees with specialized skills because PPL employees with those skills are fully employed doing this work", that the contractor would "work during seasonal/other peaks", that the "use of contractor will reduce cost of work", and that the contractor would be "required to work during emergency."  (Exhibit U-16)

The Union filed a grievance on November 12, 2015, alleging that the Company violated the parties' collective bargaining agreement by "contracting Local 1600 work".  (Exhibit J-2)  The grievance was processed through the parties' contractual grievance procedure to the instant arbitration for final resolution.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

## Relevant Provisions of the Contract

Article II
Company - Union Relations

* * *

Section 5.        Functions of Management

* * *

D.        The Company will have the right to contract out work when needed skills are not available from present employees; when public and customer relations require it; when present employees cannot complete the work in the required time; when it is economical to do so; or when peaks of work would require a temporary increase of the Company's forces with subsequent lay-off of such additional forces. No employee will be laid off or suffer loss of regular straight time pay as a result of this provision.

* * *

Article VI
Job Descriptions, Classifications and
Salary Table Procedures

Section 1.        Job Descriptions - Classifications

* * *

D.        The number of employees in each job title is limited by the amount and the nature of the work to be done. If a job vacancy occurs, the Company will notify the Union within three (3) weeks thereafter whether such vacancy will be filled.

* * *

EXHIBIT P
CUSTOMER CONTACT CENTERS

This Exhibit embodies the understanding between the parties relative to the revised progression lines for the customer Contact Centers located in Lehigh and Scranton.

The parties agree to create/maintain the following positions:
    • Customer Service Assistant- I (CSA-I)
    • Customer Service Assistant- II (CSA-II)
    • Customer Service Assistant- III (CSA-III)

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

- Customer Service Assistant- (CSR)
- Customer Service Representative (CSR)
- Customer Service Representative - Shift (Lehigh only) (CSR-Shift)
- Senior Customer Service Representative (Senior-CSR)

The following positions will be eliminated from the CCC progression line:
- Collection Assistant
- Customer Service Clerk - Customer Contact Center

Job descriptions and primary duties, within each job description, have been established. A listing of available training modules is shown at the end of this Exhibit.

Initial staffing for the newly created positions will be accomplished in the following manner:

Customer Service Clerk:

- Within sixty (60) days of the ratification of this agreement by the parties, existing Customer Service Clerks will be offered a one-time opportunity to promote to CSA-III, Step 5 (testing is waived) OR remain an incumbent CS Clerk at existing salary table.
- The four (4) incumbent Customer Service Clerks, located in the Customer Contact Center (Lehigh) will retain duties of the Customer Service Clerk should they not promote.
- The position of Customer Service Clerk in the Customer Contact Center progression line is eliminated. Incumbents who remain in the position will be eliminated through attrition and the duties will revert to the appropriate job classification within the CCC progression lines.

Customer Service Representative:
- Existing Customer Service Representatives will remain in the CSR position, at the existing salary table.

Customer Service Representative - Shift:
- There are no changes to the CSR-Shift position under this agreement.

Senior Customer Service Representative:
- A new position of Senior-CSR will be added to the Lehigh and Scranton progression lines.
- This position will be responsible for the daily assistance and direction of work as related to the lower positions within the Progression lines (excluding CSR-Shift).
- The Senior-Customer Service Representative duties and responsibilities will be as noted on the newly created job description.
- Promotions from CSR to Senior-CSR will be made as vacancies arise. Promotions will be based on the seniority of those CSRs who have

8

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

successfully completed the Senior CSR Skills Assessment at a local
community college. The training program will be developed by Human
Resources with agreement from IBEW 1600 and Customer Services.

Part-Time CSR Positions:
- Within sixty (60) days of the ratification of this agreement by the
parties, existing part-time CSRs will be offered a one-time opportunity
to convert to a full-time CSR position and will retain their Local 1600
seniority date. New company service and job seniority dates will be
established.
- Part-time CSRs who do not choose to convert during these sixty (60)
days will remain part-time CSRs and may elect to accept promotional
opportunities in the future following the language under future
promotional opportunities, immediately below.

Future promotional opportunities within the newly created progression lines will be filled
in the following manner:

Part-time Customer Service Representative (CSR-PT)
- Will be offered the opportunity to promote to an open full time position
of CSA-III as vacancies arise, based on job seniority among the
Part-time Customer Service Representatives and the CSA-IIs, providing
they have satisfactory performance.
- They will retain their Local 1600 seniority date. New company service
and job seniority dates will be established.

Customer Service Representative (CSR):
- Will be offered the opportunity to promote to Senior Customer Service
Representative as described above, providing they have satisfactory
performance.
- Lehigh based CSRs will be offered the opportunity to promote based
upon job seniority, to a Customer Service Representative - Shift position
as vacancies arise.

Customer Service Assistant-III (CSA-III):
- Will be offered the opportunity to promote, based upon job seniority,
to CSR, as vacancies arise, providing they have satisfactory
performance.

Customer Service Assistant-II (CSA-II):
- Will be offered the opportunity to promote, based upon job seniority,
to CSA-Ill as vacancies arise.

Customer Service Assistant-I (CSA-I):

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

- Will be offered the opportunity to promote, based upon job seniority, to CSA-II as vacancies are created, or promote to CSA-II automatically after 12 months providing they have satisfactory performance.
- This position will be considered the entry level position and vacancies will be filled by newly hired employees.

Overtime opportunities will follow the language in the CCC Overtime Opportunities Memorandum of Agreement for the following job classifications: CSA I, II, and III, CSR, and Sr. CSR.

The parties agree to meet and discuss staffing plans for the CCC per Article II, Section 7E, following ratification. These meetings would generally be held on an annual basis unless there are substantial changes in work load and/or staffing, causing the parties to meet sooner.

This Exhibit applies only to the progression lines mentions above, will not prejudice either party's position in the future and may not be cited as precedent in any future proceedings except to enforce the terms of this agreement.

* * *

## Discussion and Opinion

The issue in this matter is whether the Company violated the parties' collective bargaining agreement when it entered into a contract with First Contact LLC (iQor) to provide comprehensive CCC services and to provide a redundant offsite facility for emergency situations.

The Company initially raised two procedural arguments, first, that the Union failed to identify all of the contract provisions being violated in that it neglected to include

Exhibit P as one of the provisions giving rise to the grievance, and second, that it the grievance was untimely.  The Company asserts that the Union "should have filed its grievance immediately after any one of those employees [employees who left through attrition or were promoted after the April 2012 implementation of the LOU] left and was not replaced by a Union employee."  (Company's Brief, p. 5)

In response to the Company's first argument, the Union argues that the collective bargaining agreement only requires that it "specify the Article and Section of the Agreement upon which the grievance is based".  It asserts that there was sufficient specificity in its grievance and that its request that the Company "*maintain* proper staffing levels" (Exhibit J-2, emphasis added) "is the heart of the claim within Exhibit P."  (Union's Brief, p. 24) It further notes that during the processing of the grievance, the Company was made fully aware of the Union's Exhibit P claim, and that its claim of surprise at the hearing must be dismissed.  The Union asserts that its grievance was timely because the bargaining unit had been performing all of the bargaining unit work without incident.  It was only when the Union learned that the Company, through its contracting with iCor, was doing "the exact opposite of what it had represented and promised [when negotiating Exhibit P] - - increased the use of contractors while allowing the customer care bargaining

unit positions to erode", that it filed the grievance.  Therefore, the grievance was timely filed.

The record clearly demonstrated that the Company was fully aware of the Union's complaints regarding the contractual violations in the instant matter prior to the instant hearing.  Therefore, its procedural argument regarding the failure of the Union to include Exhibit P as one of the provisions in dispute must fail.  The grievance clearly put the Company on notice that the Union was requesting that it maintain staffing levels and the subsequent processing of the grievance clearly alerted the Company that a violation of the provisions and intent of Exhibit P was in question.

There was no showing that the Union had any knowledge prior to the time it learned about the iCor contract in late October of 2015 that the Company was improperly using subcontractors to perform bargaining unit work.  As the grievance was timely filed upon the Union's learning of the iCor contract, the Company's timeliness argument is dismissed.

On the merits, the Company argues that while it is only required to meet one of the criteria listed in Article II, § 5D for contracting out work, it met four.  It further notes

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

that it is not required to fill vacancies under either Article VI, § 1D or Exhibit P.  The Union argues that the Company clearly violated the intent and provisions of Exhibit P when it entered into the contract with iCor.  The Union further argues that Article II, § 5D "cannot be read alone in a vacuum."  The parties never intended that the contracting provision be used to "permanently eliminate or erode bargaining unit work." (Union's Brief, p. 12) The Union also argues that the Company violated Article II, § 5D by not declaring vacancies in the CCC positions and instead hiring iCor.

It is important to understand the history that led to this point, especially that of the bargaining of Exhibit P in this matter.  In August 2010, the Company proposed to change the CSR progression line.  At that time, it explicitly stated that "ultimately, there would be *more* bargaining unit employees" and "*fewer* contractors". (Exhibit U-1, emphasis added) Business Representative for the Union Jane Biever was involved with this matter from its inception.  She testified that "the Company was looking to expand the progression line.  What they wanted from us were some lower rated job classifications within the progression line; and in exchange for that, there would be more employees.  There would be higher staffing number, and there would be fewer contractors in use."  (NT- 39-40)

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

After over a year and a half of negotiations, the parties executed a LOU on April 12, 2012, which subsequently became Exhibit P of the collective bargaining agreement.  (Exhibit U-3)  Prior to its execution, on March 28, 2012, the Company sent the "updated LOU based on our recent telephone discussions" to the Union.  At that time, it again stated that "it provides the opportunity for *increased* 1600 [Union] membership" and that the "structure allows for a reduced #s [sic] of contractors."  (Exhibit  U-2, emphasis added) As part of the agreement, although it is not memorialized in Exhibit P, the Company  agreed to hire 18 existing employees into the new CSA-III position upon ratification of the LOU, and an additional 22 new employees within 6 months.  (Exhibit U-2) The Company complied with these obligations.  At the end of December 2012, there were 212 CCC bargaining unit employees. (Exhibit U-8)

Over the next three years, there were no additional new hires into the CCC, and, other than the automatic promotion from CSA I to CSA II, there were no promotions of employees within the CCC.   By 2015, the Company was utilizing two outside contractors to supplement the CCC work force, PPL Solutions was used during the "cut" season and NCO was used year round to cover for employee absences, which ran at 10% monthly.  The yearly work load for the period 2011 to 2015, as measured by number of customer calls, varied from a high of 2,690,243 calls in 2011 to a low of 2,208,927 calls in

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

2012.  There were 2,311,693 calls in 2013, 2,613,887 calls in 2014, and 2,258,143 calls in 2015.

As of July 2015, there were 162 CCC employees, a *decrease* of 50 CCC employees in a little

over 2½ years, however, the record did not reveal that there were any recorded issues of

the CCC employees not being able to handle the work load.


On March 30, 2015, Mr. Graham began his employment as the Director of

Customer Service Operations with the Company.  In August 2015, after an unhelpful visit

from the NCO account manager, he "contacted supply chain and asked when can we

terminate their contract, and look for another vendor." (NT-97-99)  Mr. Graham explained

that in looking for another vendor, in addition to providing coverage for absent Company

employees, he wanted to "improve the customer experience" by expanding the call service

hours beyond the 9 to 5, Monday through Friday hours under which the CCCs were

currently operating.  He wanted to expand to "24[hour]/7[day] coverage."  He also wanted

the contract employees to be able to handle "all interaction types", stating that the work

level expectation would fall "somewhere between a CSA-III and a CSR".  (NT-99-102)  At

that point, while there is no contractual requirement for the Company to negotiate with the

Union, as noted by Arbitrator Kasher in *Pennsylvania Power & Light Company and*

*International Brotherhood of Electrical Workers, Local 1600*, Case No. 14 300 0801 87W (Kasher,

1994) (*Kasher* Award2):

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

. . .  The Union has the right to have its members perform bargaining unit work, and the inherent right to persuade management that work being contracted out or contemplated to be contracted out should be performed by Company personnel. . . .

In this case, the Company provided the Union with no opportunity to suggest alternative, more economic means by which the [bargaining unit] work could be performed.

(*Kasher* Award2, p. 39)

Instead, Mr. Graham selected iCor to perform the work.  He testified regarding the analysis he performed to compare the cost of using iCor versus using in-house employees, and stated that iCor would save the Company money.  (NT- 106-111, Exhibit C-1)  The contract with iCor was signed on September 10, 2015, and the iCor employees began training/working on November 1, 2015.

The obvious problem with Mr. Graham's action of hiring iCor to perform the work in question is that the work is bargaining unit work.  His action is directly opposite what the parties had agreed to in 2012 when they executed Exhibit P.  His action served to diminish the number of bargaining unit employees and increase the use of contractors.  While the Company attempts to justify this action by solely focusing on the provisions of Article II, § 5D, it cannot ignore the overarching point of the contracting provision and the interrelationship of that provision with the other provisions of the contract, such as Article

VI, § 1D and Exhibit P.   The parties negotiated the contracting provision to allow the Company to contract under certain conditions, while allowing the Union to protect bargaining unit work and membership.  While Exhibit P does not provide for a specific level of employees and is not a guarantee of minimum manning, it does represent a commitment on the part of the Company to increase bargaining unit membership and reduce the use of contractors.

As noted by Arbitrator Kasher in *Pennsylvania Power and Light Company and International Brotherhood of Electrical Workers, AFL-CIO, Local Union No. 1600*, Case No. 14 300 1872 87W, (Kasher, January 29, 1990) (*Kasher* Award1):

> We said in <u>Feudale</u> [a prior case between the parties on a contracting issue under the same contract language] that "when the Company defends a work assignment grievance where subcontracting is involved because one of the specific bases for contracting . . . existed, then the Company has . . . raised an affirmative defense and it has the burden of proving justification for such position".

(*Kasher* Award1, p. 22)

In this matter, as the Company has asserted that it has met four of the five criteria contained in Article II, § 5.D so as to allow it to contract out the work in question, it has the burden of proof.

A review of these four criteria may prove instructive.  The first justification relied upon by the Company is that the "needed skills are not available from present employees".  The Company argues that Article VI, § 1D does not require it to fill vacancies and that Exhibit P did not create any type of minimum manning standard.  It asserts that the "create/maintain" language of Exhibit P refers to the job classifications, not the number of employees.  It points to a recent decision between the parties by the undersigned in which I stated, "There is nothing in Article II, Section 5D that requires the Company to hire new employees rather than subcontract." *International Brotherhood of Electrical Workers, Local 1600*, Case No. 01-15-0005-7227, (Skonier, Nov. 7, 2016)  (*Skonier* Award) I must note that the next sentence in that award reads, "The Section speaks to the lack of "*present* employees" with the necessary skills being unavailable to perform the work."  In that matter, the Company had a sudden loss of 40% of its Transportation Department mechanical workforce due to retirements.  None of the remaining employees had the necessary skills to enable them to bid into the positions.   That is not the situation in the instant matter.  Here, the CCC work force has been decreased by 50 employees since December 2012 because the Company chose to not fill vacancies; however, the work load has not substantially changed.  The employees were apparently keeping up with the work load, with the assistance of PPL Solutions and NCO, as there was no record of complaints.  If the Company had just replaced NCO, apparently there would not have been an issue,

however, the Company chose to expand the operations of the CCC, using a contractor, because there were no present employees available. Using the same logic as that employed by Arbitrator Kasher, this argument must fail because, contrary to the Company's assertion that the shortage of personnel was not of its doing, the Company did create the shortage of available personnel by refusing to fill vacancies. The Company again cited to the *Skonier* Award, pointing out that in that matter, the undersigned "found that the decline in bargaining unit work 'was because [the mechanics] *chose to retire.*' [citation omitted] Accordingly, this Arbitrator held that 'such natural attrition was not shown to be by the Company design.'" (Company's Brief, p. 8) Again, in that matter, the 40% reduction in the work force occurred suddenly and unexpectedly. The employees who were lost could not be replaced by promotions or with new hires, as the required skill levels of the retires required a five year progression. That attrition did not occur as it did here, over the course of several years. And the required skill levels would have been present had the Company chosen to fill vacancies. If the Company is permitted to prevail on this basis, eventually it could be argued, there would be no bargaining unit employees. Such an outcome is obviously not what the parties intended or agreed to in their collective bargaining agreement.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

The Company also claimed that it met the condition of being permitted to contract "when peaks of work would require a temporary increase of the Company's forces with subsequent lay-off of such additional forces." The record demonstrates that iCor is operating on a three-year contract with the Company to provide services 24/7 for 365 days per year. This type of contract does not fall under the permitted condition of using a contractor for peak periods of work.

Article II, § 5D allows the Company to contract "when it is economical to do so". In this matter, the Company interpreted this provision as allowing them to contract bargaining unit work if they could find a contractor who could do it cheaper. Mr. Graham testified extensively regarding the analysis he performed to compare the cost of using iCor versus using in-house employees. In this analysis, he also included the cost of using PPL Solutions. (Exhibit C-1) He concluded that iCor would save the Company money. (NT-107-111) On cross examination, he acknowledged that he did not consider any intangible factors, he focused solely on the cost, stating, "The math is the math." (NT- 122-132) The Union challenged the fact that Mr. Graham utilized the CSA-III pay rate in his calculations, pointing out that the Company has failed to promote any CSA-IIs to CSA-III.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

Mr. Graham presented a second analysis based on the actual billings paid to iCor from November 1, 2015 through July 31, 2016.  (NT- 111-121, 132, Exhibits C-2, U-15) He testified that the Company has achieved over one million dollars in savings through the use of iCor.  Mr. Graham also testified regarding a three year staffing plan he prepared, "in anticipation of this case".   This analysis is his comparison of the three year cost to the Company if they hired new CSA-I's, trained them and moved them through the progression to CSA-III's versus the cost of iCor.  (Exhibit C-3, NT- 141-147 )  The Union challenged the loader rate utilized in these calculations and, following the hearing, the parties mutually agreed upon a new rate.  (Union's Brief, Appendix 5) Pursuant to their post-hearing agreement, both parties submitted "demonstrative exhibits" based on the new loader rate when they filed their briefs.  The Company resubmitted Exhibits C-2 and C-3 as Appendix A and B to its brief.  The Union submitted its analysis which compares the cost if the Company had increased the CCC staff back to the June 2012 level of 205 employees for the period October 2015 (first iCor bill) to July 31, 2016 (last iCor bill entered into the record as part of U-15) versus what the Company actually paid to iCor as Appendix 4 to its brief.

Obviously, the results of the analyses submitted by both parties are opposite. The Company shows iCor providing savings of just under one million dollars in the first

nine months of operations (Company's Brief, Appendix A), and projects savings in excess of that over the three year period.  (Company's Brief, Appendix B)   In its brief, the Union points out that in Exhibit C-3 (which was recalculated with the new loader rate and submitted by the Company as Appendix B to its brief), the Company incorrectly assumed "that CSA-Is would be promoted after three months, rather than the automatic six month progression." (Union's Brief, p. 20)  It further notes that the Company assumed CSA-Is would be moved through the progression to CSA-IIIs within two to three years.  The Union stresses the fact that the Company has never promoted any CSA-IIs to CSA-III. (Exhibit U-10)  The Union also challenged the attrition rate assumptions utilized by Mr. Graham in the preparation of his analysis, arguing that the Company had access to actual attrition information and did not need to speculate.  The newly calculated Appendix B (former Exhibit C-3) does not appear to have corrected these errors.  The Union's Appendix 4 shows that if the Company had increased the number of bargaining unit employees to 205 in October 2015, they would have saved over $700,000 over the three year period of the iCor contract.  As previously stated, the Company has the burden of proving that it met the more economical justification for contracting, as provided in Article II, § 5D.  It cannot be found that it did so here.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

The final "justification" relied on by the Company was that the Company needed a call center outside of the northeast region so that if an emergency occurred that disabled both existing call centers, there would still be a functioning call center.  It maintains that "the parties have agreed that PPL may utilize a contractor to perform bargaining unit work required during an emergency.  (U-Ex.16)" (Company's Brief, p. 9) The record revealed that there has never been a time when an emergency occurred that disabled both call centers.  There have been situations when all of the call centers have been non-functional due to the telephone system being disabled.  Mr. Graham testified that all of the call centers are on the same switch, so if the phone system goes down, they all go down.  (NT- 134-136) Further, the parties' collective bargaining agreement allows for contracting in an emergency situation, not for a 24/7, 365 days a year contract, as is the contract at issue herein.  Once again, the Company has failed to prove that it met this justification for contracting.

It is troubling that the Company has failed to live up to the promises it made to the Union when the 2012 LOU was negotiated when the Union agreed to a new CSR progression with lower paid classifications in exchange for an increase in bargaining unit membership and a decrease in the Company's use of contractors.  The matter herein was not a situation in which the bargaining unit work decreased, in fact, it was the opposite, as

Mr. Graham testified he wanted to increase the coverage provided by the CCC. As the Company has failed to meet its burden of proof in this matter, the grievance must be sustained.

As to remedy, the Union is asking that the Company cease and desist from violating Exhibit P, Article II, § 5D and Article II, § 5D. It asks that "the Company be ordered to restore the lost customer care bargaining unit positions by promotions and new hires consistent with Exhibit P" and to "make the current customer care workers whole by providing all lost pay, including loss of overtime, and lost benefits." (Union's Brief, p. 26) The record revealed that prior to the execution of the contract with iCor, the work of the CCC was performed by bargaining unit employees and two contractors, PPL Solutions and NCO. At that time, although the number of bargaining unit employees had decreased to 156 employees (Exhibit U-11), there was no indication that the bargaining unit work was not being performed as required. Mr. Graham then caused the contract with NCO to be terminated and expressed his desire to expand the operation of the CCC. iCor was selected to perform this work. While it is clear that iCor is performing bargaining unit work, it is not clear how much of that work was work that had been previously performed by NCO, without complaint from the Union. There was no showing that any current employees lost pay or benefits as a result of the Company's decision to contract with iCor. However, the

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

Union has lost money.  The Company would have had to hire new bargaining unit

employees to perform the additional work[3] iCor is providing These new employees would

have been paying initiation fees and monthly dues to the Union.  While there is insufficient

evidence in the record to support a finding that the bargaining unit should be increased to

a level "consistent with Exhibit P", the record does demonstrate a further reduction in the

bargaining unit from 156 in October 2015 to 148 in March 2016, a difference of 8 employees,

so it seems reasonable to require the Company to hire at least eight new employees into the

CCC.  And to provide the Union with the lost fees and dues for those employees, had they

been hired at the time the contract with iCor went into effect.


Going forward, it is strongly urged that the Company abide by its expressed

intent in negotiating the 2012 LOU to increase Union membership and decrease the use of

contractors in the CCC.

---

[3] iCor is presumably performing the work that NCO had been performing, while also performing the additional work required for the CCC to function on a 24/7, 365 days a year basis.  The Union has not disputed the Company's use of NCO so that portion of work should not be considered in fashioning the remedy.

International Brotherhood of
Electrical Workers, Local 1600 and
PPL Services Corporation
Case No. 01-16-0000-3483
(Customer Call Center Contractors)

<u>Award</u>

On the basis of the record as a whole and for the reasons discussed, the grievance is sustained.   The Company is directed to immediately cease and desist from violating Article II, § 5D, Article VI, § 1D and the provisions of Exhibit P.   The Company is further directed to hire eight (8) new employees into the CCC within thirty (30) days of the issuance of this award and to provide the Union with a sum of money equivalent to what the initiation fees and dues would be as though those eight employees had been hired as of November 1, 2015.

John M. Skonier
Arbitrator

June 19, 2017

# EXHIBIT K

# Company Proposal – CSR Progression Line

### Proposal:

The Company is proposing a change to the two CSR progression lines in Lehigh and Scranton, as follows:

- Structure a career progression path that allows employees to build skills over a period of time.
- Give employees the opportunity to move through levels that add job responsibilities based on demonstrated skills, time in job, and available openings.
- Provide employees the opportunity to progress to a job that more closely suits their abilities and needs.
- Establish a new entry-level position (CSR-1).
- Establish a senior position that CSRs can aspire to based on skills as well as length of service (Senior CSR).

Ultimately, there would be more bargaining unit employees, fewer contractors and fewer generalists (proposed CSR-4). The sample pay table below includes continuing the five (5) step pay scale for CSR-1 through CSR-4 and a one step pay scale for the senior position. The proposed progression line below assumes the CSR-Shift is no longer a part of the Lehigh progression line.

| PPL Job Title | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|---|
| CSR-1 | TBD | TBD | TBD | TBD | TBD |
| CSR-2 | TBD | TBD | TBD | TBD | TBD |
| CSR-3 | TBD | TBD | TBD | TBD | TBD |
| CSR-4 | TBD | TBD | TBD | TBD | $27.761 |
| Senior CSR | TBD | N/A | N/A | N/A | N/A |

- Existing CCC personnel in the CSR progression line will be paid at the greater of the new scale or present pay until such time as the new scale exceeds existing pay.

- Existing CSRs will become CSR-4s.

- Existing Customer Service Clerks would be "grandfathered" at current pay with current responsibilities unless they select a one-time opportunity to accept a CSR-3 position, paid at the greater of that scale or present pay until such time as the new scale exceeds existing pay.

- Existing employees retain their newly defined job classifications based on satisfactory performance or until there is a promotional opportunity.

- Management is responsible to determine the staffing required at all position levels.



Exhibit 1
UNION
9/14/16
reporter: trisha sims
Veritext Legal Solutions

## Positions:

All 5 positions will have a primary responsibility of telephone answering and all 5 will have back-office assignments.

| Position | Incoming Contact types | Back office/other |
|---|---|---|
| CSR-1 | Residential Payment Agreements and Outage | Performs basic account maintenance related to the contact types handled and general clerical duties such as data entry of information to update a customer account. |
| CSR-2 | Connect/Disconnect, Termination of Service for Non-Payment | Performs basic billing for accounts generally involving two billing periods or less and no rate change or meter change involved. |
| CSR-3 | New and Upgrade Electric Service, General Billing and Energy Education | Performs manual billing covering multiple billing periods generally limited to 4 tariff changes or less (includes billing covering meter change periods). |
| CSR-4 | Complex Billing and Energy Education | Performs manual billing generally covering more than 4 tariff changes or involving several distinct programs that impacts billing. |
| Senior CSR | Escalated Contacts; Performance Coaching, Training. | Provides general floor support in answering questions; assists others to improve job skills; leads meetings, provides one-on-one and some group training, and responds to Formal PUC complaints and attends hearings. |

- By definition, the same type work can be performed by multiple job descriptions, based on complexity of the individual accounts being worked.

  - Example 1: A stopped meter covering 2 billing periods could be worked by CSR-2; a stopped meter involving less than 5 tariff changes could be worked by CSR-3 and a stopped meter covering 5 tariff changes would be worked by CSR-4.
  - Example 2: A stopped meter covering 2 billing periods and the customer is enrolled in the PPL OnTrack program, enrolled with a supplier, and has net metering would generally be worked by CSR-4.

- Employees have a 6-month probationary period in all jobs.
- Employees will "work down" the progression line depending on workload.
- As vacancies are declared, employees are promoted based on demonstrated skills and time in job. The exception is the Senior CSR position, which is selected by a joint committee. The joint committee will consist of two (2) Company Representatives and two (2) IBEW Representatives using the following criteria to select the candidates:
  - Both parties (IBEW and Company) develop a listing of the eligible employees that are satisfactorily performing CSR duties and send to other party.
  - Both parties meet and jointly determine the top candidates.
  - Both parties participate in interviewing the interested candidates.
  - When all applicants are considered equally qualified for the position, employees will be selected based on job seniority.
  - In the event of a dead-lock, the selection will be made by the VP of Customer Services, but in discussions with and guided by the advice and counsel of the President of Local 1600.