IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PPL ELECTRIC UTILITIES CORPORATION, | |
| Plaintiff, | CIVIL ACTION NO. 17-3169 |
| v. | |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1600, | |
| Defendant. | |

## MEMORANDUM

**SCHMEHL, J. /s/ JLS**                                         **SEPTEMBER 18, 2018**

Plaintiff PPL Electric Utilities Corporation ("PPL) moves for summary judgment to vacate Arbitrator John M. Skonier's (the "Arbitrator") award in favor of Defendant International Brotherhood of Electrical Workers Local 1600 ("Local 1600") and grant PPL all other legal and equitable relief deemed necessary. PPL argues the Arbitrator's award should be vacated because it fails to draw its essence from the terms of the collective bargaining agreement ("CBA") and because the Arbitrator both procedurally and substantively ignored the express terms of the CBA by basing his award solely on his own brand of industrial justice. Local 1600 cross-moves for summary judgment sustaining the Arbitrator's decision arguing the Arbitrator's decision does indeed draw its essence from the CBA. For the reasons that follow, Plaintiff PPL's Motion for Summary Judgment (Docket No. 18) is denied, and Defendant Local 1600's Cross-Motion for Summary Judgment (Docket No. 21) is granted. The Arbitrator decision sustaining Local 1600's grievance is confirmed.

## I. UNDISPUTED FACTS

Plaintiff PPL is an energy company providing electricity delivery and transmission services to over 1.4 million customers. (ECF Docket No. 18, Jt. Stip. at ¶ 1.) Defendant Local 1600 is a labor organization representing certain employees of PPL. (Id. at ¶ 2.) PPL and Local 1600 entered into a CBA and bound by the terms of the agreement from 2014-2017. (Id. at ¶ 3.) On or about November 5, 2015, Local 1600 initiated a grievance by discussing the dispute with supervision and then reduced the grievance to writing on November 12, 2015. (Id. at ¶ 4.) The grievance resulted from PPL's subcontracting with First Contact LLC ("iQor") for 24/7, 365 days a year employment. (ECF Docket No. 1.) The parties mutually selected John M. Skonier, Esq. as the neutral arbitrator to determine the merits of the grievance. (Id. at ¶ 5.) The grievance hearing took place on September 14, 2016.

Because the Arbitrator wrote extensively on the matter, some of the background can be carried over from his prior opinion sustaining Local 1600's grievance:

> It is important to understand the history that led to this point, especially that of the bargaining of Exhibit P in this matter. In August 2010, the Company proposed to change the CSR progression line. At that time, it explicitly stated that 'ultimately, there would be more bargaining unit employees' and '*fewer* contractors'. (Exhibit U-1, emphasis added) Business Representative for the Union Jane Biever was involved with this matter from its inception. She testified that 'the Company was looking to expand the progression line. What they wanted from us were some lower rated job classifications within the progression line; and in exchange for that, there would be more employees. There would be higher staffing number, and there would be fewer contractors in use.' (NT- 39-40)

> After over a year and a half of negotiations, the parties executed a LOU on April 12, 2012, which subsequently became Exhibit P of the collective bargaining agreement. (Exhibit U-3) Prior to its execution, on March 28, 2012, the Company sent the 'updated LOU based on our recent telephone discussions' to the Union. At that time, it again stated that 'it provides the opportunity for *increased* 1600 [Union] membership" and that the "structure allows for a reduced #s [sic] of contractors.' (Exhibit U-2, emphasis added) As part of the agreement, although it is not memorialized in Exhibit P, the Company agreed to hire 18 existing employees into the new CSA-III position upon ratification of the LOU, and an

additional 22 new employees within 6 months. (Exhibit U-2) The Company complied with these obligations. At the end of December 2012, there were 212 CCC bargaining unit employees. (Exhibit U-8)

Over the next three years, there were no additional new hires into the CCC, and, other than the automatic promotion from CSA I to CSA II, there were no promotions of employees within the CCC. By 2015, the Company was utilizing two outside contractors to supplement the CCC work force, PPL Solutions was used during the "cut" season and NCO was used year round to cover for employee absences, which ran at 10% monthly. The yearly work load for the period 2011 to 2015, as measured by number of customer calls, varied from a high of 2,690,243 calls in 2011 to a low of 2,208,927 calls in 2012. There were 2,311,693 calls in 2013, 2,613,887 calls in 2014, and 2,258,143 calls in 2015. As of July 2015, there were 162 CCC employees, a *decrease* of 50 CCC employees in a little over 2 1/2 years; however, the record did not reveal that there were any recorded issues of the CCC employees not being able to handle the work load.

On March 30, 2015, Mr. Graham began his employment as the Director of Customer Service Operations with the Company. In August 2015, after an unhelpful visit from the NCO account manager, he 'contacted supply chain and asked when can we terminate their contract, and look for another vendor.' (NT-97-99) Mr. Graham explained that in looking for another vendor, in addition to providing coverage for absent Company employees, he wanted to 'improve the customer experience' by expanding the call service hours beyond the 9 to 5, Monday through Friday hours under which the CCCs were currently operating. He wanted to expand to '24[hour]/7[day] coverage.' He also wanted the contract employees to be able to handle 'all interaction types', stating that the work level expectation would fall 'somewhere between a CSA-III and a CSR'. (NT-99-102) At that point, while there is no contractual requirement for the Company to negotiate with the Union, as noted by Arbitrator Kasher in *Pennsylvania Power & Light Company and International Brotherhood of Electrical Workers, Local 1600*, Case No.14 300 080187W (Kasher, 1994) (Kasher Award 2):

> . . . The Union has the right to have its members perform bargaining unit work, and the inherent right to persuade management that work being contracted out or contemplated to be contracted out should be performed by Company personnel. . . .
> In this case, the Company provided the Union with no opportunity to suggest alternative, more economic means by which the [bargaining unit] work could be performed.

(Kasher Award 2, p. 39)

Instead, Mr. Graham selected iCor to perform the work. He testified regarding the analysis he performed to compare the cost of using iCor versus using in-house employees, and stated that iCor would save the Company money. (NT-106-111,

Exhibit C-1) The contract with iCor was signed on September 10, 2015, and the iCor employees began training/working on November 1, 2015.

The obvious problem with Mr. Graham's action of hiring iCor to perform the work in question is that the work is bargaining unit work. His action is directly opposite what the parties had agreed to in 2012 when they executed Exhibit P. His action served to diminish the number of bargaining unit employees and increase the use of contractors. While the Company attempts to justify this action by solely focusing on the provisions of Article II, § 5D, it cannot ignore the overarching point of the contracting provision and the interrelationship of that provision with the other provisions of the contract, such as Article VI, § 1D and Exhibit P. The parties negotiated the contracting provision to allow the Company to contract under certain conditions, while allowing the Union to protect bargaining unit work and membership. While Exhibit P does not provide for a specific level of employees and is not a guarantee of minimum manning, it does represent a commitment on the part of the Company to increase bargaining unit membership and reduce the use of contractors.

As noted by Arbitrator Kasher in *Pennsylvania Power and Light Company and International Brotherhood of Electrical Workers, AFL-CIO, Local Union No. 1600*, Case No. 14 300 1872 87W, (Kasher, January 29, 1990) (Kasher Award l):

> We said in Feudale [a prior case between the parties on a contracting issue under the same contract language] that "when the Company defends a work assignment grievance where subcontracting is involved because one of the specific bases for contracting . . . existed, then the Company has . . . raised an affirmative defense and it has the burden of proving justification for such position".

(Kasher Award l, p. 22)

In this matter, as the Company has asserted that it has met four of the five criteria contained in Article II, § 5.D so as to allow it to contract out the work in question, it has the burden of proof.

(ECF Docket No. 18, Jt. Stip. Ex. N, at 13-17.)

In an effort to expand its services, PPL terminated its contract with NCO – one of PPL's two contractors – and agreed to contract with iQor to provide 24-hour, 365 days a year service. (ECF Docket No. 1, at ¶¶ 25-30.) On September 10, 2015, PPL entered into a contract with iQor. On October 21, 2015, PPL formally notified Local 1600 of its contract with iQor stating four contractual justifications: "(a) Contractor will provide employees with specialized skills

4

because PPL employees with those skills are fully employed doing this work; (b) Contractor to work during seasonal/other peaks; (c) Use of contractor will reduce cost of work; and (d) Contractor required to work during emergency." (Id. at ¶ 31.)

In the hearing before the Arbitrator, PPL argued Local 1600 untimely filed its grievance and lacked the specificity required under the CBA. (Id. at ¶¶ 35-43.) PPL also argued it did not violate Article II, Section 5D, Article VI, Section 1D, and Exhibit P of the CBA because the CBA unambiguously grants PPL the right to contract. (Id. at ¶ 46.) On June 19, 2017, the Arbitrator sustained Local 1600's grievance and directed PPL immediately "cease and desist from violating Article II, Section 5D, Article VI, Section 1D and the provisions of Exhibit P." (ECF Docket No. 18, Jt. Stip. Ex. N, at 26.) The Arbitrator also directed PPL hire eight new employees in the CCC and provide Local 1600 with "a sum of money equivalent to what the initiation fees and dues would be as though those eight employees had been hired as of November 1, 2015." (Id.) The Arbitrator's Opinion will be more fully addressed below.

## II.   STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial."

5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

As is the case before this Court, "[t]his standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016)).

### III. ANALYSIS

Under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, District Courts have jurisdiction to review arbitration awards. 29 U.S.C. § 185. In reviewing arbitration awards, the arbitrator's decision must be upheld if it "draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." *Akers Nat. Roll Co. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Intern. Union*, 712 F.3d 155, 160 (3d Cir. 2013) (internal quotation marks omitted) (citing *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (quoting

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960))). As our Court of Appeals states:

> [A] labor arbitrator's award does draw its essence from the collective bargaining agreement if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention.

*Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969) (internal quotation marks omitted).

Although review is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator, a reviewing court may disturb the arbitrator's award "only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." *Akers*, 712 F.3d at 160 (citing *Ludwig*, 405 F.2d at 1128); *see also Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005); *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004). The Supreme Court in *Garvey* concluded an arbitrator's award may be unenforceable "only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam).

But, even if the court concludes the arbitrator committed serious error, the arbitrator's award is enforceable "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Id.* (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). "A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract, . . . or because it believes its interpretation of the contract is better than that of the arbitrator." *Akers*, 712 F.3d at 161 (quoting *News America Publications, Inc. v. Newark Typographical Union,*

*Local 103*, 918 F.2d 21, 24 (3d Cir. 1990)). Even an arbitrator's "'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Garvey,* 532 U.S. at 509. (citing *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 39 (1987)).

When reviewing decisions made by arbitrators, the court may not disturb the arbitrator's findings of fact. In this regard, *Misco* is instructive:

> Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts and a court may not reject those facts simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

*SEIU Healthcare Pennsylvania v. Regional Hosp. of Scranton*, 2015 WL 150069, at *10 (M.D. Pa. 2015) (quoting *Misco*, 484 U.S. at 38 (internal citations omitted)). PPL argues the Arbitrator imposed his own brand of industrial justice because his decision fails to draw its essence from the CBA. In the instant case, PPL accepted the risk of arbitration, argued its position, and now seeks to avoid its result; this Court will not allow this to happen.

A. <u>THE ARBITRATOR'S DECISION DRAWS ITS ESSENCE FROM THE CBA.</u>

PPL argues the Arbitrator's decision fails to draw its essence from the CBA under Exhibit P, Article II, Section 5D, Article VI, Section 1D, and Article III. Citing *Beaird Industries, Inc. v. Local 2297, International Union,* 404 F.3d 942 (5th Cir. 2005), and *Sears, Roebuck and Co. v. Teamsters Local Union No. 243*, 683 F.2d 154 (6th Cir. 1982), PPL argues the Arbitrator disregarded the unambiguous terms of the CBA when it "acknowledged [PPL's] clear contractual right to subcontract, but ruled for the union after balancing that right with the

union's interest in performing the work." (ECF Docket No. 18, at 10.) This Court is unpersuaded with PPL's argument.

As stated above, an arbitrator's award draws its essence from the CBA "if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." *Ludwig*, 405 F.2d at 1128. The Arbitrator's conclusion that PPL violated Exhibit P and failed to satisfy one of the subcontracting justifications is rationally derived from the agreement between PPL and Local 1600.

*1. The Arbitrator's conclusion PPL violated Exhibit P will not be disturbed.*

The Arbitrator concluded PPL violated the terms of the CBA, specifically Exhibit P, by "failing to maintain the customer care positions by hiring iQor as a subcontractor rather than hiring new employees and/or promoting existing employees as Exhibit P required." (ECF Docket No. 21, at 11.) PPL contends Exhibit P only required PPL "create/maintain" the positions of CSA-I, CSA-II, CSA-III, CSR, CSR-Shift, and Senior-CSR, and does not require PPL maintain minimum staffing obligations. (ECF Docket No. 22, at 1-2.) In concluding PPL violated the terms of the CBA, the Arbitrator determined PPL filling vacancies within the customer service positions by subcontracting with iQor was "a failure to maintain the positions by filling the vacancies with newly hired employees and promotions." (ECF Docket No. 26, at 2.)

The Arbitrator also relied on PPL's representations in previous negotiation discussions as PPL's "indicia of intent" to conclude PPL violated Exhibit P. Specifically, the Arbitrator found PPL represented to Local 1600 it would increase the number of bargaining unit positions and reduce contractors. (ECF Docket No. 21, at 13.) "PPL's prior representations were offered to

Local 1600 to explain PPL's intent when making the proposal [resulting] in the [Letter of Understanding]." (Id.) PPL argues the Arbitrator's use of prior communications not included in the final agreement violates the Parol Evidence Rule and the Arbitrator's use of these communications was unnecessary given the CBA's unambiguity. (ECF Docket No. 22, at 5-6.) But, our Court of Appeals clearly states it is appropriate to look beyond the face of a CBA given it is not an ordinary contract for the purchase of goods and services. *Southeastern Pennsylvania Transp. Authority v. Brotherhood of R.R. Signalmen*, 882 F.2d 778, 784 (3d Cir. 1989). Our Court of Appeals and several courts of appeals explicitly recognize that it is entirely appropriate to look to parol evidence in the context of interpreting collective bargaining agreements. *Id*; *see also National Labor Relations Board v. L.B. Priester & Sons, Inc.*, 669 F.2d 355, 365 (5th Cir. 1982); *International Ass'n of Machinists and Aerospace Workers, Lodge No. 1194 v. Sargent Indus.*, 522 F.2d 280, 282 (6th Cir. 1975); *Tolbert v. Union Carbide Corp.*, 495 F.2d 719, 721 (4th Cir. 1974). Moreover, there are very good reasons for doing so.

While PPL argues the Arbitrator's decision regarding Exhibit P went beyond the scope of review, *Ludwig* indicates the arbitrator's authority is extremely broad when interpreting a CBA:

> In ascertaining whether language is clear and unambiguous the court must look to more than one detached section of the contract; it must consider: (1) the surrounding circumstances, prior negotiations, all relevant incidents bearing on the intent of the parties; (2) who prepared the instrument; (3) the relative bargaining position of the parties; (4) the doctrine of practical construction; and (5) the main purpose of the contract.

*Ludwig*, 405 F.2d at 1130. Because of the heavy degree of deference to the arbitrator and the arbitrator's ability to look to parol evidence, this Court declines to disturb the Arbitrator's ruling that PPL violated the terms of Exhibit P by failing to maintain the bargaining unit positions through hiring and promotion.

*2. The Arbitrator's conclusion PPL failed to satisfy the subcontracting provisions of the CBA will not be disturbed.*

PPL subcontracted iQor to replace NCO for day shift needs due to peak work and absenteeism and to expand its operations to provide 24/7 customer service. (ECF Docket No. 18, at 11.) Article II, Section 5D allows PPL to subcontract bargaining unit work if one of these conditions is met: "1) when needed skills are not available from present employees; 2) when present employees cannot complete the work in the required time; 3) when it is economical to do so; and 4) when peaks of work would require a temporary increase of the company's forces with subsequent layoff of such additional forces." (ECF Docket No. 1, at ¶ 7.) The Arbitrator concluded PPL violated the CBA, specifically the subcontracting provision, because it failed to demonstrate one of five different preconditions required before subcontracting out bargaining unit work. (ECF Docket No. 18, Jt. Stip. Ex. N.)

PPL again argues the Arbitrator imposed his own brand of industrial justice when he concluded PPL violated this provision of the CBA. PPL relies on *Beaird* which concluded the arbitrator imposed his own brand of industrial justice after the arbitrator acknowledged the employer's "clear contractual right to subcontract," but found for the union after balancing the employer's right with the union's interest in performing the work. (ECF Docket No. 18, at 10); *see also Beaird,* 404 F.3d at 947. In *Beaird*, the court addressed the parties' right to subcontract and distinguished between limited and unlimited subcontracting rights. *Id.* at 946. Citing *Folger*, the court in *Beaird* concluded when a CBA limits a subcontracting right, the subcontracting right must be balanced against the rights of the "employees, the Company and the Union." *Id.* Conversely, if the CBA does not limit the subcontracting right, no balancing is required.

In establishing the four preconditions required before subcontracting bargaining unit work (Article II, Section 5D) were interrelated with Article VI, Section 1D, and Exhibit P, the Arbitrator concluded there were limits to PPL's subcontracting right and stated: "the parties negotiated the contracting provision to allow the Company to contract under certain conditions, while allowing the Union to protect bargaining unit work and membership." (ECF Docket No. 21, at 17, citing Jt. Stip. Ex. N at 16-17.) So, while PPL may subcontract bargaining unit work – as evidenced by its subcontracts with PPLSolutions and NCO – PPL's right to subcontract is not unlimited. Based on PPL's limited right, the Arbitrator was correct to balance PPL's subcontracting rights with the rights of Local 1600 employees.

i. PPL's first justification: the availability of needed skills.

The Arbitrator concluded PPL violated the CBA by subcontracting with iQor because bargaining unit customer care employees possessed the needed skills PPL sought. PPL contends it subcontracted with iQor because the majority of Local 1600 CSAs were working from 8AM to 5PM, none of the Local 1600 CSAs had ever performed 24/7 coverage, and no Local 1600 CSAs were available to perform this work. PPL argues it satisfied this condition to subcontract with iQor, but the Arbitrator determined PPL violated the subcontracting preconditions of Article II, Section 5D. Specifically, the Arbitrator concluded:

> Here, the CCC work force has been decreased by 50 employees since December 2012 because the Company chose to not fill vacancies; however, the work load has not substantially changed. The employees were apparently keeping up with the work load, with the assistance of PPL Solutions and NCO, as there was no record of complaints. If the Company had just replaced NCO, apparently there would not have been an issue, however, the Company chose to expand the operations of the CCC, using a contractor, because there were no present employees available, . . . [and] the Company did create the shortage of available personnel by refusing to fill vacancies.

(Docket No. 18, Jt. Stip. Ex. N, at 18-19.) By refusing to fill vacancies, PPL clearly created the need for subcontracting bargaining unit work contrary to the spirt of the subcontracting provision under Article II, Section 5D. As Local 1600 contends and the Arbitrator agreed, "PPL was not permitted to shield itself with the subcontracting provision by creating need by its own actions/inactions." (ECF Docket No. 21, citing Jt. Stip. Ex. N at 18-19.) While PPL argues nothing in Article VI, Section 1D requires PPL fill vacancies, we do not find that argument persuasive enough to disturb the Arbitrator's decision.

Also, the Arbitrator disregarded PPL's argument that Article II, Section 5D allowed PPL to hire iQor "when peaks of work would require temporary increase of the Company's forces with subsequent lay-off of such additional forces." (ECF Docket No. 18, Jt. Stip. Ex. N, at 20.) The Arbitrator concluded PPL's three-year contract with iQor providing 24/7, 365 days a year service falls outside the preconditions of the subcontracting provision. Again, the Arbitrator's decision will not be disturbed.

      ii. <u>PPL's second justification: the economics of subcontracting with iQor.</u>

The Arbitrator concluded PPL failed to meet its burden proving subcontracting with iQor would be more economical than using in-house employees. (ECF Docket No. 18, at 20-22.) PPL contends the Arbitrator ignored the evidence presented "through two unchallenged calculations" that proved PPL reduced its overall costs by subcontracting with iQor instead of hiring new bargaining unit employees. (ECF Docket No. 18, at 15.) According to PPL, Chris Graham, PPL's Director of Customer Service Operations, compared the monthly cost for the Local 1600 CSA's with the estimated cost of using a subcontractor and estimated PPL would save more than $1.3 million annually by hiring iQor. (Id.) Mr. Graham then performed a second calculation after PPL subcontracted with iQor and concluded PPL saved almost $1 million in a

10 month period from November 1, 2015 through July 31, 2016. (Id., citing Jt. Stip. Ex. E, at 1-2.)

Local 1600 disputed Mr. Graham's accounting of PPL's annual savings. Local 1600 argues Mr. Graham's use of CSR-IIIs to calculate the cost for bargaining unit employees was improper because PPL incorrectly assumed "CSA-Is would be promoted after three months, rather than the automatic six month progression" and "CSA-Is would be moved through the progression to CSA-IIIs within two to three years" when PPL never promoted any CSA-IIs to CSA-III. (ECF Docket No. 18, Jt. Stip. Ex. N, at 22, citing Exhibit U-10.) Local 1600 argues PPL would have saved over $700,000 over the life of the iQor contract had it increased the number of bargaining unit employees to 205 in October 2015. Given the Arbitrator's findings of fact regarding Local 1600's economic analysis and the Arbitrator's rejection of PPL's economic analysis, we will not disturb the conclusion that PPL did not meet the "more economical justification for contracting." (Id. at 22.)

### iii. PPL's third justification: the weather-related emergency situations.

The Arbitrator rejected PPL's "weather-related emergency" justification to subcontract bargaining unit work. The Arbitrator concluded subcontracting work for 24/7, 365 a year, for a period of three years, did not fall under the Article II, Section 5D justifications. (ECF Docket No. 18, Jt. Stip. Ex. N, at 23.) PPL argued subcontracting with iQor was justified because it allowed PPL to continue operating call centers during weather-related emergencies, which falls under Article II, Section 5D. (ECF Docket No. 18, at 19.) Further, Mr. Graham testified that the proximity of the CCCs would compound PPL's issues in a weather-related emergency. (ECF Docket No. 18, at 19.) The Arbitrator disagreed.

14

As the Arbitrator notes: "[PPL] maintains 'the parties have agreed that PPL may utilize a contractor to perform bargaining unit work required during an emergency.'" (Id., Jt. Stip. Ex. N, at 23, citing Company's Brief, p. 9.) Yet, the Arbitrator noted that no weather-related emergency had ever disabled both call centers. (Id., Ex. N, at 23.) While the Arbitrator agrees the CBA allows for subcontracting during emergency situations, the Arbitrator concluded PPL's contract with iQor for 24/7, 365 days a year, did not fall under "emergency situations." (Id.) It is less clear whether it would be permissible if the contract was only for emergency situations. But, given the deference afforded to the Arbitrator, we will not disturb the ruling on this basis.

Accordingly, this Court will not disturb the Arbitrator's decision concluding PPL failed to satisfy one of the four subcontracting justifications.

B. <u>LOCAL 1600'S GRIEVANCE SATISFIES THE PROCEDURAL REQUIREMENTS OF THE CBA.</u>

The Arbitrator concluded Local 1600 satisfied the CBA's procedural requirements under Article III, Section 3B: 1) the provisions giving rise to the grievance must be identified; and 2) the grievance must be raised within five days from the date of occurrence giving rise to the grievance. (ECF Docket No. 1, at ¶¶ 45-46.) PPL argues Local 1600 failed to cite Exhibit P in its grievance as required by Article III, Section 3B. (Id. at ¶ 47.) PPL also contends that Local 1600 "should have filed its grievance immediately after any one of those employees [employees who left through attrition or were promoted after the April 2012 implementation of the LOU] left and was not replaced by a Union employee." (ECF Docket No. 18, Jt. Stip. Ex. N, at 11.)

First, Local 1600 contends it satisfied this requirement when it filled out PPL's grievance paperwork and stated grievances for "Article I, Section 1, Paragraph A (Union Recognition), Article II, Section 5, Paragraph D (Subcontracting), and Article VI, Section 1, Paragraph D (Number of Jobs) and checked the box for '[a]nd any other applicable provision.'" (ECF Docket

15

No. 21, at 15, citing Jt. Stip. Ex. B.) Local 1600 also claims there were multiple references to its Exhibit P claim throughout the grievance process. (Id., citing Jt. Stip. Exs. C at 51-53 and I at 6-11.) The Arbitrator determined Local 1600 demonstrated PPL had full knowledge of all of its complaints and specifically put PPL on notice that Local 1600 requested PPL maintain staffing levels which violated Exhibit P of the CBA. (ECF Docket No. 18, Jt. Stip. Ex. N, at 12.)

Second, Local 1600 alleges, and PPL does not dispute, it initiated a grievance by discussing the dispute with supervision on November 5, 2015 – four days after iQor began working for PPL. (ECF Docket No. 1, at ¶ 35; ECF Docket No. 21, at 15.) PPL argued to the Arbitrator Local 1600 should have initiated its complaints on "proper staffing levels" years before the subcontract with iQor when "PPL stopped filling vacancies caused by natural attrition . . . with Local 1600 CSAs." (ECF Docket No. 1, at ¶ 46.) Local 1600 countered it had "no reason to believe that PPL had violated Exhibit P until it became clear that PPL had actively undermined its obligation to maintain the customer care bargaining unit work by hiring a new contractor to perform such work 24 hours per day/365 days per year." (ECF Docket No. 21, at 15.) Local 1600 further alleged PPL failed to provide evidence CSRs were unable to handle the workload without incident prior to the grievance filing. (Id. at 16.) The Arbitrator determined Local 1600 lacked any knowledge of PPL's violation prior to the time it learned about the iQor contract to perform bargaining unit work. (ECF Docket No. 18, at 12.)

Given the parties agreed to submit all questions of contract interpretation to the arbitrator, and nothing presented before this Court provides a basis to reverse the Arbitrator's award, we agree with the Arbitrator and will not disturb his decision concluding Local 1600's grievance was timely and identified the appropriate provisions.

## IV. CONCLUSION

In the accompanying order, this Court grants Defendant Local 1600's cross-motion for summary judgment and denies Plaintiff PPL's motion for summary judgment. As the Arbitrator's decision draws its essence from the terms of the collective bargaining agreement and the Arbitrator construed and applied the contract within the scope of his authority, this Court will not disturb the Arbitrator's decision and award.